UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NAPSTER, INC. COPYRIGHT LITIGATION | **No. C MDL-00-1369 MHP** |
| This Document Relates To: | |
| UMG RECORDINGS, INC. et al., Plaintiffs, v. HUMMER WINBLAD VENTURE PARTNERS et al., Defendants. | No. C 04-1166 MHP |
| UMG RECORDINGS, INC. et al., Plaintiffs, v. BERTELSMANN AG et. al., Defendants. | No. C 04-1351 MHP |
| JERRY LEIBER et al., Plaintiffs, v. BERTELSMANN AG et al., Defendants. | No. C 04-1671 MHP |

CAPITOL RECORDS, INC. et al.,

    Plaintiffs,

    v.

BERTELSMANN AG et. al.,

    Defendants.

No. C 04-2121 MHP

**MEMORANDUM & ORDER**
**Re: Defendants' Motion for Summary Judgment**

    The above-captioned actions arise from the litigation involving the alleged copyright infringement of Napster, Inc. and its customers. Now before the court is the motion of defendants Bertelsmann AG, Bertelsmann, Inc., and BeMusic, Inc. (collectively "Bertelsmann") seeking summary judgment as to all claims filed against them in the actions <u>UMG Recordings, Inc. et al. v. Bertelsmann AG et. al.</u>, No. C 04-1351 MHP, <u>Capitol Records, Inc. et al. v. Bertelsmann AG et. al.</u>, No. C 04-2121 MHP, and <u>Jerry Leiber et al. v. Bertelsmann AG et. al.</u>, No. C 04-1671 MHP. Hummer Winblad Venture Partners, Hank Berry, John Hummer, and the various Hummer Winblad entities named as defendants in the action <u>UMG Recordings, Inc. et al. v. Hummer Winblad Venture Partners et al.</u>, No. C 04-1166 MHP (collectively "Hummer Winblad") join in the Bertelsmann defendants' motion. Having considered the parties' arguments and for the reasons set forth below, the court enters the following memorandum and order.

<u>BACKGROUND</u>

    The instant motion relates to four actions now pending before this court as part of the <u>In re Napster Copyright Litigation</u> multidistrict litigation ("MDL") proceedings, Case No. C MDL-00-1369 MHP. These consolidated proceedings initially arose from allegations that the users of the peer-to-peer Internet file-sharing network operated by Napster, Inc. infringed copyrights in musical compositions and sound recordings owned or controlled by numerous record labels, composers, and music publishers. In turn, these allegations gave rise to claims of contributory and vicarious copyright infringement against Napster.

    On August 10, 2000, this court entered an order preliminarily enjoining Napster from "engaging in, or facilitating others in copying, downloading, uploading, transmitting, or distributing plaintiffs' copyrighted

musical compositions and sound recordings . . . without express permission of the rights owner." A&M Records, Inc. v. Napster, Inc. ("Napster I"), 114 F. Supp. 2d 896, 927 (N.D. Cal. 2000) (Patel, C.J.). The substance of the court's legal conclusion was affirmed on appeal, see A & M Records, Inc. v. Napster, Inc. ("Napster II"), 239 F.3d 1004 (9th Cir. 2001), and the Ninth Circuit remanded with instructions to modify certain aspects of the preliminary injunction. On March 5, 2001, this court entered an order consistent with the Ninth Circuit's instructions. See A&M Records, Inc. v. Napster, Inc. ("Napster III"), No. C MDL-00-1369 MHP, 2001 WL 227083 (N.D. Cal. Mar. 5, 2001). After concluding that it was not technologically feasible to comply with the court's March 2001 order and continue operating its file-sharing network, Napster ceased operations on July 1, 2001.

Napster subsequently sought bankruptcy protection and is no longer party to the consolidated MDL proceedings that bear its name. The proceedings continue, however, with various plaintiffs taking aim at the still-solvent entities that invested in Napster before it ceased operations. Among those former Napster investors is Bertelsmann, a media conglomerate with interests in the fields of television and radio, publishing, online media, and music distribution, and Hummer Winblad, a private equity partnership that provides venture capital funding to private companies (collectively "defendants"). Prior to the shut-down of the Napster network, both Bertelsmann and Hummer Winblad made significant investments in Napster, with Bertelsmann investing a total of $85 million in the form of convertible loans and Hummer's equity investment totaling approximately $13 million.

