UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NAPSTER, INC. COPYRIGHT LITIGATION | **No. C MDL-00-1369 MHP** |
| This Document Relates To: | |
| UMG RECORDINGS, INC. et al., Plaintiffs, v. HUMMER WINBLAD VENTURE PARTNERS et al., Defendants. | No. C 04-1166 MHP |
| UMG RECORDINGS, INC. et al., Plaintiffs, v. BERTELSMANN AG et. al., Defendants. | No. C 04-1351 MHP |
| JERRY LEIBER et al., Plaintiffs, v. BERTELSMANN AG et al., Defendants. | No. C 04-1671 MHP |

CAPITOL RECORDS, INC. et al.,

    Plaintiffs,

v.

BERTELSMANN AG et. al.,

    Defendants.

No. C 04-2121 MHP

**MEMORANDUM & ORDER**
**Re: Motion to Compel Production of Privileged Documents**

    The above-captioned actions arise from litigation involving alleged copyright infringement by Napster, Inc. and its customers. Defendant Hummer Winblad Venture Partners ("Hummer") now moves to compel plaintiffs UMG Recordings, Inc., et al. ("UMG") and Capitol Records, Inc., et al. ("EMI") to produce documents previously withheld as privileged, or in the alternative to obtain *in camera* review of those documents. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND

    The instant motion relates to four actions now pending before this court as part of the In re Napster Copyright Litigation multidistrict litigation ("MDL") proceedings, Case No. C MDL-00-1369 MHP. Plaintiffs in this suit allege that by investing in Napster and assuming control of the operation of the Napster file-sharing network, defendants contributorily and vicariously infringed plaintiffs' exclusive rights under the Copyright Act, 17 U.S.C. section 101 et seq. See 17 U.S.C. § 106. Hummer has asserted various counterclaims and affirmative defenses, including antitrust violations, copyright misuse, and unclean hands.

    Central to the instant motion are Hummer's antitrust counterclaim and copyright misuse defense, which are predicated upon the collective failure of the record labels to license their catalogs of sound recordings to Napster. Hummer contends that the record labels refused to license Napster

2

and other music distribution services in order to retain their dominant position as the distributor of sound recordings, which have historically been sold on physical media such as compact discs.

According to Hummer, the labels coordinated their efforts to suppress competition through the formation of two joint ventures, MusicNet and pressplay (formerly called Duet). MusicNet was a joint venture between three record labels—EMI, BMG, and Warner—and RealNetworks, a manufacturer of media software. Pressplay was a venture between two record labels—Sony and UMG. The stated aim of these joint ventures was to provide platforms for the digital distribution of music, in competition with Napster.

Hummer argues that the joint ventures facilitated copyright misuse by the labels in two ways. First, Hummer contends that the labels used the joint ventures to obtain information about their competitors' content licensing practices and to coordinate the terms of their licenses. Second, Hummer argues that labels deliberately limited the joint ventures to offering unpopular forms of digital music distribution, such as streaming and "tethered" downloads, which did not threaten the market for distribution of compact discs. Thus, according to Hummer, the joint ventures were a smokescreen designed to obscure the fact that the labels were uniformly refusing to support meaningful distribution of digital music on the internet.

The Antitrust Division of the Department of Justice (the "DOJ") launched an investigation of the joint ventures in 2001 based on precisely those two concerns. Anderson Dec., Exh. 4 at 2. During the investigation, both joint ventures and their respective record label parents submitted "White Papers" to the DOJ summarizing their arguments as to why the DOJ's concerns were unfounded. The labels and joint ventures also provided the DOJ with documents related to the joint ventures, some of which were redacted in order to remove privileged material. As part of this production, UMG provided the DOJ with a set of communication guidelines (the "guidelines"), drafted by UMG's lawyers, which were ostensibly intended to avoid antitrust violations by preventing pressplay employees from disclosing competitively sensitive information to pressplay's record label parents.

