UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NAPSTER, INC. COPYRIGHT LITIGATION | **No. C MDL-00-1369 MHP** |
| This Document Relates To: | |
| UMG RECORDINGS, INC. et al., | |
| Plaintiffs, | No. C 04-1166 MHP |
| v. | |
| HUMMER WINBLAD VENTURE PARTNERS et al., | |
| Defendants. | |
| UMG RECORDINGS, INC. et al., | |
| Plaintiffs, | No. C 04-1351 MHP |
| v. | |
| BERTELSMANN AG et. al., | |
| Defendants. | |
| JERRY LEIBER et al., | |
| Plaintiffs, | No. C 04-1671 MHP |
| v. | |
| BERTELSMANN AG et al., | |
| Defendants. | |

CAPITOL RECORDS, INC. et al.,

    Plaintiffs,

v.

BERTELSMANN AG et. al.,

    Defendants.

No. C 04-2121 MHP

**MEMORANDUM & ORDER**
**Re: Motion to Compel Production of Privileged Documents**

    The above-captioned actions arise from litigation involving alleged copyright infringement by Napster, Inc. and its customers. Plaintiffs now seek to compel production under the crime-fraud exception to the attorney-client privilege of documents previously withheld by defendants Bertelsmann AG, et al. ("Bertelsmann"). Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND

    The instant motion relates to four actions now pending before this court as part of the In re Napster Copyright Litigation multidistrict litigation ("MDL") proceedings, Case No. C MDL-00-1369 MHP. Plaintiffs in this suit allege that by investing in Napster and assuming control of the operation of the Napster file-sharing network, defendants contributorily and vicariously infringed plaintiffs' exclusive rights under the Copyright Act, 17 U.S.C. section 101 et seq. See 17 U.S.C. § 106.

    Plaintiffs seek in this motion to compel production of attorney-client communications relating to Bertelsmann's initial $50 million investment in Napster, which has been characterized by the parties either as a loan (Bertelsmann's characterization) or as an equity stake (plaintiffs' characterization). The loan document contains a paragraph purporting to limit the manner in which Napster could use Bertelsmann's money: "The proceeds of this Note shall be used solely to fund the

2

development of a new model for Company's service as outlined in the Umbrella Agreement and overhead costs associated with such development." Pomerantz Dec., Exh. 1.

Bertelsmann has twice offered the loan document in this litigation as evidence that it did not intend the loan proceeds to be used to support Napster's existing file sharing system or its litigation against the record labels. In moving to dismiss plaintiffs' complaint, Bertelsmann offered the loan document to establish that it did not intend to perpetuate Napster's allegedly illegal file sharing service. Pomerantz Dec., Exh. 2 at 17. Bertelsmann also offered the loan agreement in a discovery dispute before the Special Master, to prove that its interests were not adverse to those of BMG—Bertelsmann's record label subsidiary and one of the plaintiffs in the original Napster action. Pomerantz Dec., Exh. 2. Finally, Bertelsmann submitted the loan document during Napster's bankruptcy proceedings in order to establish Bertelsmann's priority as a secured creditor of Napster.

Plaintiffs contend that the stated limitation on use of the loan proceeds is a deliberate falsehood, intended to protect Bertelsmann from any liability resulting from supporting Napster's allegedly illegal business. According to plaintiffs, Bertelsmann had a secret side agreement with Napster whereby Napster could use up to twenty percent of the loan amount—ten million dollars—to finance its litigation against the record labels. Plaintiffs further assert that Bertelsmann knew the representation in the loan document to be false when it offered the loan document as evidence in this litigation. As a result, according to plaintiffs, Bertelsmann cannot assert the attorney-client privilege with respect to communications relating to the Napster loan and the use of the loan document in this litigation.

Bertelsmann challenges the sufficiency of plaintiffs' evidence in support of the alleged fraud. Bertelsmann also argues that the claimed misrepresentation is immaterial as a matter of law, and cannot serve as the predicate for a claim of fraud.

