UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NAPSTER, INC. COPYRIGHT LITIGATION | CASE NO. C-MDL-00-1369 MHP<br><br>STIPULATION AND [~~PROPOSED~~] ORDER REGARDING STIPULATED TESTIMONY OF SHAWN TULLY |
| THIS DOCUMENT RELATES TO: | |
| UMG RECORDINGS, INC., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>HUMMER WINBLAD VENTURE PARTNERS, et al.,<br><br>Defendants. | No. C 04-1166 MHP |
| UMG RECORDINGS, INC., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>BERTELSMANN AG, et al.,<br><br>Defendants. | No. C 04-1351 MHP |

1186955.1

| | |
|---|---|
| LEIBER, et al., <br><br>  Plaintiffs, <br><br> vs. <br><br> BERTELSMANN AG, et al., <br><br>  Defendants. | No. C 04-1671 MHP |
| CAPITOL RECORDS, INC., et al., <br><br>  Plaintiffs, <br><br> vs. <br><br> BERTELSMANN AG, et al., <br><br>  Defendants. | No. C 04-2121 MHP |

By and through their respective attorneys the undersigned parties hereby stipulate and agree as follows:

WHEREAS, the UMG Plaintiffs issued a deposition subpoena out of the United States District Court for the Southern District of New York (the "Southern District") to Mr. Shawn Tully, a reporter for the *Time* family of publications and author of an August 2000 article entitled, "Big Man vs. Big Music," which appeared in *Fortune* magazine ("Article"), and which is attached hereto as Exhibit A;

WHEREAS, citing a "reporter's privilege" against testifying, Mr. Tully objected to Plaintiffs' subpoena;

WHEREAS, on April 25, 2006, the United States District Court in the Southern District of New York (Hon. Denny Chin) heard and granted, with certain conditions, Plaintiffs' motion to compel compliance with the subpoena over Mr. Tully's objection;

WHEREAS, Mr. Tully (through counsel) has indicated that he is prepared to testify that specific quotes as set forth below that are attributed by Mr. Tully to John Hummer in the Article are accurate ("Quotes");

WHEREAS, to avoid a deposition of Mr. Tully, the parties are willing to stipulate, based on the representation of counsel for *Fortune* and *Time Inc.*, that Mr. Tully, if called to

testify at deposition or trial, would testify that he believes that the Quotes attributed to John Hummer in the Article are accurate; and

WHEREAS, the parties wish to minimize the inconvenience to Mr. Tully, to obviate any objection at motion or trial to the presentation of this evidence by way of Stipulated Testimony (as defined below) rather than deposition testimony, and to reserve their other rights to object to the Stipulated Testimony and to the admissibility and/or accuracy of the Article on any ground other than what is specifically set forth in this stipulation;

NOW, THEREFORE, THE PARTIES HEREBY STIPULATE AS FOLLOWS:

1. If asked, Mr. Tully would testify in accordance with the Stipulated Testimony attached hereto as Exhibit 1.

2. The Stipulated Testimony is limited as expressly set forth herein and the Hummer Winblad Defendants reserve all rights to object to the Stipulated Testimony (including as to its accuracy or implication) and to the admissibility and/or content of the Article on any ground other than what is specifically set forth in this stipulation.

3. For purposes of motion practice (including summary judgment or trial), the parties waive any objection to the introduction or admission into evidence of the Stipulated Testimony on the ground that any rule requires Plaintiffs to call Mr. Tully live or to seek to introduce the Stipulated Testimony by means of deposition testimony. As set forth in paragraph 2 above, the parties expressly reserve all other objections.

4. Based on the foregoing stipulations, the parties agree that they shall not seek to compel the deposition of Mr. Tully in this litigation, and the deposition subpoena shall be withdrawn.

| | | |
|---|---|---|
| 1 | DATED: May 30, 2006 | MUNGER, TOLLES & OLSON LLP |
| 2 | | |
| 3 | | By: _____/s/_____<br>SUSAN T. BOYD |
| 4 | | Attorneys for UMG Plaintiffs |
| 5 | DATED: May 30, 2006 | FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP |
| 6 | | |
| 7 | | By: _____/s/_____<br>PETER L. SIMMONS |
| 8 | | |
| 9 | | Attorneys for EMI Plaintiffs |
| 10 | DATED: May 30, 2006 | PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP |
| 11 | | |
| 12 | | By: _____/s/_____<br>CAREY R. RAMOS |
| 13 | | Attorneys for LEIBER Plaintiffs |
| 14 | DATED: May 30, 2006 | KEKER & VAN NEST, LLP |
| 15 | | |
| 16 | | By: _____/s/_____<br>MICHAEL H. PAGE |
| 17 | | Attorneys for HUMMER WINBLAD Defendants |

### ORDER

PURSUANT TO STIPULATION, IT IS SO ORDERED.

