GLENN D. POMERANTZ (State Bar No. 112503)
KELLY M. KLAUS (State Bar No. 161091)
ERIC J. LORENZINI (State Bar No. 218433)
SUSAN T. BOYD (State Bar No. 229664)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071-1560
Telephone:     (213) 683-9100
Facsimile:      (213) 687-3702
Attorneys for UMG Plaintiffs

PETER L. SIMMONS
MITCHELL EPNER
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, NY  10004-1980
Telephone:     (212) 859-8000
Facsimile:      (212) 859-4000
Attorneys for EMI Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NAPSTER, INC. COPYRIGHT LITIGATION | CASE NO.  C-MDL-00-1369 (MHP) |
| | **UMG AND EMI'S NOTICE OF MOTION AND MOTION FOR TERMINATING SANCTIONS OR, ALTERNATIVELY, FOR EVIDENTIARY SANCTIONS FOR INTENTIONAL SPOLIATION OF EVIDENCE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| | Date:  July 17, 2006 Time: 2:00 p.m. Ctrm: 15 (Hon. Marilyn Hall Patel) |
| This Document Relates to: | |
| UMG RECORDINGS, INC., et al., Plaintiffs, v. HUMMER WINBLAD VENTURE PARTNERS, et al., Defendants. | CASE NO.  C 04-1166 (MHP) |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on July 17, 2006, at 2:00 p.m., or as soon thereafter as counsel may be heard in Courtroom 15 of the above-captioned Court, located at 450 Golden Gate Avenue, San Francisco, California, plaintiffs and counterclaim defendants UMG Recordings, Inc., Interscope Records, and Motown Record Company, L.P. (collectively, "UMG") and plaintiffs and counterclaim defendants Capitol Records, Inc., Caroline Records, Inc., Noo Trybe Records, Inc., Virgin Records America, Inc., Narada Productions, Inc., Higher Octave Music, Inc., Priority Records, LLC, The Forefront Communications Group, Inc., Jubilee Communications Inc., and EMI Christian Music Group, Inc. (collectively, "EMI") (UMG and EMI are referred to jointly as "Plaintiffs"), will and hereby do move, pursuant to the Court's inherent sanctioning authority, for (1) (a) an order of default judgment against Defendants Hummer Winblad Venture Partners, Hummer Winblad Venture Partners IV, L.P., Hummer Winblad Technology Fund IV, L.P., Hummer Winblad Equity Partners IV LLC, John Hummer and Hank Barry (collectively, "Hummer Winblad" or "Hummer"), or (b) alternatively, an order precluding Hummer Winblad from contesting the issues on which their deletion instructions have deprived Plaintiffs of evidence (including these Defendants' intention to induce continued and expanded infringement through Napster, as well as their knowledge of that infringing activity; their material contribution to that infringement; and their financial interest in, and their right and ability to supervise and control, that infringement), as well as an instruction telling the jury that Hummer Winblad intentionally destroyed relevant evidence and that the jury may draw the inference that the destroyed material was harmful to Hummer's position; and (2) an order imposing monetary sanctions against the Hummer Winblad defendants.  This motion is brought on the grounds that Hummer Winblad willfully destroyed relevant evidence while Hummer was under a duty to preserve that evidence, which willful destruction has prejudiced Plaintiffs' ability to present their claims and to respond to Hummer Winblad's counterclaim and defenses.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Susan Traub Boyd filed concurrently herewith, the Compendium of Documents Missing from the Hummer Winblad Document Production filed

1    concurrently herewith, the pleadings on file in this action, and on such other and further matters

2    as may be presented at or before the hearing on this motion.

3

4

5    DATED:  June 9, 2006                              /s/
                                        _____
                                        GLENN D. POMERANTZ
6                                       MUNGER, TOLLES & OLSON LLP
                                        355 South Grand Avenue
7                                       Thirty-Fifth Floor
                                        Los Angeles, CA  90071-1560
8                                       Telephone:      (213) 683-9100
                                        Facsimile:      (213) 687-3702

9                                       Attorneys for Plaintiffs
                                        UMG RECORDINGS, INC., INTERSCOPE RECORDS,
10                                      and MOTOWN RECORD COMPANY, L.P.

11   DATED:  June 9, 2006                              /s/
                                        _____
                                        PETER L. SIMMONS
12                                      FRIED, FRANK, HARRIS, SHRIVER &
                                          JACOBSON LLP
13                                      One New York Plaza
                                        New York, NY 10004
14                                      Telephone:      (212) 859-8000
                                        Facsimile:      (212) 859-4000

15
                                        Attorneys for Plaintiffs
16                                      CAPITOL RECORDS, INC., CAROLINE RECORDS,
                                        INC., NOO TRYBE RECORDS, INC., VIRGIN
17                                      RECORDS AMERICA, INC., NARADA
                                        PRODUCTIONS, INC., HIGHER OCTAVE MUSIC,
18                                      INC., PRIORITY RECORDS, LLC, THE FOREFRONT
                                        COMMUNICATIONS GROUP, INC., JUBILEE
19                                      COMMUNICATIONS INC., and EMI CHRISTIAN
                                        MUSIC GROUP, INC.
20

21

22

23

24

25

26

27

28

NOTICE OF MOT. & MOT. FOR SPOLIATION
SANCTIONS; MEMORANDUM OF P.'S & A.'S
C-MDL-00-1369 (MHP)

# I.   __INTRODUCTION__

Throughout this litigation, Plaintiffs have tried to discover why Hummer Winblad – a high-tech venture capital firm whose partners use email on a daily basis – produced virtually no emails or other electronic documents while everyone else produced reams upon reams of such electronic communications.  Plaintiffs knew from numerous other sources (including the Napster computer servers) that the Hummer Winblad document production should have been voluminous.  Indeed, other parties were producing emails that were sent to or from a Hummer Winblad email account ("humwin.com") that Hummer itself did not produce.  However, it was clear that emails produced by third parties reflected but a small subset of what Hummer should have produced.

Hummer's explanation for the manifest gaps in its document production was a classic stonewall.  Although Hummer Winblad definitively and repeatedly represented that it had retained all Napster-related documents from the time it invested in Napster in May 2000 to the present (as it had a legal duty to do), Hummer offered no factual explanation for the gaping holes in its production other than to keep insisting that it in fact retained and produced everything.  Hummer Winblad went so far as to *disclaim* any technological or other routine "automatic disposal" explanation for the missing documents.

The truth finally came out on April 28, 2006.  On that day – the very last business day before the April 30 close of discovery and after millions of dollars had already been spent on discovery – Hummer Winblad's counsel mailed out "a handful of documents that should have been produced previously," but that counsel said had been "found" in the course of complying with Judge Cahill's orders.  Buried in that stack of late-produced documents was the answer to the missing documents.  On June 3, 2000 – in the middle of the *Napster I* litigation, just two weeks after Hummer Winblad invested in Napster, and one week after Hummer Winblad received its first subpoenas from the *Napster I* plaintiffs – Hummer Winblad name partner Ann Winblad sent an email on instructions from defendant and fellow partner Hank Barry (by then also installed as Napster's CEO) advising every Hummer

Winblad partner and employee involved with Napster to *delete* all relevant emails so that they would not have to be turned over in the litigation:

> Please also be aware of our email policy.  As we have all been required to surrender Napster e-mails, this should reinforce compliance with our longstanding policies.  (1) we do not retain emails, *it is your responsibility to delete your handled emails immediately...(3) we do not retain written copies of emails in our files.*

Declaration of Susan Traub Boyd submitted concurrently herewith ("Boyd Decl.") at Exh. 1 (emphasis added).[1]

And "delete [their] handled emails" they did – knowingly and intentionally – at all levels of Hummer Winblad, including defendants John Hummer and Hank Barry.  The Hummer destruction continued throughout the *Napster I* litigation (including the *Katz* litigation where Hummer Winblad and Barry were named defendants); the *Napster* stockholder action in Delaware (where Hummer and Barry were named defendants); the *Napster* bankruptcy litigation; and threatened lawsuits by various record labels that ultimately culminated in the instant litigation.  The destruction was so successful that the Hummer Winblad document production in this lawsuit contained *less than 300 emails for a period of three-plus years*.  That equates to less than 3 emails per week for what was certainly Hummer's most high profile, labor-intensive and litigation-bound investment ever.  Notably, based on emails Hummer Winblad produced in response to subpoenas in May 2000 (before the marching orders to delete were disseminated), it is known that in just the *one week* immediately following its investment in Napster, Hummer generated approximately 272 Napster-related emails – roughly the same number of emails that Hummer Winblad tried to represent was the *entirety* of its Napster-related emails over the following three years.

---

[1] This email was apparently retained because someone printed a hard copy of it, ironically in direct contravention of Winblad's and Barry's explicit instructions.  We also note that Friday, April 28, 2006 – the date Hummer Winblad finally produced the Winblad-Barry email – was not only the effective end of the discovery period.  It was also two days *after* Ms. Winblad's deposition, where she testified under penalty of perjury that all Napster-related documents were preserved pursuant to a retention notice she had received, *see* Boyd Decl. at Exh. 2, Deposition of Ann Winblad ("Winblad Dep.") at 259:9-260:18, but which has never been produced in this case.  Ms. Winblad never mentioned in her deposition that she had sent an email instructing Hummer personnel to delete their Napster emails.

1    In a case that depends in large part on proof of intent, material contribution, and right

2    and ability to control, Hummer Winblad knew exactly what it was destroying – the clearest

3    evidence of its intimate involvement in the activities of Napster and the mass infringement

4    taking place on that system.  Hummer Winblad systematically and intentionally destroyed its

5    Napster-related documents to hide its material contribution to the ongoing infringements, and

6    its numerous (indeed, intentional) efforts to induce those infringements to continue and grow.

7    And we finally have its fingerprints on the evidence showing the deliberate effort by

8    Hummer Winblad to make sure that this critical evidence never saw the light of day.

9    The law is clear that where (as here) a party indisputably is in reasonable anticipation

10   of litigation, that party has a duty to *preserve* evidence that may be relevant to that litigation.

11   The law also is clear that where (as here) the evidence shows that the party instead destroyed

12   such documents, and that it did so willfully, the Court has ample inherent authority to protect

13   other parties to the case and the integrity of the judicial process by imposing meaningful

14   sanctions.  Hummer Winblad's conduct here is so "utterly inconsistent with the orderly

15   administration of justice," *Wyle v. R.J. Reynolds Indus., Inc.* 709 F.2d 585, 589 (9th Cir.