The plaintiffs in the above-captioned actions (collectively "plaintiffs") include UMG Recordings, Inc., Capitol Records, Inc., and a host of other record companies who own copyrighted musical compositions and sound recordings that were allegedly uploaded and downloaded by users of the Napster network, as well as music publishers and composers represented by the Harry Fox Agency, whose motion for class certification is addressed in a separate order pertaining to the action Jerry Leiber et al. v. Bertelsmann AG et. al. In each of the four pending actions, plaintiffs allege that by investing in Napster and assuming control of the operation of the Napster file-sharing network, the named defendants contributorily and vicariously infringed plaintiffs' exclusive rights under the Copyright Act, 17 U.S.C. § 101. See 17 U.S.C. § 106. In addition, the record label plaintiffs assert various state law causes of action for

3

misappropriation, unfair competition, and civil conspiracy arising out of the alleged infringement of their rights in pre-1972 sound recordings.

The court has already addressed the legally sufficiency of plaintiffs' copyright claims in its July 14, 2004 order denying the separately filed motions to dismiss of Bertelsmann and Hummer Winblad. See UMG Recordings, Inc. v. Bertelsmann AG ("Napster V"), 222 F.R.D. 408 (N.D. Cal. 2004) (Patel, C.J.). In that order, the court held that plaintiffs' allegations that Bertelsmann and Hummer Winblad "exercised essentially full operational control over Napster during periods in which Napster remained a conduit for infringing activity" would, if proven, give rise to liability for contributory and vicarious infringement under the Copyright Act. Id. at 413-14. Defendants now seek summary judgment with respect to those same secondary copyright infringement claims, as well as to plaintiffs' state law misappropriation, unfair competition, and civil conspiracy claims. The following memorandum and order address the issues raised by defendants' motion.

LEGAL STANDARD

I.  Summary Judgment

Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the proceedings. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute involving a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id. On the other hand, where the moving party bears the burden of proof on an issue, "it must come forward with evidence which would entitle it to a directed verdict if the

4

evidence went uncontroverted at trial." Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992) (quoting International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991)).

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; see also Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). However, the court may not make credibility determinations, Anderson, 477 U.S. at 249, and inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion, Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991).

II.   Copyright Infringement

Under the Copyright Act, as amended in 1976, "copyright protection subsists in original works of authorship fixed in any tangible medium of expression from which they can be perceived, reproduced, or otherwise communicated." New York Times Co. v. Tasini, 533 U.S. 483, 493 (2001) (quoting 17 U.S.C. § 102(a)) (original alterations omitted). When the work in question is an original work of music, both the composition (the "musical work") and, if fixed in a tangible medium of expression on or after January 1, 1972, the performance (the "sound recording"), are protected under section 106 of the Act. 17 U.S.C. § 102(2), (7); see Lone Ranger Television, Inc. v. Program Radio Corp., 740 F.2d 718, 720 (9th Cir. 1984) (discussing the extension of federal copyright protection to encompass post-1971 sound recordings).

A plaintiff may establish a prima facie case of copyright infringement by proof of "(1) ownership of a valid copyright[] and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991) (citing Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 548 (1985)). Furthermore, while the Copyright Act does not expressly impose liability on anyone other than direct copyright infringers, courts have long recognized that in certain circumstances, vicarious or contributory liability will be imposed. See, e.g., Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 261 (9th Cir. 1996). Even in the absence of an employment relationship, a defendant incurs liability for vicarious copyright infringement if he or she "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." Id. at 262 (quoting

5

Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971)). In addition, the doctrine of contributory infringement imposes liability where one person "knowingly contributes to the infringing conduct of another." Id. at 264. The elements of contributory infringement are: (1) direct infringement by a third party; (2) actual or constructive knowledge by the defendant that third parties were directly infringing; and (3) a material contribution by the defendant to the infringing activities. See Napster II, 239 F.3d at 1013 n.2, 1019-22.