3

On December 23, 2003 the DOJ abandoned its investigation, claiming to have found no evidence of wrongdoing. With respect to the sharing of license terms, the DOJ found as follows:

> The Division's investigation of the licensing by the major record labels revealed no evidence that the major labels impermissibly established the terms on which they licensed their music to third parties. Not only did the terms of the licenses that the major labels granted to third parties vary significantly, but it is also apparent that each label adopted its own approach toward the distribution of its music by third parties over the Internet. Safeguards adopted by both pressplay and MusicNet to prevent the sharing of confidential information among their participants also appear to have succeeded in preventing the inappropriate exchange of information among the major record labels through the medium of the joint ventures.

Id. at 4. With respect to the alleged attempt to suppress the growth of internet-based music distribution, the DOJ found that the labels had in fact granted licenses to other online music distribution services, and that the market for online music had continued to develop despite the labels' participation in the joint ventures.

The DOJ's findings are a near-verbatim recitation of the arguments advanced in the two White Papers. With respect to variation in licensing terms, the UMG / pressplay White Paper argues that

> [t]he absence of spillovers [of licensing information] is demonstrated conclusively by the wide dispersion between the terms of [Sony's] licenses with third party services, the terms of UMG's licenses with third party services, and the terms of pressplay's agreements with [Sony], UMG, and third-party licensors.

Anderson Dec., Exh. 5 ("pressplay White Paper") at 8. With respect to firewalls, the pressplay White Paper claims that "both of the parent labels, as well as pressplay, have established and adhered to durable and effective firewall arrangements to prevent such spillover." Id. at 1. Similarly, the EMI / MusicNet White Paper states that "MusicNet purposefully put safeguards in place to prevent exchanges of information, or other conduct, that could negatively affect competition. MusicNet is not aware of any breaches of these safeguards." Anderson Dec., Exh. 7 ("MusicNet White Paper") at 20.

Hummer contends that the arguments offered in the White Papers were known to be false or misleading at the time they were submitted to the DOJ, in violation of 18 U.S.C. section 1001.[1] As a result, according to Hummer, the crime-fraud exception to the attorney-client privilege applies to

4

vitiate plaintiffs' claims of privilege as to communications related to the DOJ investigation. In addition, Hummer argues that UMG's submission to the DOJ of its guidelines constitutes a waiver of privilege as to all communications related to the preparation or enforcement of those guidelines.

LEGAL STANDARD

Federal common law recognizes an attorney-client privilege protecting "communications between client and attorney for the purpose of obtaining legal advice, provided such communications were intended to be confidential." Gomez v. Vernon, 255 F.3d 1118, 1131 (9th Cir.), cert. denied sub nom Beauclair v. Puente Gomez, 534 U.S. 1066 (2001). The privilege is not absolute, however. Under the so-called "crime-fraud" exception to the privilege, communications in furtherance of an ongoing or future crime or fraud are not protected. Id. at 1131 n.7.

A party seeking to vitiate the attorney-client privilege under the crime-fraud exception may pursue one of two paths. In order to vitiate the privilege directly, the moving party must establish "reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme." In re Grand Jury Proceedings, 87 F.3d 377, 381 (9th Cir.), cert. denied sub nom Corporation v. United States, 519 U.S. 945 (1996) (internal quotations and ellipses omitted).

In the alternative, a party may seek *in camera* review of privileged documents in order to permit the court to determine whether the crime-fraud exception should apply. The required showing for *in camera* review is less than that for vitiation of the privilege. United States v. Zolin, 491 U.S. 554, 572 (1989). Determining whether *in camera* review is appropriate is a two-step process. First, the moving party must provide "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." Id. (internal citation omitted). Second, once the initial showing has been made

> the decision whether to engage in *in camera* review rests in the sound discretion of the district court. The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the

5

case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.

Id.

DISCUSSION

Hummer claims that UMG and EMI, through their attorneys, made three types of deliberate misrepresentations in their White Paper submissions and document productions to the DOJ, in violation of 18 U.S.C. section 1001. First, Hummer argues that UMG incorrectly stated that it continued to license its recordings on terms that were widely disparate from those offered by its competitors—a fact offered to demonstrate that the labels were not impermissibly obtaining pricing information from their competitors. Second, Hummer argues that the guidelines described by UMG and EMI, which ostensibly restricted the flow of information from the joint ventures to the labels, were a sham, as label executives remained closely involved in the day-to-day activities of the joint ventures, including content licensing. Third, Hummer argues that UMG selectively redacted nonprivileged documents in an attempt to hide the first two alleged misrepresentations. The court will consider each contention in turn.