LEGAL STANDARD

Federal common law recognizes an attorney-client privilege protecting "communications between client and attorney for the purpose of obtaining legal advice, provided such

3

communications were intended to be confidential." Gomez v. Vernon, 255 F.3d 1118, 1131 (9th Cir.), cert. denied sub nom Beauclair v. Puente Gomez, 534 U.S. 1066 (2001). The privilege is not absolute, however. Under the so-called "crime-fraud" exception to the privilege, communications in furtherance of an ongoing or future crime or fraud are not protected. Id. at 1131 n.7. In order to vitiate the privilege under the crime-fraud exception, the moving party must establish "reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme." In re Grand Jury Proceedings, 87 F.3d 377, 381 (9th Cir.), cert. denied sub nom Corporation v. United States, 519 U.S. 945 (1996) (internal quotations and ellipses omitted).

DISCUSSION

I.   Scope of Review

The parties disagree as to the depth of review this court must conduct in order to resolve the instant motion. Plaintiffs argue that the court should only consider whether the moving party's evidence, "if believed by the jury would establish the elements of an ongoing violation." See United States v. Chen, 99 F.3d 1495, 1503 (9th Cir. 1996), cert. denied, 520 U.S. 1167 (1997); United States v. Laurins, 857 F.2d 529, 541 (9th Cir. 1988), cert. denied, 492 U.S. 906 (1989). Bertelsmann disagrees, arguing that plaintiffs must establish by a preponderance of all of the evidence, including that submitted by Bertelsmann, that a crime or fraud was committed. See Laser Indus., LTD. v. Reliant Techs., Inc., 167 F.R.D. 417, 438 (N.D. Cal. 1996) (Brazil, Mag. J), dismissed by 232 F.3d 910 (Fed. Cir. 2000) (holding that the "moving party could penetrate the privilege by satisfying the less demanding 'preponderance of the evidence' standard."); see also In re Omnicom Group, Inc. Sec. Litig., 233 F.R.D. 400, 405–08 (S.D.N.Y. 2006) (reviewing and endorsing the reasoning of Laser Industries).

Laurins and Chen represent the last published word from the Ninth Circuit on the standard of proof for vitiating the attorney-client privilege. The Laurins court stated, without elaboration, that the party seeking to vitiate the attorney-client privilege must present only a "prima facie case" of fraud; i.e., that the moving party must show "evidence that if believed by the jury would establish

4

1 the elements of an ongoing violation." Laurins, 857 F.2d at 541. Similarly, the court in Chen held
2 that the moving party must submit evidence establishing reasonable cause, which is "more than
3 suspicion but less than a preponderance of the evidence." Chen, 99 F.3d at 1503. On its face, the
4 Laurins / Chen standard is quite lenient and does not require the court to consider conflicting
5 evidence offered by the party seeking to uphold the privilege. The court need only consider the
6 evidence offered by the moving party.

7 Laser Industries, decided after Laurins but before Chen, adopted a far stricter standard,
8 requiring the moving party to prove the fraud by a preponderance of the evidence, in light of the
9 entire evidentiary record. Other district courts in this circuit appear to have adopted the Laser
10 Industries formulation. See, e.g., Medical Lab. Mgmt. Consultants v. American Broad. Cos., 30 F.
11 Supp. 2d 1182, 1206 (D. Ariz. 1998), aff'd, 306 F.3d 806 (9th Cir. 2002); In re Heritage Bond Litig.,
12 No. CV 02-1475-DT, 2004 WL 1970058, at *3 (C.D. Cal. Jul. 23, 2004). The Laser Industries court
13 distinguished Laurins on the grounds that Laurins was a criminal case, in which a lower standard of
14 proof should apply. Laser Indus., 167 F.R.D. at 427 (arguing that "reasoning about [the crime-fraud
15 exception] in the civil context is not fungible with reasoning about them in the context of grand jury
16 investigations and criminal prosecutions").