May 31, 2006

_____
HON. MARILYN HALL PATEL
UNITED STATES DISTRICT JUDGE

*[Stamp: IT IS SO ORDERED / Judge Marilyn H. Patel / United States District Court, Northern District of California]*

EXHIBIT 1

## STIPULATED TESTIMONY OF SHAWN TULLY

I wrote the Article, a true and correct copy of which is attached hereto as Exhibit A.

In connection with the Article, I interviewed John Hummer.

I believe that the following quotes that I attribute to Mr. Hummer in the Article are accurate:

(1) "Before they close Napster, they'll have to pry it from my cold, dead fingers."

(2) "The fireworks are just beginning."

(3) "When I decided I was willing to lose my whole $13 million investment rather than change Napster, a wonderful feeling of peace came over me."

(4) "They want to treat us as just another online retailer. We'll charge by the download when pigs fly."

**EXHIBIT A**

# SPECIAL INVESTOR'S ISSUE
# FORTUNE

AUGUST 14, 2000  $4.95

# Retire
# RICH

**EIGHT IDYLLIC HIDEAWAYS TO CALL HOME**

**Real Strategies For Real People:**
- **TEN STOCKS TO LAST THE DECADE**
- **MUTUAL FUNDS WITH PUNCH**
- **THE ULTIMATE INCOME PORTFOLIO**

THE LIBRARY
WITHDRAWN
1201 E CALIFORNIA BLVD
PASADENA California Institute of Technology 91125-0001

EXHIBIT 176

www.fortune.com    aol keyword: fortune

NAPSTER

# Big Man



John Hummer—
NBA veteran, VC
pioneer, and scourge
of the record labels—
answers to no one
except his black

IT'S THE FOURTH OF JULY IN SAN FRANCISCO, AND big John Hummer, co-founder of the venture capital firm Hummer Winblad, is holding court at the Dolphin Club. The club stands out amid the tony tourist shops on Fisherman's Wharf, and not in an elegant way. It's a rickety boathouse maintained (barely) by a group of eccentrics fond of swimming in the frigid waters of the Bay. This evening the club is Hummer's stage, and he dominates it as any hyperkinetic, 6-foot-10 Seattle SuperSonics center-turned-new-economy-millionaire might tend to do. Towering over his fellow Dolphins, 52-year-old Hummer slaps backs and swaps Bay-swimming yarns in a basso as *profondo* as the sub-woofers at a Limp Bizkit concert.

What everyone really wants to talk about, though, is Hummer's latest business venture. This time the big guy has got himself into some really deep water. Hummer has ation of America (RIAA), is seeking an injunction that could put Napster out of business by the end of summer. Most of Silicon Valley thinks Napster is doomed.

Hummer, however, has a David to match up against the Goliaths: über-attorney David Boies, fresh from eviscerating Bill Gates at Microsoft's antitrust trial. Other assets include Napster's CEO Hank Barry, a Hummer Winblad partner and an accomplished copyright lawyer in his own right; and Napster's 20-million-kid user base, which constitutes prima facie evidence that Napster provides a valuable service to multitudes (or delivers stolen property, depending on your point of view). Not least, there's Napster's chairman, John Hummer himself, a man for whom the phrase "larger than life" seems to have been minted. Hummer brings to the fray considerable dealmaking skill, a good eye for calculated risk, and an abiding sense of

# Against Big Music

*Think the record companies will bury Napster? John Hummer is betting you're wrong—and he's hired David Boies to prove it.*

## by Shawn Tully

decided to save Napster Inc., the song-swapping, copyright-flouting music Website targeted for annihilation by five of the world's largest media conglomerates. In late May, Hummer Winblad poured $13 million into Napster, for which it got a 20% interest in a Website with 20 million fanatical young customers but no revenues, no business model, and half a dozen pending lawsuits. As a bonus, the purchase put John Hummer at the center of one of the defining battles of the Internet.

Arrayed against Napster are the giants of the music industry, the five "majors"—Sony, Bertelsmann, Universal, EMI, and Warner (owned by FORTUNE's parent, Time Warner)—representing a collective $250 billion in market value. Their trade group, the Recording Industry Associ- himself as the star of his own melodrama. "Before they close Napster," he booms, "they'll have to pry it from my cold, dead fingers."