16   1983), as to warrant terminating sanctions against the Hummer Winblad defendants.

17   Alternatively, and at a minimum, Plaintiffs are entitled to an order (a) precluding the

18   Hummer Winblad defendants from contesting the issues on which their deletion instructions

19   have deprived Plaintiffs of evidence (including, among other issues, their intent to induce

20   continued and expanded infringement through Napster, as well as their knowledge of that

21   infringing activity; their material contribution to that infringement; and their financial interest

22   in, and their right and ability to supervise and control, that infringement); and (b) granting an

23   adverse inference instruction, which tells the jury that Hummer Winblad intentionally

24   destroyed relevant evidence and that the jury may thereby infer that the destroyed material

25   was harmful to Hummer's position.  In all events, Plaintiffs are entitled to be reimbursed for

26   their attorneys' fees and costs incurred in having to ferret out this destruction of evidence,

27   and additional monetary sanctions should be imposed for this affront to the judicial system.

28

1

## II.   BACKGROUND

2

**A.     Hummer Winblad Reasonably Anticipated Litigation From The Start Of Its**
**Napster Involvement And Was Fully Aware Of Its Obligation To Preserve**

3

**Documents.**

4

The facts make clear that, even before it invested in Napster in May 2000, Hummer

5

Winblad was fully aware of the litigation that had been filed against Napster by the record

6

companies and by a putative class of music publishers.  In fact, in evaluating the legal risk to

7

itself in making its Napster investment, Hummer Winblad conducted due diligence regarding

8

these litigations.  Boyd Decl. at Exh. 3, Deposition of John Hummer ("Hummer Dep.") at

9

68:9-19 (Hummer Winblad conducted legal due diligence and obtained opinion from

10

Fenwick & West); *id*. at Exh. 4 (Hummer Winblad due diligence checklist requesting, *inter*

11

*alia*, "description of any claims or litigation . . ." and "[a]ll active litigation files"); *id.* at Exh.

12

5, Deposition of Dan Beldy ("Beldy Dep.") at 40:3-25 (when evaluating the Napster

13

investment, Hummer Winblad concluded that "there was legal risk").  Indeed, Barry admitted

14

in a declaration to this Court that Hummer Winblad specifically factored in that litigation risk

15

when deciding what price to pay for its Napster investment.  *Id.* at Exh. 6, ¶ 7.

16

Even *before* Hummer Winblad signed its actual deal with Napster, it entered into a

17

written "Common Interest & Defense Agreement" with Napster.  *See* Boyd Decl. at Exh. 7.

18

The agreement was necessary, Hummer Winblad wrote, because Napster and Hummer

19

Winblad shared "common legal interests in connection with the legal defense" of claims

20

against Napster and related parties.  *Id*.  Similarly, at least as early as December 2000,

21

Hummer Winblad was negotiating to sign onto the pre-existing 1999 joint defense agreement

22

in *Napster I* because of "actions involving Napster, Inc. that are or may become pending

23

against [them] or in which any of them may be a witness, including but not limited to

24

[*Napster I*] and [*Katz*]."  Boyd Decl. at Exh. 8 (draft Joint Defense Agreement listing

25

Hummer Winblad as a signatory).

26

Hummer Winblad's anticipation that its own documents would be sought in the

27

*Napster* litigation was proved correct almost immediately after its investment.  On May 26,

28

2000, the *Napster I* plaintiffs served document subpoenas and deposition notices on Messrs.

NOTICE OF MOT. & MOT. FOR SPOLIATION
SANCTIONS; MEMORANDUM OF P.'S & A.'S
C-MDL-00-1369 (MHP)

1   Hummer and Barry, *see* Boyd Decl. at Exh. 9, which Hummer Winblad properly understood

2   to apply to "everybody at Humwin." *Id*. at Exh. 10.  Less than two months later, in July of

3   2000, Matthew Katz filed a complaint against both Hummer Winblad and Mr. Barry. *Id.* at

4   Exh. 11.  Hummer Winblad's 30(b)(6) witness has admitted that the firm was aware of the

5   *Katz* complaint at the latest by "the late fall of 2000." *See id.* at Exh. 12, Deposition of Todd

6   Forrest ("Forrest Dep.") at 74:6-9.  During this same period, according to Mr. Barry,

7   Universal executive Edgar Bronfman warned Mr. Barry (in June 2000) that "we will sue the

8   venture firm and you people personally." *Id.* at Exh. 13, Deposition of Hank Barry ("Barry

9   Dep.") at 478:18-20 and 479:9-16.  *See also* Boyd Decl. at Exh. 14 (October 10, 2000 email

10  in which Mr. Barry discusses the fact that Hillary Rosen of the RIAA is "definitely, explicitly

11  threatening the venture firm").

12       The *Katz* complaint against Hummer Winblad was not dismissed until July 2001.

13  Although the court dismissed Katz's claims against Barry and Hummer Winblad, the pre-

14  existing *Napster* litigation continued, as did the assertions that Hummer Winblad was liable

15  (and would be sued) for contributory and vicarious infringement for its actions regarding the

16  Napster service.[2]  Within a month of the *Katz* dismissal, counsel for certain *Napster I*

17  Plaintiffs (including UMG and EMI) wrote to Hummer Winblad to detail the basis for the

18  current suit.  *See id.* at Exh. 15.  Hummer properly understood from this letter that there was

19  a "very serious[]" likelihood that the instant litigation would ensue.  *Id*. at Exh. 16. *see also*

20  *id.* at Exh. 17 (August 2001 email in which Mr. Barry discusses a "threatening letter" from

21  the RIAA, seeking to impose liability on Hummer Winblad for "Napster's infringements").

22  Messrs. Hummer and Barry likewise confirmed being aware in 2001 and 2002 of claims

23  threatened by EMI and UMG (*id.* at Exh. 3, John Hummer Dep. 214-215), and of discussing

24  with Bertelsmann CEO Thomas Middelhoff their concern that they might face personal

25  liability.  *Id.* at Exh. 3, John Hummer Dep. at 218-219; *id.* at Exh. 13, Barry Dep. 39-50

26  (Barry testimony that Middelhoff, in April 2001, promised to indemnify him for his Napster

27  
_____

28  [2]   Hummer Winblad acknowledges that its preservation obligations did not stop after the *Katz* dismissal.  *See* Boyd Decl. at Exh. 12, Forrest Dep. at 86:21-87:24 & 99:10-100:2.

1    liability risk).  On top of this, in March 2002, John Hummer and Hank Barry were sued in

2    Delaware concerning their service as Napster directors (*id.* at Exh. 18), and in June 2002,

3    Napster filed for bankruptcy, making Hummer Winblad a party in interest to that legal

4    proceeding as well.  *See* 11 U.S.C. § 1109(b).

5            In view of the actual and threatened litigation, Hummer Winblad, through its

6    designated corporate representative (Mr. Forrest), *admitted* in deposition, as it had to, that it

7    had a duty to preserve Napster-related documents that arose at least by May 2000, and which

8    has continued to exist continuously thereafter.  Boyd Decl. at Exh. 12, Forrest Dep. at 11:8-

9    12:1, 88:20-89:6, 99:10-100:2.  Mr. Forrest testified that Hummer Winblad attempted to meet

10   these retention obligations by placing relevant personnel under continuous instructions to

11   retain Napster-related documents:

12           Q:     So, upon receipt of the subpoena [in May of 2000], the relevant
             individuals were instructed generally to keep documents surrounding Napster.
13           Is that accurate?

14           A:     That's an accurate statement, yeah.  Again, I don't know specifically
             what they were instructed to keep, but, again, based on our standard practice.
15

16           *Q:     Right.  And those instructions to retain documents continued through
             the relevant period that you're here to testify to today?*

17           *A:     That's correct.*

18   *id.* at 88:20-89:6 (emphasis added).  *See also id.* at 78:24-79:7, 86:21-87:1 (employees were

19   instructed "not to delete or destroy electronic or hard copy documents" upon receipt of the

20   May 2000 Hummer and Barry subpoenas and were never instructed that "they were no longer

21   under an obligation to retain documents").  Of course, Mr. Forrest gave this testimony before

22   disclosure to Plaintiffs of the Winblad-Barry email instructing Hummer Winblad employees

23   to delete "handled emails immediately."  Boyd Decl. at Exh. 1.

24           In addition to the obligation to preserve documents because of the subpoenas in the

25   *Napster I* litigation (Forrest Dep. at 78:24-79:7), the *Katz* litigation (*id.* at 74:6-9) and in

26   response to the receipt of the letter from *Napster I* Plaintiffs' counsel laying out the grounds

27   for this litigation (*id.* at 98:8-100:2), Mr. Forrest testified that Hummer Winblad was also

28   required to preserve Napster related documents according to its own internal guidelines.

NOTICE OF MOT. & MOT. FOR SPOLIATION
SANCTIONS; MEMORANDUM OF P.'S & A.'S
C-MDL-00-1369 (MHP)

1   Touting a "public" document retention policy, Mr. Forrest testified that the relevant Hummer

2   Winblad entities were instructed, continuously since 2000:

3
> Upon learning of any litigation matter involving the Company or a portfolio
> company, all records relating to the portfolio company or relating to the

4
> subject matter of the Company should be retained pending advice from
> outside counsel.  This means that, if possible, all relevant email and voice mail

5
> should be backed up prior to automatic purging.

6   Boyd Decl., at Exh. 19; *id.* at Exh. 12, Forrest Dep. at 17:11-25.[3]  Because Napster was a

7   "portfolio company" involved in a "litigation matter," this provision required the retention of

8   all Napster-related documents *from the moment that Hummer Winblad invested in Napster*, if

9   not before.  Mr. Forrest testified that, in practice, Hummer Winblad had actually been *more*

10  protective of preserving potentially relevant documents than the supposedly applicable policy

11  required.  He said (among other things) that while the policy refers to "automatic purging," in

12  fact, "there is no automatic disposal of anyone's e-mail."  *Id.* at 22:15-23:11.  Mr. Forrest

13  claimed that Hummer Winblad *did* purport to follow the above-quoted provision, by placing

14  relevant personnel under a continuous obligation to preserve Napster-related documents

15  beginning in late May of 2000.  *See id.* at 42:11-43:7, 76:10-79:7.  As explained below,

16  however, Mr. Forrest's testimony cannot be reconciled with the Winblad-Barry email, or the

17  overwhelming evidence of the inadequacies of Hummer Winblad's document production.