DISCUSSION

I.  Secondary Copyright Infringement

The court first addresses the primary issue raised by defendants' motion: namely, whether defendants can as a matter of law be held secondarily liable for the alleged acts of direct copyright infringement committed by Napster and its users. To a large extent, the court's order denying defendants' motion to dismiss addressed this question and answered it in the affirmative, holding that plaintiffs' allegations that "defendants exercised essentially full operational control over Napster" were sufficient to state claims for both contributory and vicarious copyright infringement. Napster V, 222 F.R.D. at 413. In the instant motion, defendants do not seek to revisit the issues raised by their motion to dismiss, which focused on the degree of defendants' involvement in the acts of direct infringement underlying plaintiffs' claims. Rather, defendants now assert that they are entitled to judgment as a matter of law based on the absence of any evidence that plaintiffs' copyrighted works have been directly infringed by Napster or by any of its users.

Defendants are of course correct to point out that proof of direct infringement by the primary infringer is a necessary precondition to establishing both contributory and vicarious liability under the Copyright Act. See, e.g., Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd., 380 F.3d 1154, 1160, 1164 (9th Cir.), cert. granted, __ U.S. __, 125 S. Ct. 686 (2004). In recognition of this fact, plaintiffs have proffered three theories of direct infringement as the basis for their secondary infringement claims against Bertelsmann and Hummer Winblad: first, that Napster users who made "MP3"-formatted music files available on the Napster network engaged in the unauthorized distribution of plaintiffs' copyrighted

6

works in violation of section 106(3) of the Copyright Act, 17 U.S.C. § 106(3); second, that the downloading of such MP3 files by Napster users infringed plaintiffs' exclusive rights to reproduce their copyrighted works under Copyright Act § 106(1), 17 U.S.C. § 106(1); and third, that Napster itself violated plaintiffs' exclusive distribution rights under section 106(3) by indexing MP3 files that its users posted on the Napster network. See generally Liber Pls.' Statement Re Theory of Direct Infringement; UMG and EMI Pls.' Statement Re Theory of Direct Infringement. The court considers each of these theories below.

        A.      Plaintiffs' Indexing Theory

Defendants' summary judgment motion focuses primarily on plaintiffs' third theory of direct infringement. As noted above, this theory posits that Napster itself directly infringed plaintiffs' distribution rights by maintaining a centralized indexing system listing the file names of all MP3-formatted music files available on the Napster network. Cf. Grokster, 380 F.3d at 1158-59 (contrasting Napster's centralized index with other decentralized methods for operating peer-to-peer file-sharing networks). According to defendants, this "indexing" theory fails as a matter of law because merely listing a work in a directory does not result in the actual transfer of a copy of the work and thus does not violate the copyright owner's distribution right.

The gravamen of the parties' dispute lies in whether the Copyright Act requires proof of the actual dissemination of a copy or phonorecord in order to establish the unlawful distribution of a copyrighted work in violation of 17 U.S.C. § 106(3). That section provides, subject to a number of limitations that are not relevant here, that the owner of a copyright has the exclusive right to distribute or to authorize the public distribution of copies or phonorecords of his or her copyrighted work. 17 U.S.C. § 106(3). Certainly, there is authority outside the Ninth Circuit that supports defendants' view that distribution of a copyrighted work requires the transfer of an identifiable copy of that work. See, e.g., National Car Rental Sys., Inc. v. Computer Assoc. Int'l, Inc., 991 F.2d 426, 434 (8th Cir.), cert. denied, 510 U.S. 861 (1993); Arista Records, Inc. v. Mp3Board, Inc., No. 00 Civ. 4660 (SHS), 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002); Olbolensky v. G.P. Putnam's Sons, 628 F. Supp. 1552, 1555-56 (S.D.N.Y.), aff'd, 795 F.2d 1005 (2d. Cir. 1986). Indeed, a number of courts, including the Eighth Circuit, have held that "infringement