I.  Disparate Licensing Terms

Hummer argues that UMG's claim regarding disparate licensing terms is demonstrably false because any differences in licensing terms were illusory. This is so, Hummer argues, because each of the labels insisted on the inclusion of so-called "Most Favored Nation" ("MFN") clauses in its licenses. MFN clauses guarantee that the licensor will receive terms that are no less favorable than the terms offered to other licensors. As a result, the written terms of a license will only be enforced to the extent that they are at least as favorable as the terms in other licenses.

UMG does not disagree with Hummer's characterization of the effect of MFN clauses, or dispute that each of the agreements cited in the White Paper contains an MFN clause. Instead, UMG claims that it sufficiently alerted the DOJ to the presence of the MFN clauses, belying any claim of

6

intent to mislead. UMG bases this assertion on two disclosures. First, UMG mentions certain MFN clauses at two points in its submission to the European Commission, which pursued an antitrust inquiry similar to that conducted by the DOJ. Pomerantz Dec., Exh. 2 at 35-36, 60. A copy of the European submission was provided to the DOJ. The MFN clauses mentioned in the European submission are in the labels' agreements with pressplay. See id.

UMG's argument is unavailing for two reasons. First, the agreements for which UMG disclosed MFNs in the European filing are different from the agreements relied upon in the White Paper. The White Paper cites agreements between UMG or Sony and third party music distribution services such as listen.com. See pressplay White Paper at 8. The only agreements discussed in the European filing are between the labels and pressplay. Second, it is not the presence of MFNs in particular agreements which undermines the truth of the disparate licensing representation, but rather the consistent practice of including MFNs in *all* license agreements. This practice—which UMG does not deny—is fundamentally incompatible with UMG's assertion that the licenses granted by the labels show a "wide dispersion" of terms. See id.

UMG's second argument is that the words "MFN" or "Most Favored Nation" appeared in numerous documents produced to the DOJ. UMG does not explain, however, why the DOJ would or could have searched for those words without some motivation to do so. The White Paper, which omits any mention of MFNs, did not alert the DOJ that such a search may have been necessary.

UMG does not dispute that its attorneys were involved in the drafting of the portion of the White Paper containing the disparate licensing argument. The disparate licensing argument is arguably entirely false, and is certainly highly misleading. The court therefore finds "reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme." See In re Grand Jury Proceedings, 87 F.3d at 381.

II. Efficacy of the Joint Ventures' Firewalls

Hummer also argues that both UMG and EMI improperly exchanged competitively sensitive information with pressplay and MusicNet, including the terms of the joint ventures' content license

7

agreements with third parties. If so, according to Hummer, the labels' representations to the DOJ about the protection of sensitive information are false. The court will consider Hummer's argument with respect to each label in turn.

    A.    UMG

The parties disagree as to what UMG represented to the DOJ with respect to pressplay's independence from UMG. UMG argues that it made only a limited representation—that the firewall between pressplay and UMG restricted access to information about the specific terms of content licenses between pressplay and third party content providers. Content providers are entities, such as other record labels, holding rights to sound recordings. Hummer argues that the pressplay White Paper makes broader claims about pressplay's independence from UMG.

Certain representations in the pressplay White Paper are indeed qualified, as UMG notes. The firewall guidelines are limited to detailed information about content licenses: "[Sony] and UMG understood that they would not have access to the terms of [pressplay's] content agreements with third parties." Pomerantz Dec., Exh. 1 at 8; see also id. at 9 (setting forth the guidelines, each of which is limited to agreements with "third party content providers."). The description of pressplay's management structure also indicates that record label executives had access to the terms of some of pressplay's deals. The labels oversaw pressplay's operations through an "Operating Committee" consisting of UMG and Sony employees. The Operating Committee was permitted to review most aspects of pressplay's operations:

> At Operating Committee meetings, pressplay management reports on a variety of matters, including consumer reaction to the service, negotiations with potential affiliates, possible changes to the business model and service offering, technical issues, and budget matters. Management also, where necessary, reports generally on the overall status of negotiations with third party content providers. However, as set forth in the presentation decks, the terms of third party content agreements under negotiation or agreed to by pressplay are not shared with the parents.