17 The Laser Industries preponderance of the evidence standard is irreconcilable with Chen,
18 decided four months later. See Chen, 99 F.3d at 1503 (reasonable cause is "more than suspicion but
19 less than a preponderance of the evidence."). Moreover, the civil / criminal distinction adopted by
20 the Laser Industries court is unpersuasive, as the privilege has an even greater importance in the
21 criminal context where individual liberty is at stake. See, e.g., In re Sealed Case, 754 F.2d 395, 403
22 (D.C. Cir. 1985) (Mikva, J., concurring) (arguing that "the Sixth Amendment and the underlying
23 policies of the common law privilege require heightened protection of confidential communications
24 between lawyer and client when the lawyer is defending the client against criminal charges.").
25 Finally, although the Ninth Circuit has not yet directly addressed the question of whether an
26 adversarial minitrial should be used to determine the exception's applicability, other courts have
27 found such a weighing of conflicting evidence to be unnecessary. See, e.g., In re Grand Jury
28

5

Proceedings (Vargas), 723 F.2d 1461, 1467 (10th Cir. 1983) ("[T]he determination of whether the government shows a prima facie foundation . . . can be made *ex parte* and a 'preliminary minitrial' is not necessary.") (citation omitted) (cited with approval by In re Grand Jury Proceedings (Doe), 867 F.2d 539, 540 (9th Cir.1989)).  The court also finds that vitiating the privilege upon a *prima facie* showing is sensible, as the party seeking to vitiate the privilege does not have the benefit of access to the full set of communications which might prove the existence of the crime or fraud.

The language in controlling Ninth Circuit decisions such as Laurins and Chen is sufficiently clear.  This court will therefore follow the Laurins standard, and will vitiate the privilege if plaintiffs have presented "evidence that if believed by the jury would establish the elements of an ongoing violation."  Laurins, 857 F.2d at 541.

II.     Plaintiffs' Showing

Plaintiffs' argument in support of vitiation hinges on three pieces of evidence directly supporting their contention that a side agreement existed, as well as circumstantial evidence that Bertelsmann had a motivation to fund Napster's legal defense and that Bertelsmann knew that the loan proceeds were being used to do so.

The first piece of direct evidence is an email dated October 25, 2000 from Hank Barry, then Napster's CEO, to several Napster employees and Napster's outside counsel.  Pomerantz Dec., Exh. 4.  The email, which is titled "Thunderball notes," describes the outcome of a meeting between Barry and Thomas Middelhoff, CEO of Bertelsmann, about the Bertelsmann loan to Napster.  Relevant to the instant motion, the email states that

> [t]here are 2 things that we agreed that will not be in the papers.  These are the subjects of handshakes between Thomas and me, witnessed yesterday by Hummer, Andreas, Aydin Caginalp and Andreas' assistant Oliver. . . . [T]he papers will say that the $50M is to be used for development and overhead and g and a related to that.  *We have an agreement that up to $10M may be used for litigation expenses.*  Legal team, that's you.

Id. (emphasis added).

6

The second piece of direct evidence is a memorandum written by Carol Timm, an associate at Wilson Sonsini—Napster's counsel. The memorandum, written for inclusion in the Napster file, documents a conversation between Timm and Barry. The memorandum states, in relevant part, that

> [t]he Memorandum of Terms between the parties states that, "The loan proceeds will be used to fund the development of the business model outlined above as well as general, administrative and overhead expenses associated with such development." *Although not expressed in the Memorandum of Terms or the transaction documents, Mr. Barry informed me that the parties had verbally agreed that Napster could use up to 20% of the proceeds toward litigation expenses.* This agreement and the handshake between Hank Barry of Napster and Andreas Schmidt of Bertelsmann was witnessed by John Hummer . . . , Aydin Caginalp . . . , and Oliver Schusser.