In short, the battle over Napster has suddenly become a lot more suspenseful. Neither Hummer nor Boies, after all, is known for championing hopeless causes. And if Napster succeeds in fighting off the injunction, things really will get intense. In that instance, the two parties would be exponentially more likely to settle—an outcome that could revolutionize the way people buy music and transform Napster from a fad into a Web powerhouse. Looking out at the Golden Gate Bridge from the Dolphin Club's deck, Hummer rumbles, "The fireworks are just beginning." He's not talking about the Fourth of July.

PHOTOGRAPHS BY KATRINA DICKSON                    August 14, 2000 FORTUNE • 187

# NAPSTER



*Microsoft slayer David Boies says the law lets Napster users download all the music they want.*

Napster is one of those only-in-the-Internet-Age phenomena that cause executives over 40 to wake up in the middle of the night and check the locks on their business model. In case you've been out swimming around Alcatraz, Napster was founded in May '99 by a 19-year-old college dropout (what else?) named Shawn Fanning and his 20-year-old buddy Sean Parker. The pair adapted a technology called peer-to-peer file sharing in a way that essentially turned the Web into a giant free music exchange. The site's users—most of them under 25—log on to Napster, enter the name of a song they want, and are directed to a digital version in a format known as MP3. But the places the songs are stored aren't giant central servers that can be controlled by, say, record retailers; they're the hard drives in the personal computers of other Napster users. When the searcher clicks, the requested song is copied from the other Napsterite's PC and zapped over the Net to the searcher's hard drive. It doesn't cost a penny.

Napster's growth has redefined Internet speed. It took just a year for the service to reach 20 million users. By comparison, it took AOL ten years (and untold zillions of unsolicited direct-mail disks) to reach the 23 million subscribers it has today. By some reports, downloading MP3 files recently became the most popular activity on the Net, dethroning the old favorite: cruising sex sites.

For obvious reasons, Big Music has not taken kindly to a technology that allows millions of kids to get the latest songs without paying. In December the major labels sued for copyright infringement. For good measure, they were joined by 1960s songwriters Jerry Leiber and Mike Stoller ("Love Potion No. 9"), the heavy metal group Metallica, and rapper Dr. Dre. Their case is blunt. As Cary Sherman, general counsel for the RIAA, sums it up: "Napster is facilitating theft. This is a flagrant case of piracy." The damage is so great, the plaintiffs argue, that the court should enjoin Napster from helping its users trade copyrighted songs, an action that would effectively scuttle Napster without a trial.

The first skirmish went the record industry's way. In early May, before Hummer appeared on the scene, a San Francisco judge brushed aside Napster's request to dismiss the industry's case on the lame grounds that it was an Internet service provider and therefore not responsible for its users' actions. Most observers concluded that Napster was living on borrowed time. The only open question was whether the company would run out of money before the court ordered it to shut down.

Then came Hummer Winblad's cash infusion, which installed Hummer as chairman and Barry as CEO and forced the record companies to play out their legal hand. Hummer countered in June by hiring Boies, a coup that immediately lifted Napster out of the terminal ward. "I am the record companies' worst nightmare," Hummer crows. Boies has completely re-energized Napster's legal stance, throwing out the former passive defensive strategy and incorporating an aggressive position that is far more compelling. (More on that later.)

The same month he landed Boies, Hummer got another shot of confidence from Andy Grove, the Intel chairman and leading elder of the tech industry. Grove phoned Hummer to say that Napster-like technology is a Web innovation on a par with the browser. (Grove recognizes that file sharing can apply to all kinds of information, not just music files; see "Napster: The Hot Idea of the Year" in the fortune.com archive.) "It was as if Jerry West phoned when I was a high school basketball player," booms Hummer. Over a sushi lunch in Hummer Winblad's conference room, Grove advised Hummer, above all, not to change the freewheeling Napster experience. The words reinforced Hummer's resolve. "When I decided I was willing to lose my whole $13 million investment rather than change Napster," Hummer says, "a wonderful feeling of peace came over me."