18  **B.**   **Hummer Winblad's Patently Incomplete Document Production**

19       In this litigation, Hummer Winblad and Bertelsmann were each served with

20  substantially similar document requests.  *See* Boyd Decl. at Exh. 20.  Those requests sought,

21  among other things, all communications relating to Napster up through the filing of Plaintiffs

22  complaint in 2003.  In response, Hummer Winblad produced *less than 300* emails that could

23  conceivably have been preserved on the Hummer Winblad electronic servers.[4]  The paucity

24

---

25  [3] The public document retention policy states on its face that it applies to "Hummer Winblad
    Equity Partners III" but also applies in practice to defendant "Hummer Winblad Equity
    Partners IV."  Boyd Decl. at Exh. 12, Forrest Dep. at 37:25-38:5.

26  [4] Hummer Winblad has produced only approximately 568 email documents in this litigation

27  (excluding documents originally produced by non-Hummer Winblad sources that were then
    *reproduced* by Hummer Winblad – simply by slapping on a new Bates Number).  *See* Boyd

28  Decl. ¶¶ 7-8 and Exh. 38.  But roughly half of these (approximately 287) consist of redacted
    communications between Hummer Winblad and its attorneys, produced from the *files of*

of documents produced from the Hummer Winblad server is highly significant because that server would have been the principal source for the purely *internal* communications among the Hummer Winblad personnel, writing from their "humwin.com" accounts about Napster. Hummer Winblad's total document production in this case is alarmingly small.[5]

The lack of internal Hummer Winblad emails after June 3, 2000 (the date of the Winblad-Barry email instructing employees to "delete handled emails immediately") is fundamentally at odds with the fact that these defendants were prolific email users, as evidenced by their response to the May 26, 2000 subpoenas in the *Napster I* litigation. That production included approximately 271 emails (including approximately 89 strictly *internal* emails) from a period of only seven days (between May 20, 2000 and May 26, 2000).[6]

As telling as these numbers are, however, they are only part of the story. The rest of the story is confirmed by the document productions made by third parties which conclusively shows that Hummer Winblad employees (including Hummer and Barry) were using their Hummer Winblad accounts on a regular basis to send and receive emails relating to Napster. As such, these emails (preserved by other parties) provide concrete evidence of the palpable prejudice to Plaintiffs. They demonstrate that Hummer Winblad's intentional destruction policy cut across documents relevant to every major liability issue in the case. *See*

---

*those attorneys – but not* preserved on and produced from the Hummer Winblad server. *See id.* ¶ 7 and Exh. 38. The fact that these emails are available only from the files of Hummer Winblad's attorneys is further proof that the files were not being properly preserved by *Hummer Winblad* personnel on the *Hummer Winblad* servers. That leaves only approximately 281 emails that even *conceivably* have been preserved on and produced from the Hummer Winblad electronic servers.

[5] The Hummer Winblad document production consisted of only about 4,000 documents, whereas Bertelsmann produced over 45,000 documents. Boyd Decl. ¶¶ 3-4. The UMG Plaintiffs have produced over 50,000 documents, and the EMI Plaintiffs have produced over 144,000 documents. *Id.* ¶¶ 5-6. While Hummer Winblad likes to point out that it is a much smaller organization than these other entities, it neglects to mention that the proportion of people inside its organization concerned with Napster (the highest profile investment the firm ever made) was so high as to make an 11:1 (or as compared to EMI, nearly 30:1) discrepancy in volume of productions impossible to fathom.

[6] In this litigation, these documents bear the prefix N_HW, and were retrieved by Plaintiffs by contacting the law firm of Mitchell, Silverberg and Knupp. Boyd Decl. ¶ 9. This production also includes 13 miscellaneous emails of an earlier date.

Compendium of Documents Missing from the Hummer Winblad Document Production

("Comp. of Missing Documents").[7]:

- October 8, 2000 email exchange between Messrs. Hummer and Barry (at Mr. Hummer's "humwin.com" email address) regarding a billionaire investor whom the two were trying to lure into a Napster investment – but whom Mr. Barry said would back down on his request for a Board seat "once he gets some counsel." This email not only highlights Hummer Winblad's understanding of the illegal nature of the Napster system, but it also show Hummer Winblad's right and ability to control all aspects of the Napster system. Comp. of Missing Documents at Dep. Exh. 248 (retrieved by Plaintiffs from the files of the Napster trustee; not produced by Hummer or its attorneys or agents, Boyd Decl. ¶ 28).

- May 29, 2000 email written by Hank Barry (from his "humwin.com" email address) in which Mr. Barry states his concern that users "will leave the [Napster] system if it is not convenient and comprehensive" and then suggests that for each song "[u]ntil an official [*i.e.* authorized] version is posted, the nonofficial version will still be up and can be shared exactly as today." This email evidences Hummer Winblad's intentional inducement of continued and expanded infringement to maintain and grow the highly valuable infringing base of Napster users as well as a clear understanding that authorization from the copyright owners was necessary. Comp. of Missing Documents at Dep. Exh. 3162 (retrieved by Plaintiffs from the Napster CDs not produced by Hummer or its attorneys or agents, Boyd Decl. ¶ 40).

- June 27, 2000 email, from Napster attorney David Hayes to Messrs. Hummer, Barry, and Olin (at their "humwin.com" email addresses) discussing whether Napster should "set up an elaborate control system" to police its users, and forwarding a June 26, 2000 email discussing the fact that Napster was expecting to receive over a million "takedown notices." This email chain is highly relevant to show Hummer Winblad's knowledge of infringing activity – it was anticipating receiving a million takedown notices – and its right and ability to supervise the activity taking place every day on Napster.[8] Comp. of Missing Documents at Dep. Exh. 205 (retrieved by Plaintiffs from the Napster servers; not produced by Hummer or its attorneys or agents, Boyd Decl. ¶ 20).

- October 15, 2000 email from Boies Schiller, sent to Mr. Barry's Napster and "humwin.com" email addresses, advising Mr. Barry not to "alter the decentralized nature" of the Napster technology. Once again, this email

---

[7] The Comp. of Missing Documents contains dozens of highly-relevant documents, including emails sent or received from a Hummer Winblad email address ("humwin.com") and letters sent or received by Hummer Winblad personnel, that were missing from Hummer Winblad's document production. *See* Boyd Decl. ¶¶ 10-44. These documents were retrieved by Plaintiffs, at their own expense, from the Napster servers and files, or produced in this litigation by parties *other than* Hummer Winblad. *Id.* For convenience, Plaintiffs refer to these documents using the "deposition exhibit" (or "Dep. Exh.") number assigned to the document when it was introduced during a deposition in this litigation, as applicable. By contrast, documents attached to the concurrently filed Boyd Declaration are referred to as "exhibits" (or "Exh.").

[8] The "privilege" designation on this and other documents does not explain Hummer's failure to produce it. Any privilige belonged only to Napster and was waived by its Trustee.

highlights Hummer's Winblad right and ability to supervise the activity on the Napster system, as well as its efforts to willfully blind itself to knowledge of that activity.  Comp. of Missing Documents at Dep. Exh. 203 (retrieved by Plaintiffs from the files of the Napster trustee; not produced by Hummer or its attorneys or agents, Boyd Decl. ¶ 19).

- September 23, 2000 email written by John Hummer and sent from his "humwin.com" email account, discussing Napster business strategy and stating "30 MM folks in Napster nation translate into a multi, multi billion dollar business."  This email, too, shows Hummer Winblad's intent to maintain and expand the infringing user base to line its own pockets.  Comp. of Missing Documents at Dep. Exh. 165 (produced by defendant Bertelsmann; not produced by Hummer or its attorneys or agents, Boyd Decl. ¶ 11).

- September 25, 2000 email chain between Mr. Olin (at his "humwin.com" email address), Mr. Barry, and Napster attorneys discussing Napster settlement strategy.  On September 24, a Napster attorney writes "it is clearly the case that we need all plaintiffs to be in."  This email refutes Hummer's position in this litigation, that is was the record companies (not Napster) that insisted on a "global" settlement.  Comp. of Missing Documents at Dep. Exh. 199 (retrieved by Plaintiffs from the Napster CDs; not produced by Hummer or its attorneys or agents, Boyd Decl. ¶ 18).

Each of these emails is relevant and responsive to Plaintiffs' earliest requests; each was indisputably within Hummer's possession, custody, or control following its anticipation of litigation; and each was not produced by Hummer Winblad.  Plaintiffs have identified scores of other documents that indisputably were within Hummer's possession at one time but which it has failed to produce.  *See* Boyd Decl. ¶¶ 10-44; Comp. of Missing Documents. Many of these are email chains, where Hummer has produced *none* of the included emails.

The documents missing from Hummer's production are not limited to emails.  For example, Mr. Hummer was copied on a March 21, 2001 letter including "a list of the titles of musical compositions" controlled by Hamstein Music Company, which is directly relevant to establish that Mr. Hummer received notice of alleged infringements on the Napster service. *See* Comp. of Missing Documents at Exh. 1472.  Similarly, on December 13, 2001, Mr. Barry wrote to Napster attorney Jonathan Schwartz, indicating that Mr. Barry had conducted a search of his email in response to a Justice Department CID issued to Napster, and forwarding a list of emails.  *See* Comp. of Missing Documents at B-128304 (for reasons unknown to Plaintiffs, defendant Bertelsmann apparently received and retained the letter).

1    Plaintiffs have been unable to find this letter, or the documents described in it, within the

2    Hummer Winblad document production.  *See* Boyd Decl. ¶ 44.

3         In short, a variety of documents known to be sent or received by Hummer Winblad

4    personnel have been produced in this case only because parties *other* than Hummer Winblad

5    preserved and produced them.  But they are only the tip of the iceberg.  The prejudice to

6    Plaintiffs is far worse than can ever be revealed by the few documents that Plaintiffs were

7    able to cobble together, at great expense, from other sources.  The rest of the iceberg has

8    been destroyed by Hummer Winblad's document destruction policy as set forth in the

9    Winblad-Barry email.  Precisely because Hummer Winblad destroyed immeasurable amounts

10   of relevant evidence, Plaintiffs will *never* know the full extent of relevant documents that

11   have been placed out of discovery's reach.  *No* third party source can ever recreate the purely

12   *internal* communications among the Hummer Winblad defendants that were destroyed

13   pursuant to Hummer's intentional deletion policy.