1  of the distribution right requires an actual dissemination of either copies or phonorecords." National Car
2  Rental, 991 F.2d at 434 (citation and original alterations omitted); see also Mp3Board, 2002 WL
3  1997918, at *4 (same). Likewise, Professor Goldstein has observed that if the distribution right is to be
4  infringed, "an actual transfer must take place; a mere offer for sale will not violate the right." 2 Paul
5  Goldstein, Copyright § 5.5.1, at 5:102 to 5:102-1 (2d ed. 2000 & Supp. 2005). There is no dispute that
6  merely listing a copyrighted musical composition or sound recording in an index of available files falls short
7  of satisfying these "actual dissemination" or "actual transfer" standards.

8  Nevertheless, plaintiffs, relying primarily on the Fourth Circuit's decision in Hotaling v. Church of
9  Jesus Christ of Latter-Day Saints, 118 F.3d 199 (4th Cir. 1997), assert that a copyrighted work is
10 "distribut[ed]" within the meaning of section 106(3) whenever it is "made available" to the public without
11 the authorization of the copyright owner. The Hotaling case arose from the plaintiff copyright owners' claim
12 that a library operated by the Latter-Day Saints Church made unauthorized copies of copyrighted
13 genealogical materials and distributed those materials to its branch libraries. Id. at 201. In its defense, the
14 church pointed to the plaintiffs' failure to offer any evidence that could establish the actual dissemination of
15 the copyrighted materials to the branch libraries' borrowers. Id. at 203. Thus, characterizing the act of
16 placing a copyrighted work in a library collection open to the general public as an offer to distribute that
17 work, the church argued that it should not be held liable under section 106(3) for merely making such an
18 offer. Id. The Fourth Circuit disagreed, holding that a publicly accessible library engages in the distribution
19 of a copyrighted work whenever it "adds a work to its collection, lists the work in its index or catalog
20 system, and makes the work available to the borrowing or browsing public." Id.

21 First of all, it must be pointed out that it is the dissemination of "unauthorized" copies that violates
22 the statute. It is significant that the plaintiffs in Hotaling submitted uncontroverted evidence that the Latter
23 Day Saints Church had made actual, unauthorized copies of the copyrighted genealogical materials available
24 to borrowers at its branch libraries. See id. at 202-03. The instant plaintiffs seize upon the cataloging or
25 indexing system in Hotaling and argue that Napster's "indexing" system is akin to that in Hotaling. There is,
26 however, more to Hotaling than that. In that case the library had a copy of the copyrighted work in its
27 "collection". Napster did not have works in its "collection"; it did not have a "collection" of recordings.
28

The infringing works never resided on the Napster system. Instead, plaintiffs here seek to establish copyright infringement based on the mere fact that the names of their copyrighted musical compositions and sound recordings appeared in Napster's index of available files. This might constitute evidence that the listed works were available to Napster users, but it is certainly not conclusive proof that the songs identified in the index were actually uploaded onto the network in a manner that would be equivalent to the way in which the genealogical materials at issue in Hotaling were copied and distributed to the church's branch libraries.

In any event, to the extent that Hotaling suggests that a mere offer to distribute a copyrighted work gives rise to liability under section 106(3), that view is contrary to the weight of above-cited authorities. It is also inconsistent with the text and legislative history of the Copyright Act of 1976 ("1976 Act"), Pub. L. 94-553, 90 Stat. 2546 (1976) (codified as amended at 17 U.S.C. § 101 et seq.). In addition to being the most recent major revision of copyright law, the 1976 Act was the first federal copyright statute to include an exclusive right to distribute copyrighted works. See H.R. Rep. 94-1476, at 62 (1976). The Supreme Court considered the scope of that newly enacted right in Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539 (1985). While conceding that the statute lacks any express definition of "distribution," the Court observed that the legislative history of the 1976 Act equates the term with the right of "publication," which it defines as a copyright owner's "right to control the first public distribution of an authorized copy of his work.'" Id. at 552 (quoting H.R. Rep. No. 94-1476, at 62) (original alteration omitted); see also Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 299 (3d Cir.) (noting that "'[p]ublication' and the exclusive right protected by section 106(3) . . . are for all practical purposes[] synonymous"), cert. denied, 502 U.S. 939 (1991) .