Id. at 12. This paragraph, like the firewall guidelines, also places special emphasis on third-party content agreements.

8

A different section of the White Paper makes broader claims about pressplay's independence. In the section titled "The Duet Management Team," the White Paper represents that

> [t]he efficacy of the firewalls is also demonstrated by the conduct of Duet's management team. Between April and July 2001, several former UMG employees became Duet employees. The independence of these employees was understood and adhered to by the parent companies, pressplay, and the particular employees involved.

Id. at 10. Later in the "The Duet Management Team" section, the White Paper cites a negotiation with Microsoft as an example of how the two companies operated independently. However, Microsoft is not a third party content provider; it is an "affiliate"—a potential user of pressplay's services. The guidelines do not forbid UMG from involving itself in pressplay's dealings with affiliates. See id. at 12. It is therefore reasonable to read the White Paper as representing that pressplay employees enjoyed more independence from UMG than expressly provided in the guidelines.

The documents provided by Hummer undermine the White Paper's claims of independence. For example, UMG employees were directly involved in pressplay's negotiations with AOL and Yahoo!, other affiliates. Anderson Dec., Exhs. 8, 20–23. The employees from pressplay and UMG who were involved in the negotiations expressed confusion as to their roles and the scope of their authority. Id. Exhs. 21–23. UMG also does not dispute that for the first several months of pressplay's existence pressplay had no employees of its own. Finally, at least one document submitted by Hummer indicates that UMG received information from pressplay about content licenses. In an email dated April 12, 2001, two UMG executives discussed the negotiation position taken by an independent consultant working for pressplay, Ted Green, and stated an intent to "debrief" Mr. Green. Id. Exh. 9. As UMG acknowledges, Mr. Green was hired by pressplay "to conduct negotiations for third-party content licenses"—the very subject of communication forbidden by the guidelines. Brief in Opposition at 12. UMG's knowledge of Mr. Green's negotiating position, as well as UMG's stated intent to "debrief" Mr. Green, are both suggestive of action which violates the guidelines.

9

Viewed in combination with UMG's false "disparate licensing" argument, discussed supra, the documents offered by Hummer provide reasonable cause to believe that the statements in the White Paper were deliberately misleading, if not completely false.

As the court finds that UMG's privilege should be vitiated based on the misrepresentations in the White Paper, the court need not reach Hummer's additional argument that UMG and its attorneys deliberately redacted nonprivileged material in an attempt to mislead the DOJ.

### B.    EMI

Hummer alleges that several statements in the EMI / MusicNet White Paper are similarly misleading. Like pressplay, MusicNet claimed that it had safeguards in place to prevent "exchanges of information, or other conduct, that could negatively affect competition." Anderson Dec., Exh. 7 at 20. MusicNet further claimed that it was "not aware of any breaches of these safeguards." Id.

At oral argument, EMI claimed that MusicNet's firewall, like pressplay's, was limited to information about the price terms in licenses from content providers. The language in the MusicNet White Paper is quite broad, however, and belies EMI's narrow reading. For example, in discussing the confidentiality rules governing MusicNet's distribution agreements to downstream parties, the White Paper states that "each Distribution Agreement is bilateral between MusicNet and the individual distributor. Similarly, the Distribution Agreements themselves and Section 5.4(c) of the Amended and Restated Stockholders Agreement [with the parent record labels] prohibit disclosure of the terms of the Distribution Agreements." Id. at 22. The White Paper also claims that MusicNet's pricing structure was kept secret from the parent labels:

> At present, MusicNet is still contemplating the manner in which it will price subscription services and the terms on which it will offer permanent downloads to its distributors . . . . The individuals involved in this process at MusicNet include Alan McGlade (President and CEO), Cindy Charles (Senior Vice President - Law & Business Affairs and General Counsel), Ellinor Hirschhorn (Executive Vice President and General Manager), and Mark Mooradian (Senior Director of Strategic Planning). All of these individuals are independent, full-time MusicNet employees and are not employed by any outside stockholders.