Pomerantz Dec., Exh. 5 (emphasis added). Bertelsmann points out that the two accounts of the meeting differ in one respect—in the email, the handshake agreement was between Barry and Middelhoff, while in the memorandum the agreement was between Barry and Schmidt. In all other respects, however—the terms of the side deal and the other parties present at the meeting—the two documents are in accord.

The third piece of direct evidence is a passage from the deposition testimony of Hank Barry, wherein Barry describes the meeting at which he reached the handshake agreement with Bertelsmann. According to Barry's testimony, he announced to the Bertelsmann executives that he understood the reference to "general and administrative expenses" in the loan document to include litigation expenses. Pomerantz Dec., Exh. 6. He further represented that he would "endeavor to keep the litigation expenses under $10 million." Id. Barry testified that none of the participants in the meeting objected to his statements.

Bertelsmann argues that Barry's testimony establishes only that he had a different interpretation of the agreement than Bertelsmann, and does not support an inference that Bertelsmann intended to defraud the court. The problem with this argument is that, according to Barry's testimony, Barry communicated his understanding to Bertelsmann executives at the time the loan agreement was created, and the executives did not object. Bertelsmann's knowledge that Barry planned to use the loan proceeds to fund the litigation—regardless of whether that understanding was the subject of a formal side agreement—is fundamentally at odds with Bertelsmann's

7

1   representations as to the meaning of the loan agreement in this lawsuit. Viewed together with
2   Barry's email and the Wilson Sonsini memorandum, Barry's testimony is more than adequate to
3   make a *prima facie* showing that Bertelsmann's characterization of the loan agreement in this
4   litigation is false.

5   Plaintiffs' circumstantial evidence further buttresses the *prima facie* case. The parties do not
6   dispute that Napster in fact used the loan proceeds to fund its litigation. Plaintiff has also pointed to
7   some evidence suggesting that Bertelsmann wished to keep the existing Napster service running in
8   order to retain the Napster user base, and that Bertelsmann knew that Napster would be forced to
9   close its doors without securing additional funding. Pomerantz Reply Dec., Exh. 3, at 88–98, 109.
10  In sum, plaintiffs have carried their burden of providing evidence which, if believed by the finder of
11  fact, would establish fraud in Bertelsmann's representations to this court.

12  Even if the court were to follow Laser Industries and consider the evidence offered by
13  Bertelsmann to rebut plaintiff's case, the result would be the same. Bertelsmann's contrary evidence
14  falls into three categories. First, Bertelsmann argues that the Napster service was not known to be
15  illegal at the time of the loan agreement. Thus, according to Bertelsmann, there was no incentive for
16  Bertelsmann to keep its investment in Napster a secret. This argument ignores the very precarious
17  legal position Napster faced in late 2000, after this court had entered a preliminary injunction. The
18  fact that the injunction was still on appeal—thus raising some possibility that the Napster service
19  might be lawful—does not suggest that Bertelsmann had no reason to be concerned about its
20  liability.

21  Second, Bertelsmann presents documentary evidence and testimony from Bertelsmann and
22  Napster employees stating that Bertelsmann did not intend to fund the existing Napster service, and
23  that Bertelsmann's sole goal was to transform Napster into a legal, profit-making venture. The fact
24  that Bertelsmann executives have corroborated Bertelsmann's stated position (as reflected in the
25  loan agreement) is unsurprising. Indeed, much of Bertelsmann's defense in this lawsuit is based on
26  the argument that Bertelsmann lacked the requisite mental state for contributory or vicarious
27  infringement. Although the statements of Bertelsmann and Napster employees should be given
28

8

1 some weight, they are not sufficient to rebut the evidence of an alternate arrangement included in
2 plaintiff's submissions.