In many ways Napster is a huge departure for Hummer Winblad, which has never before taken on this kind of high-profile crusade. The firm was the first VC outfit to specialize in software. (Hummer's named partner is Ann Winblad, a successful software entrepreneur who may be most famous for being Bill Gates' former girlfriend.) Hummer Winblad

# NAPSTER



*Napster CEO Hank Barry: Copyrights need to make room for new technology.*

tends to play a conservative game: Of the 70 investments the partnership has made since 1989, Hummer counts only half a dozen failures; on more than 40, he's cashed in via IPOs or acquisitions. Among the big scores: Wind River (market cap: $2.4 billion), a pioneer in operating systems for everything from cell phones to auto brakes; $870 million HomeGrocer.com; and $270 million Liquid Audio, which ironically enough makes digital security to prevent the pirating of recorded music. Overall, Hummer Winblad has provided its investors with a decade of respectable (though not sensational, in the VC world) annual returns of 50%.

Hummer has remained stubbornly old-fashioned on earnings, demanding that CEOs target 20% pretax profit margins, even if it takes a while to get there. "I wanted to grow at all costs," recalls Jerry Fiddler, co-founder of Wind River. "But John jumped up and down about profits, saying it's better to grow slowly, let rivals spend themselves into oblivion, and keep margins up. He was right."

It's not clear, however, how Hummer plans to find those 20% margins in Napster. No money at all currently changes hands on the site. Hummer has said only that he intends not to interfere with the Napster "experience"—which means no fees for downloading. But it doesn't take too much imagination to think of ways Hummer and Barry might eventually cash in on 20 million music-loving, computer-savvy users, including advertising, concert

*It's not too hard to imagine ways that Hummer might be able to cash in on 20 million fanatical, computer-savvy users.*

promotions, even—why not?—selling CDs.

Before Napster can get to that point, though, it has to survive the music industry's efforts to kill it. The case is going to be close. To shut Napster down, the majors must first show that the law is on their side, so that their chances of winning eventually at trial (should it come to that) would be excellent. They then have to prove that leaving Napster open until the trial would cause them severe economic harm.

Napster's problem is that the recording companies have a point. They claim that users of the site clearly violate copyrights whenever they swap music without paying. As for the severe economic harm that would justify an injunction, say the majors, isn't it obvious? If they couldn't freeload on Napster, users would buy a lot more CDs.

Boies parries with an intriguing argument. Copyrights, he says, aren't absolute. They're designed to stimulate innovation and creativity by bestowing special rewards on artists and those who support them. But they also grant a monopoly, and monopolies can harm the public good. Hence, Congress and the courts regularly impose restrictions on copyrights—especially when copyrights inhibit the spread of new technology. "Copyrights are all about balance," says Barry. "The record labels don't see it that way. They view them as ironclad monopoly rights, and they're not."

Boies cites half a dozen reasons that the record companies' copyrights should not be enforced at Napster's expense. The most persuasive, say neutral lawyers, is that Napster users are arguably doing nothing wrong. Every American's freedom to copy songs for personal, noncommercial use is protected by the 1992 Audio Home Recording Act (AHRA). Taping a CD onto a cassette to play in the car, for example, is legal. Moreover, the law was designed to be flexible so that Congress wouldn't have to intervene every time a new copying technology came along.

Boies argues that the Napsterites are fully protected by AHRA. They're copying files for themselves, not selling anything. So what if Napster allows copying to take place on a massive scale? "The AHRA doesn't say it's illegal if lots of people do it," says Boies. "So what if no one saw this technology coming? The point of the law is to shield innovations like Napster." The RIAA replies that the AHRA clearly does not protect copying done on computers. (More recent case

law suggests, however, that it may.)

As Boies points out, the entertainment industry brandished copyrights to try to stop or hobble radio, cable TV, digital cassettes, and the VCR. In every case, Congress and the courts made room for those innovations to flourish—to everyone's benefit. Indeed, the echoes of other misbegotten copyright challenges sometimes resonate in the Napster case—as when the industry trotted out Jack Valenti, president of the Motion Picture Association of America, as a friendly witness. Some 17 years earlier, Valenti had testified memorably about the mortal danger posed by the VCR. The VCR is to film "as the Boston Strangler is to a woman alone," he hyperventilated. Valenti's opposition to Napster makes the veins bulge on Hummer's neck. "I'll die before I lose to Jack Valenti," he roars. "Who are you going to believe: that guy or me?"

Even if the record labels convince the court that copyright law is on their side, they haven't clinched the injunction. They still may have to prove that the very existence of Napster causes them grievous economic harm. The companies claim it's obvious. Why buy CDs if you can get the cuts for free? They cite a survey by SoundScan, a firm that tracks music retail sales, reporting that CD sales sag in stores near colleges where Napster use is rampant.