14   **C.   Hummer Winblad Stonewalls When Pressed To Explain The Manifest Gaps In Its Production**

15
16        For nearly a year, Plaintiffs have been trying, without success, to determine why

17   Hummer Winblad's production was undeniably light on relevant documents.  In July 2005,

18   Plaintiffs' counsel alerted Hummer's counsel that document productions from other sources

19   contained large quantities of documents sent to or from Hummer Winblad, but that Hummer

20   had not produced, including as an example a December 2001 communication from Mr. Barry

21   to Napster General Counsel Jonathan Schwartz, purportedly forwarded a list of emails (all of

22   which should have been retained and produced here).  *See* Boyd Decl. at Exh. 21.

23        Hummer Winblad responded with the boilerplate assertion that its efforts in the

24   production of documents was "diligent."  Boyd Decl. at Exh. 22.  After Plaintiffs reiterated

25   their request for an explanation, *id.* at Exh. 23, and one was not forthcoming, Plaintiffs

26   noticed a 30(b)(6) deposition of Hummer concerning its document preservation and

27   collection efforts.  *Id.* at Exh. 24.  Hummer partner Todd Forrest testified for these

28   defendants.  *Id.* at Exh. 12.  The Forrest deposition resulted in more blanket assertions of

NOTICE OF MOT. & MOT. FOR SPOLIATION
SANCTIONS; MEMORANDUM OF P.'S & A.'S
C-MDL-00-1369 (MHP)

1  continuous preservation, with *no* explanation as to how those assertions could be squared

2  with the obvious gaps in Hummer Winblad's production.

3       In discussing the many emails that Plaintiffs identified as sent or received from a

4  Hummer Winblad email account, but that were only produced by parties *other* than Hummer

5  Winblad, Mr. Forrest conceded that: (1) the email was sent or received from a Hummer

6  Winblad email address; (2) the email *should* have been retained by Hummer Winblad; and

7  (3) *had the email been retained*, it would have been collected in response to Plaintiffs'

8  request for production.  *See* Boyd Decl. at Exh. 12, Forrest Dep. at 151:20-154:11 (Dep. Exh.

9  205); *id.* at 154:17-155:23 (Dep. Exh. 216); *id.* at 158:20-159:18 (Dep. Exh. 231); *id.* at

10 159:20-161:4 (Dep. Exh. 241); *id.* at 161:5-162:16 (Dep. Exh. 248); *id.* at 162:17–164:21

11 (Dep. Exh. 264); *id.* at 148:18–150:1 (Dep. Exh. 686); *id.* at 178:13-22 (Dep. Exh. 1472); *id.*

12 at 181:7-183:15 (Dep. Exh. 1473).  *See also* Boyd Decl. at Exh. 2, Winblad Dep. at 260:19-

13 261:14 (Dep. Exhs. 4209 and 4210).

14       Plaintiffs' numerous, subsequent requests for an explanation were similarly

15 unavailing.  *See* Boyd Decl. at Exhs. 25-27.  Hummer Winblad responded with more

16 platitudes, stating that "the Hummer Winblad Defendant's actions have at all times been

17 reasonable and appropriate."  *Id.* at Exh. 28.  On March 13, 2006 – only weeks before the

18 discovery cut-off – Hummer made a supplemental production of a handful of additional

19 documents, some of which had never been received before from *any* source.[9]  *Id.* at Exh. 29.

20 This "supplemental production" thus raised entirely new questions about Hummer Winblad's

21 collection efforts, without providing any answers.  The smattering of additional documents

22 left intact the dozens of unexplained gaps in the Hummer Winblad document production.

23 Plaintiffs' further requests for specific explanation once again went unheeded.  *Id.* at Exh. 31.

24

25 ─────────────────

26 [9] One of the suddenly discovered documents – produced after the depositions of all the
relevant people had already been taken – was an email from Hank Barry referring to a
"quasi-Board meeting for Napster (with Middelhoff, Joel Klein and others)."  Boyd Decl. at
27 Exh. 30.  Given that Bertelsmann claims to have had no role in running Napster, the fact that
Bertelsmann executives (Messrs. Middelhoff and Klein) were, according to Mr. Barry's
28 notes, *de facto* directors on Napster's Board is obviously highly relevant to this litigation.

1   Hummer again said its "document collection and production efforts have been reasonable and

2   appropriate." *Id*. at Exh. 32.

3   **D.      The Truth Comes To Light:  Hummer's Post-Eleventh Hour Production Of The
        Winblad-Barry Email**

4

5          On April 28, 2006, the last Friday of the discovery phase, Hummer mailed out "a

6   handful of documents that should have been produced previously."  Boyd Decl. at Exh. 1.

7   There, in the middle of the stack of belatedly produced documents, was a June 3, 2000 email,

8   sent from Ms. Winblad to every Napster-related partner and employee in the firm instructing

9   them to destroy all Napster-related documents.  The email was as plain in its orders ("delete

10  your handled e-mails immediately," "we do not retain written copies of emails in our files,"

11  and "our document retention policy is that we do not retain documents on any public or

12  acquired company and retain limited information on private companies") as it was in its

13  motive ("we have all been required to surrender Napster emails").  *Id*.

14         Ms. Winblad and Mr. Barry justified this destruction order by referring to Hummer

15  Winblad's "long standing document retention policy" (Boyd Decl. at Exh. 1) – a policy

16  which Hummer's 30(b)(6) witness had denied ever existed.  *Id.* at Exh. 12, Forest Dep. at

17  23:2-11, 30:21-23.  Given this testimony, it is clear that the reference to a "long standing

18  policy" was camouflage for the destruction that was about to commence and that continued

19  through the period when all documents should have been retained.  Further, that this email

20  deletion policy was directed by Mr. Barry is particularly significant given that Mr. Barry (a

21  lawyer by training) was the Hummer partner responsible for Napster-related document

22  *retention*.  *See id.* at Exh. 33, Deposition of Chuck Robel ("Robel Dep.") at 206:13-207:3.

23         The Winblad–Barry email was not only produced on the eve of the close of

24  discovery, it was produced just *two days after* Ms. Winblad was deposed and specifically

25  *disclaimed* any policy of email destruction.  Ms. Winblad testified that, to the best of her

26  knowledge, "all of [her] emails relating to Napster were preserved by Hummer Winblad."

27  Boyd Decl. at Exh. 2, Winblad Dep. at 261:15-18.

28         Anything that had anything to do with any – with Napster or anyone

NOTICE OF MOT. & MOT. FOR SPOLIATION
SANCTIONS; MEMORANDUM OF P.'S & A.'S
C-MDL-00-1369 (MHP)

1

2

3

4

> associated with Napster that I might have around.  I just left them where
> they were. . . . If on – if at that moment there were any e-mails in my
> delete box, I didn't delete them.  If there were any e-mails that were still
> sitting in my mailbox that I could delete, I just left them.  And I never – I
> just didn't go through the normal deletion process, as you read them and
> delete and read them and delete, consciously viewed as any that might
> have anything to do with anything to do with Napster, which is left intact.

5   *Id.* at 260:1-4 & 10-18.  Mr. Winblad had no explanation as to why certain emails that

6   Plaintiffs have identified as missing from the Hummer's Document Production, and that Ms.

7   Winblad believes she retained, were not produced.  *See* Boyd Decl. at Exh. 2, Winblad Dep.

8   at 260:19-261:10; Comp. of Missing Documents at Dep. Exhs. 4209 & 4210.

9        It is questionable (to say the least) whether Ms. Winblad – who was deposed just two

10  days before the Winblad-Barry email was finally produced – did not know of that email

11  when she provided this testimony.  And even if Ms. Winblad now says that she did not

12  review the email while preparing for her deposition, there is no explanation for her failure to

13  correct her testimony on this point after the June 3, 2000 email was produced.  (She did

14  correct other portions of her testimony, however.  *See* Boyd Decl. at Exh. 2.)  In all events,

15  Plaintiffs were deprived of the opportunity to cross-examine Ms. Winblad (and the other

16  recipients of the Winblad-Barry email) because of this belated production.

17                              **III.  ARGUMENT**

18       "A federal trial court has the inherent discretionary power to make appropriate

19  evidentiary rulings in response to the destruction or spoliation of relevant evidence."  *Glover*

20  *v. Bic Corporation*, 6 F.3d 1318, 1329 (9th Cir. 1993).  The "failure to preserve property for

21  another's use as evidence in pending or reasonable foreseeable litigation" constitutes

22  spoliation.  *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)

23  ("*Zubulake IV*").  *See also Nat'l Assoc. of Radiation Survivors v. Turnage*, 115 F.R.D. 543,

24  556-57 (N.D. Cal. 1987).

25  **A.    Hummer Winblad Had A Duty To Preserve Relevant Evidence Beginning In**
          **May Of 2000**

26

27       The preservation duty arises once a party "should have known that the evidence may

28  be relevant to future litigation."  *Zubulake IV*, 220 F.R.D. at 216.  The duty to preserve

1    material evidence arises not only during litigation but also extends to that period before the

2    litigation when a party reasonably should know that the evidence may be relevant to

3    anticipated litigation." *Silvestri v. General Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001).

4         Hummer Winblad has *admitted*, at it has to, that it was under a duty to preserve

5    Napster-related documents beginning in May of 2000 as a result of the anticipated and actual

6    group of overlapping lawsuits against Hummer Winblad and its partners.  *See Boyd Decl.*

7    Exh. 12, Forrest Dep. at 78:24-79:5, 88:20-89:6, 99:10-100:2.  Hummer Winblad purported

8    to instruct relevant individuals "to keep documents surrounding Napster" and, according to

9    Hummer Winblad, those instructions "continued through the relevant period [up through and

10   including August 13, 2004]"  *Id*. at 11:8-21, 88:20-89:6.

11        Hummer Winblad's concession is consistent with the overwhelming evidence that it

12   anticipated the instant litigation (and other similar suits such as the *Katz* litigation) from the

13   moment it invested in Napster.  Hummer Winblad invested in Napster well aware of

14   Napster's legal troubles, as revealed through its due diligence process (*see* Boyd Decl. at

15   Exh. 3) and the testimony of its own partners (*id*. at Exh. 3, Hummer Dep. at 68:9-19; *id*. at

16   Exh. 4, Beldy Dep. at 40:3-25).  Indeed, when Messrs. Barry and Hummer took on their roles

17   as Napster CEO and directors, they knew that several current Napster officers had *already*

18   been sued in litigation pending before this Court.  Hummer Winblad – which, among other

19   things, had a duty to indemnify Messrs. Hummer and Barry[10] – thus knew that it would soon

20   be embroiled in the *Napster I* litigation, and took concrete steps to prepare for that

21   eventuality.  Hummer entered into a "Common Interest Defense Agreement" with Napster

22   because the entities shared a "common legal interest."  *Id.* at Exh. 7; *see also id.* at Exh. 8.