The significance of this passage of the Copyright Act's legislative history lies in the fact that "publication" is defined by the 1976 Act. Specifically, the Act provides that publication of copyrighted work requires either "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending," or alternatively, "[t]he offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display." 17 U.S.C. § 101. There can be no serious dispute that the first of these two provisions requires

9

the actual transfer of a copy of a copyrighted work. Accord H.R. Rep. No. 94-1476, at 138 ("[A] work is 'published' if one or more copies or phonorecords embodying the work are distributed to the public . . . . [A]ny form or dissemination of the work in which a material object does not change hands . . . is not a publication no matter how many people are exposed to the work."). Moreover, while the latter provision might be read to support Hotaling's view that an offer to distribute a copyrighted work constitutes publication (and hence distribution) of that work, the plain meaning of the statute strictly limits the circumstances under which that holds true to those in which "further distribution, public performance, or public display" of the work is contemplated. 17 U.S.C. § 101.

Perhaps the best explanation for imposing such a limitation on the scope of the distribution right can be found in Agee v. Paramount Communications, Inc., 59 F.3d 317 (2d. Cir. 1995). In that case, the Second Circuit considered whether the unauthorized satellite transmission of a copyrighted sound recording (a television program) violated section 106(3) of the Copyright Act. Id. at 324-25. The court held that it did not, observing that a contrary result would have the effect of granting the owners of copyrighted sound recordings "the performance rights expressly denied them under the statute." Id. at 325; cf. 17 U.S.C. § 101 ("A public performance or display of a work does not of itself constitute publication."); 17 U.S.C. § 106 (limiting the exclusive right of public performance to "literary, musical, dramatic, and choreographic works"). Accordingly, the court concluded that absent the "transmission of a 'material object' in which the sound recording is fixed," the defendants' satellite broadcast constituted the public performance rather than the distribution of the copyrighted sound recording at issue. Id. at 325-26.

Plaintiffs suggest that the rationale underlying Agee's "transmission of a material object" requirement is no longer viable in light of the recently enacted Artists' Rights and Theft Prevention Act of 2005 ("the ART Act"), Pub. L. No. 109-9, 119 Stat. 218 (2005). Specifically, plaintiffs cite section 103(a)(1)(C) of the statute, which provides:

> Any person who willfully infringes a copyright shall be punished as provided under section 2319 of title 18, if the infringement was committed—
>
> . . . .
>
> (C) by the distribution of a work being prepared for commercial distribution, by making it available on a computer network accessible to members of the public, if such person knew or should have known that the work was intended for commercial distribution.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  ART Act § 103(a)(1)(C) (amending 17 U.S.C. § 506(a)).  Plaintiffs interpret section 103(a)(1)(C) as
2  imposing criminal liability on any person who willfully makes an authorized copy of a copyrighted work
3  available on a publicly accessible computer network while that work is being prepared for commercial
4  distribution.  Thus, plaintiffs argue that because this provision imposes criminal liability on individuals who
5  make certain copyrighted works available to members of the public, Congress must have understood civil
6  liability for copyright infringement to be equally broad.

7  The court finds this argument unpersuasive for a number of reasons.  First, and most importantly,
8  the ART Act does not amend section 106(3) of the Copyright Act.  If Congress wanted to make clear that
9  the distribution right was broad enough to encompass making a work available to the public without proof
10 of actual distribution, it was perfectly capable of doing so.  Yet plaintiffs have failed to identify anything in
11 ART Act's legislative history, much less the statute itself, to suggest that Congress even considered the
12 scope of civil liability for copyright infringement in enacting the statute.  Any attempt to infer legislative intent
13 from such silence is at best speculative.