10

Id. at 26. The White Paper thus represents that the parent labels were prevented from learning the price terms of both upstream content licenses with record labels and downstream distribution agreements with online music retailers.

Hummer identifies several documents in support of its argument that MusicNet knew of substantial breaches of the safeguards. First, MusicNet's CEO, Rob Glaser, entered into a "side-letter" agreement with EMI, separate from EMI's content license to MusicNet, which "commits that EMI's core economic terms (price per song, advance, % of revenue pool that goes to rightsholders, etc) will be no less favorable than BMG and WMG's." Anderson Dec., Exh. 64. Glaser decided to confine the MFN to a side letter because "there are legal / antitrust reasons why it would be a bad idea to have MFN clauses in any, or certainly all, of these agreements." Id. Further confirming the existence of these side letter agreements—and the fact that all of the parent companies were aware of them—is an email between two lawyers representing the labels. Anderson Dec., Exh. 66 ("Everyone saw and presumably still has the near final draft of the BAG-MN side agreement."). As discussed supra, MFN clauses result in uniform pricing regardless of the written terms of the content licenses. This side letter therefore resulted in EMI knowing the terms of MusicNet's licenses with the other record label parents.

Second, MusicNet provided to EMI and the other labels a complete copy of MusicNet's content license to Napster.[2] Anderson Dec., Exhs. 67–68. EMI argues that the Napster license was produced only in response to EMI's concern that MusicNet's license to Napster violated the terms of EMI's agreement with MusicNet. Even if true, EMI's argument does not change the fact that it received significant information about the terms of one of MusicNet's distribution agreements.

In sum, the documents produced by Hummer reflect the disclosure to EMI of the terms of content licenses between MusicNet and third parties. These disclosures directly contradict the claims in the MusicNet White Paper that no competitively sensitive information was exchanged through the joint venture. As a result, the court finds reasonable cause to believe that the statements related to safeguards in the White Paper were deliberately misleading.

11

III. Scope

The Ninth Circuit has not expressly considered the scope of communications that must be produced upon a *prima facie* showing of crime or fraud. The court has suggested, however, that there must be "some relationship between the communications and the illegality." United States v. Laurins, 857 F.2d 529, 540 (9th Cir. 1988), cert. denied, 492 U.S. 906 (1989); see also Loustalet v. Refco, Inc., 154 F.R.D. 243, 245 (C.D. Cal. 1993) ("it must be shown that there is some relationship between the particular communications sought and the illegality.").

Here, the alleged fraud is the preparation and submission of the two White Papers to the DOJ. The White Papers reflect the culmination of the labels' efforts to bring closure to the DOJ antitrust investigation, and are presumably based on extensive investigation into the dealings between the joint ventures and their label parents. UMG and EMI are therefore ordered to produce all previously withheld communications related to the DOJ's antitrust investigation, including but not limited to the following:

(1) internal investigations of the relationship between the labels and the joint ventures, including the disclosure of competitively sensitive information;

(2) communications made in the course of preparing the White Papers;

(3) other communications concerning what information and documents should be produced to the DOJ.

UMG and EMI shall make these communications available within 30 days of this order.

12

CONCLUSION

For the foregoing reasons, the court hereby GRANTS defendant's motion to compel. UMG and EMI shall produce communications related to the DOJ's antitrust investigation, as set forth above, within 30 days of this order.

IT IS SO ORDERED.

Dated: April 20, 2006

MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

13

## ENDNOTES

1. 18 U.S.C. section 1001 provides criminal penalties for "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry."

2. MusicNet, unlike pressplay, was both a licensee of content (from the record labels) and a licensor (to music distribution services such as Napster).