3       Finally, Bertelsmann argues that there is no evidence that its lawyers were knowingly
4 engaged in improper conduct. However, "the lawyers' innocence does not preserve the
5 attorney-client privilege against the crime-fraud exception." Chen, 99 F.3d at 1504. This is so
6 because "[t]he privilege is the client's, so it is the client's knowledge and intentions that are of
7 paramount concern to the application of the crime-fraud exception." Id. (internal quotations
8 omitted). Here, the handshake agreement was witnessed by Bertelsmann executives, as well as one
9 of Bertelsmann's lawyers, who was also involved in drafting the loan agreement. In addition,
10 Bertelsmann, through its lawyers, offered the loan document as evidence on two occasions in this
11 litigation. The loan agreement contains the allegedly false statement about the use of the loan
12 proceeds. Plaintiffs' proffer thus indicates, at a minimum, that Bertelsmann's lawyers were active
13 participants in perpetuating that falsehood, whether or not they knew they were doing so at the time.

14       In sum, regardless of the applicable standard of review, the court finds that plaintiffs have
15 satisfied their burden in seeking to vitiate Bertelsmann's privilege.

17 III.    Materiality

18       Bertelsmann argues that even if the loan document contains a false statement, the statement
19 does not constitute actionable fraud because it is not material. Bertelsmann offers two bases for this
20 assertion. First, Bertelsmann argues that even if it intended and agreed to fund Napster's previous
21 litigation, any such funding cannot serve as the basis for copyright infringement because funding of
22 litigation is constitutionally protected under the Noerr-Pennington doctrine. Second, Bertelsmann
23 argues that funding of litigation, without more, falls short of the level of involvement required for
24 vicarious or contributory liability.

25       Assuming without deciding that Bertelsmann's legal arguments have merit, its use of the
26 loan document in proceedings before the court was nonetheless material. If the court had somehow
27 concluded based on the loan document that, as a matter of law, Bertelsmann had no financial stake in

9

1  Napster's allegedly illegal service, plaintiff's claims may very well not have survived Bertelsmann's
2  motion to dismiss. Similarly, if the Special Master had accepted Bertelsmann's argument that it had
3  no stake in the outcome of Napster's litigation against the record labels, Bertelsmann might not have
4  been required to produce previously withheld communications between Bertelsmann and BMG.

5       Bertelsmann argues that the loan document is immaterial because investment in Napster's
6  litigation cannot serve as a basis for copyright liability. Bertelsmann offered the loan document,
7  however, to prove the converse—that absence of any investment in Napster's service or its litigation
8  demonstrates an absence of liability. The loan document, which on its face indicates a lack of
9  investment, is unquestionably material evidence in support of Bertelsmann's claim.

11  IV.    Scope of Vitiation

12       The Ninth Circuit has not expressly considered the scope of communications that must be
13  produced upon a *prima facie* showing of crime or fraud. The Laurins court suggested, however, that
14  there must be "some relationship between the communications and the illegality." Laurins, 857 F.2d
15  at 540; see also Loustalet v. Refco, Inc., 154 F.R.D. 243, 245 (C.D. Cal. 1993) ("it must be shown
16  that there is some relationship between the particular communications sought and the illegality.").

17       The fraud alleged by UMG has two components. First, Bertelsmann executives and
18  Bertelsmann's outside counsel allegedly cooperated in documenting the investment in Napster in a
19  manner contrary to the parties' actual understanding. Second, Bertelsmann submitted the loan
20  document, through its lawyers, both in the bankruptcy litigation and in the litigation before this
21  court. Both components—the drafting of the loan document and the submission of the document in
22  this court—bear a relationship to the alleged fraud. Bertelsmann is therefore ordered to produce
23  communications related to the creation of the loan document and to the submission of that loan
24  document in the bankruptcy proceedings and to this court.

CONCLUSION

For the foregoing reasons, the court hereby GRANTS plaintiffs' motion to compel production of Berteslmann documents and testimony previously withheld as privileged.

IT IS SO ORDERED.

Dated: April 20, 2006

MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

11