That might not be all Napster's fault, though. Those Web-enabled students could simply be ordering CDs through online retailers. Moreover, the SoundScan survey contradicts two other independent studies. Forrester Research found that Napster is actually *increasing* CD sales, and Webnoize concluded that Napster is helping to create buzz that will help sales in the future. Nationwide, there's no evidence the record companies are hurting. In the first quarter of 2000, CD sales jumped 8% from the year before, to 177 million units, according to SoundScan. The record labels could still win the injunction, but it would be a lot easier if Napster were obviously pummeling their business. It's not.

If Napster does survive the injunction motion, the future becomes very interesting. Sure, the record industry could wait months or longer to kill Napster in a jury trial—even as millions of new users get initiated into the delights of free music. Or it could deal. Hummer, for his part, could continue to chew the scenery in his David vs. the Goliaths drama, and try to build his business under the constant threat of legal annihilation. Or he could deal too.

What about all those CDs that won't be sold because people are stealing music on Napster? Well, think back to the Forrester and Webnoize surveys. Maybe those CDs—and more—*are* being sold after all. MP3 files, as it turns out, are a poor substitute for CDs. The sound quality is mediocre. Creating a CD from Napster can take two hours of laboriously downloading and reformatting tunes one at a time, not to mention a $300 CD burner and other hardware.

Why, then, do kids adore Napster? We put the question to veteran (six months) Napster fan John Garret Denise, 17, of Princeton, N.J. Denise uses the service to check out songs that his friends turn him on to. If he likes what he hears, he buys the CD. In other words, for Denise, Napster isn't a substitute for a bought-and-paid-for CD; it's an improved, cyberspace version of

> "When I realized I'd rather lose $13 million than change Napster, a wonderful feeling of peace came over me."

the radio. On Napster, Denise can sample music he wants to hear, rather than what the DJ wants to play. He can discuss his favorite bands in Napster's chat rooms, and if he digs one tune from someone's collection, or "hot list," he can sample more. In music, buzz is everything. And among computer-literate kids, Napster builds buzz. "This is guerrilla marketing, and we think it's really helping the major labels," says consultant Billy Pidgeon of Jupiter Communications. "We believe that it's via Napster that kids decide to buy CDs."

Pidgeon isn't the only one who thinks so. Jim Guerinot, manager of the band The Offspring, is convinced that MP3 downloads helped his group sell 10.5 million copies of their latest CD, *Americana*, which was produced on the Columbia label. "Everyone said music was a mature business," he says. "Then file sharing came along, and it has enormously boosted sales."

Of course, the songwriters get paid a fee for work that plays on the radio, about 3% of revenues. Hummer has not ruled out sharing revenues with the majors. Perhaps the radio model might be a reasonable starting point. What Hummer won't do is charge for downloading songs, which to date has been the industry's non-negotiable demand. "They want to treat us as just another online retailer," he bellows. "We'll charge by the download when pigs fly."

Chances are good that, sooner or later, the record labels' demands will be swept away by events. Even if the majors close Napster down, there's no going back to the days before free music. Without Napster, music lovers will still trade MP3 files using Gnutella or Freenet, and unlike Napster, those alternatives are virtually impossible to eradicate. Gnutella, for example, isn't a company at all, merely a maverick software program that users store and transfer on their PCs.

Another inevitability: The music industry will have to improve its own online offerings. Sony has already begun selling downloadable singles for $2.49 through retailers' Websites. They will feature higher-quality sound than MP3 and, needless to say, will be encoded to prevent piracy. Don't even think about uploading them to Napster.

The industry is already discussing digital-music delivery that is more than just an online extension of the current retailing system. Warner and EMI, for example, are talking about providing subscription plans—perhaps for $10 to $20 a month—that give customers carte blanche to roam through the label's entire catalog, chat online with artists, and sample certain songs for free. Without Napster, such innovation would probably have come later. "It's been a wake-up call for the entire industry," admits Paul Vidich, executive vice president of Warner Music.

Hummer has left his size-15 footprints on the industry in other ways as well. Simply by keeping Napster alive, he has introduced millions of new Napsterites to free music and made it harder for the industry to turn back the clock. But what he'd really like is to see Napster at peace with the record companies. A rapprochement could open the way to profits, perhaps from feeding the industry data on who's downloading music or from selling CDs and merchandise. Seated in his giant paneled kitchen overlooking the Bay, Hummer turns reflective. "It's two worlds colliding—us and the record companies," he rumbles. "But they're feeling my presence." ◼

FEEDBACK? shully@fortunemail.com