23        Ms. Winblad and Mr. Barry's instructions in June 2000 leave *no doubt* that Hummer

24   not only anticipated further Napster litigation, but instituted a policy of destruction, *with just*

25   *that eventuality in mind*.  "*All* emails re: napster at this point are *related to the litigation*,"

26   they wrote.  Boyd Decl. at Exh. 1 (emphasis added).  It was precisely because these

27   _____

28   *See, e.g.,* Boyd Decl. at Exh. 34 (April 3, 2003 letter from Hank Barry to Chuck Robel
     demanding indemnification under the LLC agreements).

1   defendants had been subpoenaed immediately after investing in Napster that they anticipated

2   that their communications would be discoverable in anticipated litigation.  But since they did

3   not want to "surrender" any more communications in discovery, relevant personnel were told

4   – in no uncertain terms – to delete everything.  *Id.*  The email also instructed employees to

5   title all Napster related communications "attorney communications" – another clear marker

6   that the defendants believed these emails were pertinent to litigation.  *See Zubulake IV*, 220

7   F.R.D. at 216-17.  *Accord Barsoum v. NYC Housing Authority*, 202 F.R.D. 396, 398

8   (S.D.N.Y. 2001) (receiving the assistance of counsel demonstrates that litigation reasonably

9   is anticipated).

10          But even if the duty to preserve documents attached at some later date – despite

11   Hummer Winblad's contrary *concession* and the overwhelming evidence – the result is the

12   same.  Throughout the relevant period, numerous successive events triggered Hummer

13   Winblad's duty to preserve Napster-related documents – yet *at no point* did that duty

14   translate into documents actually being preserved:

15   •   Receipt of the *Katz* complaint in the fall of 2000 triggered Hummer Winblad's
        duty to preserve documents.  And yet, numerous missing documents post-date
16      the filing of the *Katz* complaint.  *See, e.g.*, Comp. of Missing Documents at
        Dep. Exh. 1335 (Nov. 25, 2000); *id.* at Dep. Exh. 241 (Dec. 7, 2000); *id.* at
17      Dep. Exh. 656 (Dec. 18, 2000); *id.* at Dep. Exh. 183 (Feb. 8, 2001); *id.* at Dep.
        Exh. 231 (Apr. 26, 2001); *id.* at Dep. Exh. 280 (June 21, 2001); *id.* at Dep.
18      Exh. 1341 (June 21, 2001); *id.* at Dep. Exh. 186 (July 5, 2001); *id.* at Dep.
        Exh. 222 (July 8, 2001); *id.* at Dep. Exh. 275 (Jan. 24, 2002); *id.* at Dep. Exh.
19      267 (Feb. 19, 2002); *id.* at Dep. Exh. 185 (Apr. 21, 2002); *id.* at Dep. Exh. 181
        (May 19, 2002); *id.* at Dep. Exh. 216 (Aug. 9, 2002).
20
21   •   Receipt of the August 2001 letter from Plaintiffs' counsel triggered the duty to
        preserve documents because Hummer Winblad properly understood from this
22      letter that there was a "very serious[]" likelihood that litigation would ensue.
        Boyd Decl. at Exh. 16.  And yet, numerous missing documents post-date
23      receipt of this letter.  *See, e.g.*, Comp. of Missing Documents at Dep. Exh. 275
        (Jan. 24, 2002); *id.* at Dep. Exh. 267  (Feb. 19, 2002); *id.* at Dep. Exh. 185
24      (Apr. 21, 2002); *id.* at Dep. Exh. 181 (May 19, 2002); *id.* at Dep. Exh. 216
        (Aug. 9, 2002).

25   •   In April of 2002, Mr. Hummer was so sure that he would be sued that he
        insisted on indemnity from Bertelsmann, writing "[w]e know we are going to
26      be sued."  *See* Boyd Decl. at Exh. 35.  Numerous missing documents post-
        date Mr. Hummer's unequivocal (and correct) prediction regarding pending
27      litigation.  *See e.g.*, Comp. of Missing Documents at Dep. Exh. 185 (Apr. 21,
        2002); *id.* at Dep. Exh. 181 (May 19, 2002); *id.* at Dep. Exh. 216 (Aug. 9,

28

1          2002).

2

**B.      Hummer Winblad Willfully Destroyed Documents**

3

4          Spoliation of evidence thwarts the "wide access to relevant facts" that "serves the

5   integrity and fairness of the judicial process by promoting the search for the truth." *Shoen v.*

6   *Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993). As this Court has stated, "[w]here one party

7   wrongfully denies another the evidence necessary to establish a fact in dispute, the Court

8   must draw the strongest allowable inferences in favor of the aggrieved party." *National*

9   *Radiation Survivors*, 115 F.R.D. at 557. This is particularly so where, as here, the

10  destruction was willful. Although sanctions are appropriate even in the absence of "bad

11  faith," the degree of fault is relevant to what type of sanction is imposed. *See Glover*, 6 F.3d

12  at 1329; *Advantacare Health Partners, LP v. Access IV*, 2004 WL 1837997, at *4 (N.D. Cal.

13  Aug. 17, 2004). Here, Hummer Winblad was more than just negligent. All available

14  evidence shows that Hummer Winblad partners at the highest levels destroyed evidence

15  pursuant to an *affirmative policy of destruction*, for the *stated purpose* of avoiding discovery.

16  There is no technological or innocuous explanation, and defendants have made no attempt to

17  offer one in response to a year's worth of requests that they do so. Willfulness is apparent.

18          The Winblad-Barry email could not be clearer – all Napster-related emails were to be

19  "delete[d] … immediately." Boyd Decl. at Exh. 1. Nor is there any doubt as to motivating

20  *purpose* behind these instructions. Days after being served with a subpoena in the *Napster I*

21  litigation, these defendants determined that they never wanted to be "required to surrender

22  Napster e-mails" to the discovery process again. *Id.* And the timing of this reminder

23  coincides *precisely* with the precipitous drop-off in emails retained on the Hummer Winblad

24  servers. Whereas these defendants produced approximately 272 documents in a *seven day*

25  *period* before receiving the Winblad-Barry email, they only produced a comparable number

26  of emails retained on the Hummer server for the ensuing *years* after the email issued.

27  Willfulness is clear. *See United States v. Quattrone*, 441 F.3d 153, 173-75 (2d Cir. 2006)

28  (direction to staff, following notice of governmental investigation, entitled "Time to Clean

NOTICE OF MOT. & MOT. FOR SPOLIATION
SANCTIONS; MEMORANDUM OF P.'S & A.'S
C-MDL-00-1369 (MHP)

1  Up Those Files," and urging compliance with policy not to retain notes and drafts, supported

2  conviction for obstruction of justice).

3      The Winblad-Barry email aside, willfulness is also clear because "[t]his is not a

4  situation where the documents were destroyed as a matter of routine." *Pelletier v.*

5  *Magnusson*, 195 F. Supp. 2d 214, 236 (D. Me. 2002) (finding willful destruction).

6  Hummer's 30(b)(6) witness provided sworn testimony that there was "no automatic disposal

7  of anyone's email" and "no sort of formal disposal of documents, whether they be hard copy

8  or electronic." Boyd Decl. at Exh. 12, Forrest Dep. at 23:2-11; 30:21-23.  Thus, any

9  document that was destroyed was the result of someone making an *affirmative* decision to

10  destroy it. *Id.* at 174:10-14.  The missing emails would have remained on the Hummer

11  Winblad servers to this day absent the actions of Hummer Winblad personnel in locating and

12  deleting – not once, but twice – Napster-related emails.  As Mr. Forrest testified:

13      Q:    Just so I understand, if an individual receives an e-mail in a Hummer
          Winblad e-mail address, to delete that e-mail from the Hummer Winblad Fund

14      IV Entities e-mail system, they have to take two steps: They have to delete
          that item from their in-box and then go into their deleted items folder and

15      permanently delete that item.  Is that accurate?

16      A:    Correct.

17  *Id.* at 59:7-15; *see also id.* at 59:8-61:5.  Nor did Hummer Winblad personnel face any space

18  limitations on email storage  *Id.* at 157:2-7.

19      Take, for example, the fact that Hummer Winblad did not retain the August 9, 2000

20  email discussing policing of Napster users (*see* Comp. of Missing Documents at Dep. Exh.

21  686).  No less than *three* individuals –  Messrs. Olin, Barry, and Hummer – all must have

22  made an affirmative decision to purge this email from the Hummer Winblad servers.  And

23  this is but one document from the scores that Plaintiffs have identified as missing from

24  Hummer Winblad's production.  The only plausible explanation is that the defendants were

25  willfully and systematically taking affirmative steps to destroy relevant documents.

26      Finally, Hummer Winblad's failure to "proffer[] an innocuous explanation for the

27  absent records" supports a willfulness finding.  *Pelletier*, 195 F. Supp. 2d at 236.  Hummer

28  Winblad, in the best position to shed light on what actually occurred, has consistently

1  stonewalled Plaintiffs' requests for an explanation, offering talismanic assertions of

2  compliance that simply cannot be squared with the evidence.  Defendants' refusal to

3  undertake a meaningful investigation after being apprised of patent inadequacies in their

4  document production is *in and of itself* sanctionable behavior.  *See Metropolitan Opera*

5  *Ass'n, Inc. v. Local 100 Hotel Employees*, 212 F.R.D. 178, 223 (S.D.N.Y. 2003).

6          In these circumstances, the only reasonable conclusion (and Hummer Winblad has

7  offered no other explanation) is that Hummer Winblad personnel at the highest levels were

8  intentionally carrying out the multi-step process required to delete Napster-related documents

9  as specifically required by the Winblad-Barry email.  The sheer numbers of missing

10  documents, coupled with the pitifully few documents that Hummer Winblad has been able to

11  locate and produce in this case, simply leaves no other permissible conclusion but that

12  Hummer engaged in a systematic effort to destroy documents. [11]

13  **C.      Hummer Winblad's Intentional Document Destruction Has Prejudiced Plaintiffs**

14          Hummer Winblad's deliberate destruction of documents has caused manifest

15  prejudice to Plaintiffs' right to present the jury a complete record of what these defendants

16  intended to do and what they did regarding Napster.  The destroyed documents – which

17  include among them these defendants' internal communications with one another – constitute

18  probative admissions.  Party admissions are powerful evidence in any case, and they are

19  particularly relevant to a party's motives and intent – two issues that the *Grokster* Court

20  found to be highly relevant to liability for intentionally inducing infringing activity.  *Metro-*

21  *Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*, 125 S. Ct. 2764, 2780 (2005).