14 While the court would be reluctant to engage in such a speculative inquiry under any circumstances,
15 it is particularly inappropriate to do so here.  Indeed, the plain language of section 103(a)(1)(C) makes
16 clear that willful copyright infringement and "making [the infringed work] available on a computer network"
17 are separate elements of the criminal offense defined by section 103(a)(1)(C).  Thus, regardless of the
18 manner in which a court interprets section 106(3) of the Copyright Act for the purpose of finding copyright
19 infringement, criminal liability under the ART Act cannot be imposed unless such an act of infringement is
20 proven beyond a reasonable doubt.  This is hardly persuasive evidence of what the words of section
21 106(3) mean in the context of a civil copyright infringement action.

22 In any event, the court does not believe that the 109th Congress' views would affect the outcome
23 of this action even if it had explicitly commented on the scope of the distribution right in the course of
24 enacting the ART Act. The Supreme Court has repeatedly emphasized that such subsequent legislative
25 history "is a hazardous basis for inferring the intent of an earlier Congress."  Jones v. United States, 526
26 U.S. 227, 238 (1999) (quoting Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650 (1990))
27 (internal quotation marks omitted); see also Sullivan v. Finkelstein, 496 U.S. 617, 632 (1990) (SCALIA,

11

J., concurring) (observing that "[a]rguments based on subsequent legislative history . . . should not be taken seriously"). That is certainly the case here. If legislative history is to inform the court's interpretation of the Copyright Act of 1976, it must reflect the views of the members of Congress who enacted that statute into law. The opinions of members of the 109th Congress are of little, if any, relevance to such an inquiry and need not be considered for the purpose of adjudicating the instant motion.

In short, the "making . . . available" language of the ART Act does nothing to save plaintiffs' "indexing" theory of direct copyright infringement. Rather, what controls the outcome of this action is the text and legislative history of the Copyright Act of 1976. These sources clearly imply that a copyright owner seeking to establish that his or her copyrighted work was distributed in violation of section 106(3) must prove that the accused infringer either (1) actually disseminated one or more copies of the work to members of the public or (2) offered to distribute copies of that work for purposes of further distribution, public performance, or public display.

Applying this standard to the case at bar, it is apparent that plaintiffs' "indexing" theory falls well short of meeting the requirements for establishing direct copyright infringement. Rather than requiring proof of the actual dissemination of a copyrighted work or an offer to distribute that work for the purpose of its further distribution or public performance, plaintiffs' theory is premised on the assumption that any offer to distribute a copyrighted work violates section 106(3). This is not sufficient to satisfy plaintiffs' burden of proving that Napster or its users directly infringed their copyrighted musical compositions and sound recordings, as they must do if they are to hold defendants secondarily liable for that infringement. Accordingly, the court holds that defendants are entitled to summary judgment on this issue.

B. <u>Plaintiffs' Uploading and Downloading Theories</u>

While the above discussion makes clear that plaintiffs' "indexing" theory must fail as a matter of law,     that theory is but one of three theories of direct infringement that have been proffered to the court. Plaintiffs' other two theories rely on the uploading and downloading of copies of copyrighted musical compositions and sound recordings by Napster users for the purpose of establishing the direct infringement element of their contributory and vicarious copyright infringement claims. There is no doubt that these "uploading" and "downloading" theories are legally sufficient to establish defendants' liability for secondary

12

copyright infringement. See Napster I, 114 F. Supp. 2d at 911 (finding that evidence of unauthorized uploading and downloading of copyrighted music by Napster users established a prima facie case of direct copyright infringement); see also Napster II, 239 F.3d at 1013 (observing that Napster users infringed both the reproduction and distribution rights of copyright owners whose works were uploaded and downloaded via the Napster network).