22          Hummer Winblad's willful destruction of evidence has been all the more prejudicial

23  here because the Hummer Winblad witnesses – including John Hummer himself – have

24  exhibited classic "litigation amnesia" in claiming an inability to recall what they said and did

25  with respect to Napster.  For example:

26  ─────────────────────

[11] Even if Hummer Winblad's actions were not intentional (and there can be no doubt that
27  they were), sanctions would still be warranted, because "[t]he obligation to retain
discoverable materials is an affirmative one."  *National Radiation Survivors*, 115 F.R.D. at
28  557-58.  *See also Prudential Ins. Co. of AM. Sales Practices Litigation*, 169 F.R.D. 598, 615
(D.N.J. 1997) (sanctioning Prudential for "haphazard" document preservation efforts).

- Mr. Hummer claimed to have no recollection of the discussion – reflected in an email from Mr. Barry during the negotiation of Hummer's investment in Napster – about Hummer Winblad's planned control of Napster: "Control of Board … HWVP [Hummer Winblad Venture Partners] controls three of five seats." (Boyd Decl. Exh. 3, Hummer Dep. at 139-40, *id.* at Ex. 36.)

- Mr. Hummer similarly purported to have no recollection of musical works being shared over the Napster system even before they were publicly released but suggested that *if he were shown some documents* his memory on that subject might be refreshed. (Boyd Decl. at Exh. 3, Hummer Dep. at 116.)

- Contrary to Hummer Winblad's clear (albeit incorrect) memory that the record labels refused to license Napster, Mr. Hummer professed to have no idea whether Napster's lawyers ever expressed a view to Napster's management or board of directors as to whether Napster was entitled to any such license. (Boyd Decl. at Exh. 3, Hummer Dep. at 98-100.)

- Mr. Hummer repeatedly talked around but refused to answer whether Napster needed licenses from the record labels and publishers in order to be profitable. (Boyd Decl. at Exh. 3, Hummer Dep. at 100-103.)

As a consequence, Plaintiffs have been forced in large measure to rely on these witnesses' contemporaneous communications that happened to be preserved (in almost all cases by third parties) as the only available testimony for what these defendants intended, what they said, and what they did during their three-plus-year involvement with Napster.

Those documents that were retained (in virtually all cases by parties *other than* Hummer Winblad) provide invaluable insight into the far greater mass of documents that Hummer Winblad intentionally destroyed. The remaining documents reveal that the Hummer Winblad defendants were constantly engaged in written communications across the entire range of relevant issues in the case. These documents make clear that the destroyed documents would further cement these defendants' own liability – as well as the absence of liability by Plaintiffs on Hummer's affirmative antitrust claims – and therefore underscore the prejudice to Plaintiffs from Hummer's intentional destruction of relevant evidence:

(1)   Hummer Winblad's Intention To Maintain And Expand The Infringement On Napster In Order To Financially Benefit Hummer Winblad:  The documents destroyed by Hummer Winblad and produced from non-Hummer sources leave no doubt that the Hummer Winblad defendants routinely communicated about their intention to profit from Napster's infringing user base. John Hummer boasted in one email sent from his "humwin.com" email

1   account (but produced only from non-Hummer sources) that "30MM folks in the Napster

2   Nation translate into a multi, multi billion dollar business."  Comp. of Missing Documents at

3   Dep. Exh. 165.  These were not isolated musings.  *See also* Comp. of Missing Documents at

4   Dep. Exh. 186 (John Hummer recounting in an email from his "humwin.com" account that

5   he told newly appointed Napster CEO (and former Bertelsmann executive) Konrad Hilbers

6   that his "number one objective was to 'make me [*i.e.*, Hummer] rich'"). [12]  The Hummer

7   defendants memorialized in writing their intention to continue and expand the infringing

8   activity, so as to prevent the Napster user base from leaving for other websites.  *See id.* at

9   Dep. Exh. 3162 (concerned that users "will leave the system if it is not convenient and

10  comprehensive," Mr. Barry suggests that "until an official [*e.g.* authorized] version [of a

11  song] is posted, the nonofficial versions will still be up and can be shared exactly as today").

12      Admissions of this type are directly probative of Hummer Winblad's intent to induce

13  infringing activity.  *See Grokster*, 125 S. Ct. at 2782 (intent to derive revenue from size of

14  the user base, where users are primarily infringing, demonstrates unlawful intent and

15  inducement).  These documents are also probative of Hummer Winblad's direct financial

16  interest in continued infringement on Napster, as is relevant to vicarious liability.  The few

17  documents that have survived (largely because preserved by other parties) leave no doubt but

18  that the documents Hummer Winblad deleted contain similar highly probative admissions.

19      (2)   Hummer Winblad's Knowledge Of Infringing Activity:  Documents that

20  survived because they were produced by *other* sources also confirm that Hummer Winblad

21  was fully aware of the massive infringement occurring on the Napster system on a daily

22  basis.  *See* Comp. of Missing Documents at Dep. Exh. 1472 (letter from Hamstein Music

23

24  _____

    [12]  The few documents that by happenstance were preserved on the Hummer Winblad server
25  confirm the type of email communications that were occurring during this period.  In
    personally negotiating a settlement on Napster's behalf with Universal chairman Edgar
26  Bronfman – the man who Hummer Winblad tried to portray as a mastermind of the supposed
    antitrust conspiracy – Mr. Hummer emailed Mr. Bronfman:  "we cannot agree to [] a deal
27  where the market cap of Napster does not have a chance to be in the multi-billions.  It really
    just comes down to that.  That and of course, my personal ownership!"  He continued in the
28  same vein, "if we settle the lawsuit, Hummer Winblad is taking every thing we can get."  *See*
    Boyd Decl. at Exh. 37.

1189658.1                                  - 21 -

1    Company to John Hummer enclosing "a list of the titles of musical compositions" controlled

2    by Hamstein and found on Napster's servers); *id.* at Dep. Exh. 205 (email discussing the fact

3    that Napster is about to receive over a million "takedown notices"); *id.* at Dep. Exh. 3163

4    (Hummer partner Dan Beldy notes with enthusiasm that "[w]hen we link all the servers

5    together, for [the] most part it is not [a] stretch to say we will collectively have inventory of

6    85%-90% of recorded music to date on our network, this will go higher as others

7    join/share").  Once again, there is little doubt that additional probative evidence would have

8    been contained within the reams of documents that Hummer Winblad deleted.

9            (3)    Hummer Winblad's Right And Ability To Supervise The Infringing Activity

10   On The Napster System, and Material Contribution To That Activity:  Documents that were

11   deleted by Hummer (and recovered by Plaintiffs from other sources) also reveal numerous

12   communications from Hummer Winblad reflecting its right and ability to control the

13   infringing activity taking place every day on Napster.  For example, there are Hummer

14   communications about exercising editorial control over Nazi speeches and bands on the

15   Napster system (Comp. of Missing Documents at Dep. Exh. 686), whether to "alter the

16   decentralized nature" of the Napster technology (*id.* at Dep. Exh. 203), and whether to "set

17   up an elaborate control system" to police Napster users (*id.* at Dep. Exh. 205).  Of course,

18   these defendants never exercised their right and ability to stop the mass infringing activity

19   until ordered to do so by this Court, because doing so would have hurt them financially.

20           Still other documents confirm the Hummer Winblad defendants' ability to control the

21   full range of Napster's daily operations – which of course included keeping the infringing

22   service up and running.  *See id.* at Dep. Exh. 245 (Hank Barry directing Napster litigation);

23   *id.* at Dep. Exh. 248 (evaluating a potential Napster investor); *id.* at Dep. Exh. 280

24   (approving Napster CEO Hilbers to replace Hank Barry); *id.* at Dep. Exh. 656 (determining

25   whether to integrate with CDNow); *id.* at Dep. Exh. 4210 (Hummer Winblad is "keeping

26   Napster alive").  These documents also demonstrate Hummer Winblad's material

27   contribution to the infringements taking place on the Napster system.  Additional probative

28   evidence on these issues clearly would have been within the documents Hummer deleted.

(4)    Documents That Give Lie To Hummer Winblad's Antitrust Allegations:  The documents deleted by Hummer Winblad (and produced from other sources) relate not only to Hummer Winblad's own liability, but to the bankruptcy of Hummer's own allegations in its misuse defense and antitrust counterclaim.  Documents deleted by Hummer Winblad (but preserved by other parties) reveal, among other things, that Hummer was admitting in written communications that *Napster* – rather than the labels (as Hummer contends) – was insisting on a unified licensing or settlement deal with Napster.  *See* Comp. of Missing Documents at Dep. Exh. 199 ("it is clearly the case that we need all plaintiffs to be in"); *id.* at Dep. Exh. 264 (analysis from Napster's attorneys concluding that a global settlement is proper).  The documents that still exist also show that Hummer routinely engaged in written communications reflecting that *Napster* – rather than the record companies (as Hummer Winblad now alleges) – refused to finalize licensing agreements on commercially reasonable terms.  *See id.* at Dep. Exh. 267 ("Bertelsmann changes the terms so the deals do not get done . . . Something is very wrong here); *id.* at Dep. Exh. 185 (acknowledging that Napster missed an opportunity to execute "deals with every label.  They were ready to sign").

Hummer cannot claim an absence of prejudice to UMG and EMI on the ground that Plaintiffs could have retrieved all communications by accessing the Napster servers in the custody of its Bankruptcy Trustee.  Almost all Hummer Winblad personnel – including John Hummer and Ann Winblad – did not have Napster email accounts, and therefore their communications not sent to (and preserved on) the Napster server would not have survived the Hummer document destruction.  Although Barry used his Napster email account during the May 2000 – July 2001 period he was CEO, the record in the case shows that even within that time frame, Barry continued to send highly relevant communications also from his Hummer Winblad email account.  *See* Comp. of Missing Documents at Dep. Exh. 21; *id.* at Dep. Exh. 241.  In all events, neither the Napster servers nor any other non-Hummer source would have had the purely *internal* communications among the Hummer partners about the Napster investment – communications that surely occurred given that we know that Hummer

1    Winblad personnel sent approximately 89 *internal* emails amongst themselves during the

2    week prior to the destruction directive.  *See* Boyd Decl. ¶ 9.