Defendants do not ask the court to revisit the legal issues surrounding plaintiffs' "uploading" and "downloading" theories. Rather, they assert that plaintiffs have failed to submit enough evidence in support of these theories to permit a reasonable jury to find that their copyrighted works were in fact uploaded to the Napster network or downloaded by Napster users. However, there is evidence in the record suggesting that almost 15 billion files were downloaded by Napster users between September 2000 and May 2001, Johnson Decl., Exh. F at B-156416, and that at least some of these files contained copies of plaintiffs' copyrighted musical compositions and sound recordings, id., Exh. W at 13-17. It should also be noted that the plaintiffs in the first round of the In Re Napster proceedings submitted statistical evidence sufficient to establish that Napster enabled its users to engage in "illegal copying on a scale that is without precedent." Napster I, 114 F. Supp. 2d at 927. The sum of this evidence strongly suggests that at least some of plaintiffs' copyrighted works were uploaded and downloaded by Napster users.

It may be true that the link between such statistical evidence of copyright infringement and the uploading or downloading of specific copyrighted works is at the moment a weak one. However, to avoid summary judgment, plaintiffs need only establish that triable issues of material fact preclude entry of judgment as a matter of law. In this respect, the instant motion closely parallels the matter before the court in MP3 Board, another district court case in which various record labels brought secondary copyright infringement claims against the operator of an online file-sharing service. See 2002 WL 1997918, at *1. There, the record label-plaintiffs moved for summary judgment of infringement based on evidence that it was "statistically likely" that users of the defendant's file-sharing network directly infringed their copyrighted works. Id. at *3. The court denied the plaintiffs' motion, holding, *inter alia*, that genuine disputes of material fact as to whether particular copyrighted works were actually disseminated to the public precluded entry of summary judgment. Id. at *4.

13

Admittedly, the instant motion for summary judgment was filed by defendants rather than by plaintiffs. Nonetheless, the court believes that the holding of MP3 Board accurately reflects the factual nature of inquiries into the actual dissemination of copyrighted works via an online file-sharing service like the Napster network. Such factual disputes will only rarely be an appropriate subject for resolution on a motion for summary judgment. Here in particular, the court is mindful of the fact that the parties have not even completed discovery relating to issues of copyright ownership and infringement. Ramos Decl. ¶¶ 3-6. Thus, in light of the evidence submitted and the understandable need for further discovery, the court must conclude that plaintiffs have met their burden of producing sufficient evidence to establish genuine disputes of material fact as to whether Napster users directly infringed their copyrighted works by uploading and downloading MP3-formatted files using the Napster network. The court therefore denies defendants' motion for summary judgment that they are not liable for secondary copyright infringement under plaintiffs' "uploading" and "downloading" theories.

II.     State Law Claims

As noted above, defendants also move for summary judgment as to the state law misappropriation, unfair competition, and civil conspiracy claims asserted by the record label plaintiffs. These claims arise from allegations that Napster users infringed plaintiffs' common law rights in sound recordings made prior to January 1, 1972, the date on which federal copyright protection was extended to encompass recorded musical performances in addition to musical compositions. See Lone Ranger Television, 740 F.2d at 720. Because none of the parties disputes the record label plaintiffs' assumptions that New York law governs their state law claims against Bertelsmann and California law applies in the action against Hummer Winblad, the court adopts those assumptions for purposes of the instant motion. As defendants concede (and indeed emphasize), there is significant "legal overlap" between the federal secondary copyright infringement claims and the state law claims that the record label plaintiffs have asserted here. Accord MP3 Board, 2002 WL 1997918, at *12 (citing Kregos v. Associated Press, 3 F.3d 656, 666 (2d Cir. 1993)) (applying New York law); see also Self-Realization Fellowship Church v. Ananda Church of Self-Realization, 206 F.3d 1322, 1326 (9th Cir. 2000) (observing that California Civil Code § 980 "extends common law copyright protection to sound recordings"), cert. denied, 531 U.S. 1126 (2001). Thus, because the court concludes

14

that judgment as a matter of law is not appropriate with respect to plaintiffs' uploading and downloading theories of direct copyright infringement, it necessarily follows that the record-label plaintiffs' state law claims are also sufficient to withstand summary judgment as to those issues. The court therefore denies defendants' motion with respect to those claims

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is hereby GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

Date: May 31, 2005

_____
MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California