3         Hummer Winblad also cannot claim that the communications that remain at the tip of

4    the iceberg shows that Plaintiffs have not been prejudiced by Hummer's intentional

5    destruction. The documents that remain represent but a tiny slice of the true volumes of

6    evidence that should have been available to Plaintiffs.  Where a party engages in the deletion

7    of documents, the fact that some *portion* of those documents later can be salvaged does not

8    remove the prejudice.  *See Zubulake v. UBS Warburg,* LLC, 229 F.R.D. 422, 436 (S.D.N.Y

9    2004) (*"Zubulake V"*).  Rather, there is every reason to believe that the unknown quantities

10   of destroyed documents would have provided Plaintiffs with evidence that is "similarly, if

11   not more favorable" to Plaintiffs' case as the evidence contained in the documents that could

12   be salvaged.  *Id.* at 437.  While the smattering of Hummer Winblad emails obtained from

13   other sources help to fill in the evidentiary story about the extent of Hummer Winblad's (and

14   even Bertelsmann's) involvement in Napster's activities, they are not the full story.  What is

15   missing from the story is only missing because Hummer Winblad destroyed it.

16        Where, as here, "the very fact of their destruction" makes it impossible to identify the

17   full scope of purged documents, prejudice is presumed.  *See National Radiation Survivors*,

18   115 F.R.D. at 557.  As this Court has stated, "[t]he culpable party can hardly assert any

19   presumption of irrelevance as to the destroyed documents."  Rather, "the court must draw the

20   strongest allowable inferences in favor of the aggrieved party."  *Id.  See also Chan v. Triple 8

21   Palace Inc.*, 2005 WL 1925579, at *8 (S.D.N.Y. Aug. 11, 2005) ("bad faith alone is

22   sufficient circumstantial evidence from which a reasonable fact finder could conclude that

23   the missing evidence was unfavorable to the party").

24        Where, as here, Plaintiffs have been deprived of more than three years' worth of

25   potentially devastating admissions – and Hummer's own actions make it impossible to know

26   the full extent of what has been lost – prejudice is more than established.[13]

27   _____

28   [13]  Ironically, Hummer Winblad has indicated that it expects to file a motion for summary
     judgment claiming that there is a lack of evidence of its liability.  While Hummer Winblad is

1

**D.    Plaintiffs Are Entitled To Meaningful Sanctions:  Either Entry Of Default Judgment, Or At  A Minimum, An Issue Preclusion Order And An Adverse Inference Instruction**

2

3       Hummer Winblad's wholesale destruction of critical evidence not only substantially

4   prejudices Plaintiffs, but it also irreparably impairs the integrity of the judicial process.

5   Judge Fogel has well summarized the Court's remedial powers to address such misconduct:

6           Courts may sanction parties responsible for spoliation of evidence in four
            ways that are relevant here.  First, a Court may enter a default judgment
7           against the party responsible for destroying evidence.  *Chambers*, 501 U.S.
            at 45 ("[O]utright dismissal ... is a particularly severe sanction, yet is
8           within the court's discretion.").  Second, a Court may instruct the jury that
            it may draw an inference adverse to the party responsible for destroying
9           the evidence. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993);
            *Akonia v. United States*, 938 F.2d 158, 161 (9th Cir. 1991), *cert. denied*,
10          503 U.S. 962 (1992).  Third, a Court may issue civil contempt sanctions,
            which coerce a party into compliance with the Court's order and/or
11          compensate the plaintiff for the violation.  *Whittaker Corp. v. Execuair
            Corp.*, 953 F.2d 510, 516 (9th Cir. 1992).  Finally, a Court may assess
12          attorney's fees. *Chambers*, 501 U.S. at 45 (1991); *Roadway Express, Inc.
            v. Piper*, 447 U.S. 752, 764 (1980).

13  *AdvantaCare*, 2004 WL 1837997, at *4.

14      When choosing among possible sanctions, the Court should consider a sanction

15  designed to:  (1) penalize those whose conduct may be deemed to warrant such a sanction;

16  (2) deter parties from engaging in the sanctioned conduct; (3) place the risk of an erroneous

17  judgment on the party who wrongfully created the risk; and (4) restore the prejudiced party to

18  the same position he would have been in absent the wrongful destruction of evidence by the

19  opposing party.  *Id.*; *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643

20  (1976); *Wyle v. R .J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983); *West v.

21  Goodyear Tire and Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).

22          **1.    Default Judgment Is Warranted**

23      The evidence here is unmistakable that Hummer Winblad undertook a deliberate

24  effort, on instruction from some of its most senior partners, to destroy emails that it knew

25

26  wrong about the strength of the evidence against it, it is this exact situation for which
    evidentiary sanctions were created.  Having been successful in its systematic and successful
27  efforts to destroy emails that would be probative of material facts in this case, the Hummer
    Winblad defendants have forfeited their right to complain about the weight of the evidence.
28  *See Rogers v. Chicago Park Dist.*, 89 F.R.D. 716, 718 (N.D. Ill. 1981).

1   were related to pending and anticipated *Napster* litigation.  Having deleted the emails to be

2   sure they would never be subject to discovery, Hummer then repeatedly claimed that all

3   responsive documents had been retained and produced, including through a Rule 30(b)(6)

4   witness who claimed (falsely) that Hummer had retained all Napster-related emails.

5        It is well settled that dismissal of a claim is warranted where "a party has engaged

6   deliberately in deceptive practices that undermine the integrity of judicial proceedings."

7   *Anheuser-Busch, Inc. v. Natural Beverage Distrib.*, 69 F.3d 337, 348 (9th Cir. 1995)

8   (affirming dismissal for withholding relevant documents and falsely claiming they were

9   destroyed in a fire).  "Courts have inherent power to dismiss an action when a party has

10   willfully deceived the court and engaged in conduct utterly inconsistent with the orderly

11   administration of justice."  *Wyle*, 709 F.2d at 589.  *Accord Allstate Ins. Co. v. Sunbeam

12   Corp.*, 53 F.3d 804, 807 (7th Cir. 1995) (upholding district court's order of dismissal based

13   on the fact that plaintiff's "failure to preserve ... evidence prejudiced [defendant]'s efforts to

14   present a defense....").  Here, because Hummer Winblad is the defendant, the appropriate

15   remedy is the counterpart of dismissal – a default judgment of liability.

16        The Ninth Circuit has upheld the use of a default judgment as an appropriate sanction

17   when parties obstruct the judicial process through the withholding or falsification of

18   evidence.  *See, e.g., Prof'l Seminar Consult., Inc. v. Sino Am. Tech. Exch. Council, Inc.*, 727

19   F.2d 1470, 1474 (9th Cir. 1984) (upholding dismissal based on deliberate submission of false

20   documents).  Entering a default judgment is particularly appropriate where, as here, a

21   defendant's destruction of documents "deprived [the plaintiff] of the opportunity to present

22   critical evidence on its key claims to the jury."  *Thompson v. Gen'l Nutrition Corp.*, 593 F.

23   Supp. 1443, 1456 (C.D. Cal. 1984).

24        Hummer Winblad's destruction of untold numbers of documents has deprived UMG

25   and EMI of key evidence that it would have been able to use to establish Hummer Winblad's

26   contributions to and inducement of the mass infringements that occurred on the Napster

27   system.  Hummer Winblad should not now be heard to protest that the evidence of its

28   contribution to the infringements, or of its right and ability to control the activity on Napster,

NOTICE OF MOT. & MOT. FOR SPOLIATION
SANCTIONS; MEMORANDUM OF P.'S & A.'S
C-MDL-00-1369 (MHP)

or of its intent to induce infringement, is somehow deficient when the evidence that could have helped button up that proof was deliberately destroyed.  The most logical place to find this evidence would have been in Hummer Winblad's own communications – the very communications that the Hummer Winblad defendants willfully destroyed.

Courts have repeatedly imposed the remedy of a default judgment under such circumstances as no lesser sanction will both address the willful misconduct and deter such abuses.  *See, e.g., Moyers v. Ford Motor Co.*, 941 F. Supp. 883, 885 (E.D. Mo. 1996) ("the Court bases its decision [of summary judgment for defendant] on the substantial prejudice to [defendant].  The Court does not believe that ... a lesser sanction would suffice to reduce the unfairness to [defendant] resulting from plaintiff's failure to preserve [evidence]"); *Cabnetware, Inc. v. Sullivan*, No. Civ. S-90-313, 1991 U.S. Dist. LEXIS 20329, at *11 (E.D. Cal. July 16, 1991) ("Although ... alternative sanctions are reasonably tailored to put the plaintiff in the position he would have been in but for defendant's transgression, I conclude that they are inadequate to protect the integrity of the court's process.)  As once Court has summarized:

> [N]o alternative sanction short of a default judgment would adequately punish [defendant] and deter future like-minded litigants.  Any lesser sanction would allow a party possessing evidence that would insure an adverse result to destroy that evidence with impunity, thus assuring defeat for the opponent while risking only a comparatively mild rebuke.  One who anticipates that compliance with discovery rules, and the resulting production of damning evidence, will produce an adverse judgment, will not likely be deterred from destroying that decisive evidence by any sanction less than the adverse judgment he (or she) is tempted to thus evade.  It follows that the only sanction adequate and appropriate to punish [defendant] and deter future similarly situated litigants is default judgment on liability.

*Computer Assoc. Int'l, Inc. v. Am. Fundware, Inc.*, 133 F.R.D. 166, 169 (D. Colo. 1990); *accord Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 489 (S.D. Fla. 1984) (finding that defendant routinely destroyed engineering documents with the intention of preventing them from being produced in lawsuits, striking defendants pleadings, entering a finding of liability against defendants, and ordering trial to proceed on issue of damages only).

**2.       At Minimum, Plaintiffs Are Entitled To An Issue Preclusion Order And An Adverse Inference Instruction**

While a default judgment is appropriate, to the extent that the Court believes that a lesser sanction is more suitable, issue preclusion has also been endorsed as a remedy for destruction of evidence.  *See, e.g., Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (refusing to allow plaintiff to present expert evidence in support of its claim after having destroyed physical evidence that would have been probative of the same claim); *Rogers v. Chicago Park Dist.*, 89 F.R.D. 716, 718 (N.D. Ill. 1981) (holding a number of facts adverse to defendant as established based on defendant's destruction of probative documents).

As applied to this case, that would mean that the Hummer Winblad defendants should be precluded from contesting all or some of the following issues:

(1)      That Hummer Winblad intended to and did induce, promote and contribute to maintained and expanded mass infringement of Plaintiffs' copyrights through Napster;

(2)      That Hummer Winblad had a direct financial interest in that infringing activity;

(3)      That Hummer Winblad had knowledge about that infringing activity;

(4)      That Hummer Winblad had the right and ability to supervise that infringing activity;

(5)      That Hummer Winblad's contribution to the infringement of Plaintiffs' copyrights was willful;

(6)      That Napster insisted on a unified or "global" settlement and licensing deal with the labels, and not the other way around; and

(7)      That Napster refused to enter into agreements with the labels on commercially reasonable terms.

Plaintiffs also are entitled to an adverse inference instruction.  "[A] trial court also has the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior....  [A] finding of 'bad faith' is not a prerequisite to this corrective procedure." *Glover*, 6 F.3d at 1329-30.  *See also Akonia v. United States*, 938 F.2d 158, 160-61 (9th Cir. 1991).  The

1    adverse inference is based on, among other things, "the common sense observation that a

2    party who has notice that a document is relevant to litigation and who destroys the document

3    is more likely to have been threatened by the document than is a party in the same position

4    who does not destroy the document. *AdvantaCare*, 2004 WL 1837997, at *7 (granting

5    adverse inference instruction); *Nation-Wide Check Corp. v. Forest Hills Distrib., Inc.*, 692

6    F.2d 214, 217 (1st Cir. 1982) ("When the contents of a document are relevant to an issue in a

7    case, the trier of fact generally may receive the fact of the document's nonproduction or

8    destruction as evidence that the party which has prevented production did so out of the well-

9    founded fear that the contents would harm him").  The instruction here should read:

10          The Court determined during pretrial proceedings that the Hummer
      Winblad Defendants willfully and systematically destroyed documents
11          relevant to the issues you have to decide in this case, and that the Hummer
      Winblad Defendants carried out this intentional destruction at a time they
12          knew they were obligated to preserve those documents for possible
      production in litigation and, ultimately, presentation to you as the trier of
13          fact.  You may infer from this destruction that the documents Hummer
      Winblad intentionally destroyed would have been unfavorable to its
14          position on the fact issues that you are being asked to decide in this case.

15          **3.      Monetary Sanctions Should Be Imposed Against Hummer Winblad**

16          In addition to terminating or evidentiary sanctions, courts routinely award the moving

17    party its attorneys' fees and costs for having to pursue the evidence of spoliation and filing

18    the appropriate motion.  *See, e.g., AdvantaCare*, 2004 WL 1837997, at *9-11; *National*

19    *Radiation Survivors*, 115 F.R.D. at 558-59; *Thompson*, 593 F. Supp. at 1456-57; *Capellupo*

20    *v. FMC Corp.*, 126 F.R.D. 545 (D. Minn. 1989).  Monetary sanctions are not in lieu of

21    terminating or evidentiary sanction.

22          Here, UMG and EMI incurred additional expenses that they would not otherwise

23    have had to incur, for instance, taking the 30(b)(6) deposition of a Hummer Winblad witness

24    concerning Hummer's document retention efforts and policies, as well as pursuing this

25    motion.  But that pales in comparison to the costs incurred by UMG and EMI in having to

26    conduct two years worth of discovery and spending millions of dollars in the process without

27    the benefit of the destroyed documents.

28

1    Because reimbursement of the prevailing party's costs and fees often will not

2    sufficiently remedy the abuse of the court's processes, or deter them in the future, courts may

3    award additional financial penalties.  *See, e.g., National Radiation Survivors*, 115 F.R.D. at

4    559 ("The defendant shall pay an additional sum of $15,000.00 to the clerk of this court for

5    the unnecessary consumption of the court's time and resources"); *Capellupo*, 126 F.R.D. at

6    551-53 (same).  An additional financial sanction is amply warranted here.

7    **IV.  <u>CONCLUSION</u>**

8    Plaintiffs respectfully submit their motion should be granted.

9    Respectfully submitted,

10

11   DATED: June 9, 2006                         _____/s/_____

12                                               GLENN D. POMERANTZ
                                                 MUNGER, TOLLES & OLSON LLP

13                                               Attorneys for the UMG Plaintiffs

14

15   DATED: June 9, 2006                         _____/s/_____

16                                               PETER L. SIMMONS
                                                 FRIED, FRANK, HARRIS, SHRIVER &

17                                                 JACOBSON LLP

18                                               Attorneys for the EMI Plaintiffs

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND .................................................................................................. 4

    A.   Hummer Winblad Reasonably Anticipated Litigation From The Start Of Its Napster Involvement And Was Fully Aware Of Its Obligation To Preserve Documents. ............................................................................. 4

    B.   Hummer Winblad's Patently Incomplete Document Production .................... 7

    C.   Hummer Winblad Stonewalls When Pressed To Explain The Manifest Gaps In Its Production ............................................................................ 11

    D.   The Truth Comes To Light:  Hummer's Post-Eleventh Hour Production Of The Winblad-Barry Email ..................................................... 13

III.  ARGUMENT ..................................................................................................... 14

    A.   Hummer Winblad Had A Duty To Preserve Relevant Evidence Beginning In May Of 2000 ........................................................................ 14

    B.   Hummer Winblad Willfully Destroyed Documents .................................... 17

    C.   Hummer Winblad's Intentional Document Destruction Has Prejudiced Plaintiffs ................................................................................................. 19

    D.   Plaintiffs Are Entitled To Meaningful Sanctions:  Either Entry Of Default Judgment, Or At  A Minimum, An Issue Preclusion Order And An Adverse Inference Instruction ............................................................... 25

        1.   Default Judgment Is Warranted ....................................................... 25

        2.   At Minimum, Plaintiffs Are Entitled To An Issue Preclusion Order And An Adverse Inference Instruction .................................... 27

        3.   Monetary Sanctions Should Be Imposed Against Hummer Winblad ........................................................................................ 29

IV.   CONCLUSION .................................................................................................. 30

# TABLE OF AUTHORITIES

Page

## Federal Cases

*Advantacare Health Partners, LP v Access IV*,
2004 WL 1837997 (N.D. Cal. Aug. 17, 2004) ...................................... 17, 25, 29

*Akonia v. United States*,
938 F.2d 158 (9th Cir. 1991), *cert. denied*, 503 U.S. 962 (1992) .............................. 25, 28

*Allstate Ins. Co. v. Sunbeam Corp.*,
53 F.3d 804 (7th Cir. 1995) ......................................................................... 26

*Anheuser-Busch, Inc. v. Natural Beverage Distrib.*,
69 F.3d 337 (9th Cir. 1995) ......................................................................... 26

*Barsoum v. NYC Housing Authority*,
202 F.R.D. 396 (S.D.N.Y. 2001) ................................................................. 16

*Cabnetware, Inc. v. Sullivan*,
1991 U.S. Dist. LEXIS 20329 (E.D. Cal. July 16, 1991) ................................ 27

*Capellupo v. FMC Corp.*,
126 F.R.D. 545 (D. Minn. 1989) .............................................................. 29, 30

*Carlucci v. Piper Aircraft Corp.*,
102 F.R.D. 472 (S.D. Fla. 1984) ................................................................. 27

*Chan v. Triple 8 Palace Inc.*,
2005 WL 1925579 (S.D.N.Y. Aug. 11, 2005) ............................................... 24

*Computer Assoc. Int'l, Inc. v. Am. Fundware, Inc.*,
133 F.R.D. 166 (D. Colo. 1990) ................................................................. 27

*Glover v. Bic Corporation*,
6 F.3d 1318 (9th Cir. 1993) ...................................................... 14, 17, 25, 28

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*,
125 S. Ct. 2764 (2005) .......................................................................... 19, 21

*Metropolitan Opera Ass'n, Inc. v. Local 100 Hotel Employees*,
212 F.R.D. 178 (S.D.N.Y. 2003) ................................................................. 19

*Moyers v. Ford Motor Co.*,
941 F. Supp. 883 (E.D. Mo. 1996) ............................................................. 27

*Nat'l Assoc. of Radiation Survivors v. Turnage*,
115 F.R.D. 543 (N.D. Cal. 1987) ............................................ 14, 17, 19, 24, 29, 30

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
427 U.S. 639 (1976) ................................................................................. 25

*Nation-Wide Check Corp. v. Forest Hills Distrib., Inc.*,
692 F.2d 214 (1st Cir. 1982) ..................................................................... 29

*Pelletier v. Magnusson*,
195 F. Supp. 2d 214 (D. Me. 2002) ............................................................. 18

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

3

*Prof'l Seminar Consult., Inc. v. Sino Am. Tech. Exch. Council, Inc.*,

4

727 F.2d 1470 (9th Cir. 1984) ........................................................................ 26

*Prudential Ins. Co. of AM. Sales Practices Litigation*,

5

169 F.R.D. 598 (D.N.J. 1997) ......................................................................... 19

6

*Roadway Express, Inc. v. Piper*,

7

447 U.S. 752 (1980) ........................................................................................ 25

*Rogers v. Chicago Park Dist.*,

8

89 F.R.D. 716 (N.D. Ill. 1981) ................................................................. 25, 28

9

*Shoen v. Shoen*,

5 F.3d 1289 (9th Cir. 1993) ............................................................................ 17

10

*Silvestri v. General Motors Corp.*,

11

271 F.3d 583 (4th Cir. 2001) .......................................................................... 15

*Thompson v. Gen'l Nutrition Corp.*,

12

593 F. Supp. 1443 (C.D. Cal. 1984) .......................................................... 26, 29

13

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*,

982 F.2d 363 (9th Cir. 1992) .......................................................................... 28

14

*United States v. Quattrone*,

15

441 F.3d 153 (2d Cir. 2006) ........................................................................... 17

16

*West v. Goodyear Tire and Rubber Co.*,

167 F.3d 776 (2d Cir. 1999) ........................................................................... 25

17

*Whittaker Corp. v. Execuair Corp.*,

18

953 F.2d 510 (9th Cir. 1992) .......................................................................... 25

*Wyle v. R.J. Reynolds Indus., Inc.*

19

709 F.2d 585 (9th Cir. 1983) .............................................................. 3, 25, 26

20

*Zubulake v. UBS Warburg, LLC*,

220 F.R.D. 212 (S.D.N.Y. 2003) ............................................................. 14, 16

21

*Zubulake v. UBS Warburg*, LLC,

22

229 F.R.D. 422 (S.D.N.Y 2004) ..................................................................... 24

23

**Federal Statutes**

24

11 U.S.C. § 1109(b) .......................................................................................... 6

25

26

27

28

-iii-