UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE NAPSTER, INC. COPYRIGHT
LITIGATION

No. C MDL-00-1369 MHP

This Document Relates To:

UMG RECORDINGS, INC. et al.,

        Plaintiffs,                                          No. C 04-1166 MHP

    v.

HUMMER WINBLAD VENTURE PARTNERS et al.,

        Defendants.

UMG RECORDINGS, INC. et al.,

        Plaintiffs,                                          No. C 04-1351 MHP

    v.

BERTELSMANN AG et. al.,

        Defendants.

JERRY LEIBER et al.,

        Plaintiffs,                                          No. C 04-1671 MHP

    v.

BERTELSMANN AG et al.,

        Defendants.

UNITED STATES DISTRICT COURT
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

CAPITOL RECORDS, INC. et al.,

       Plaintiffs,

    v.

BERTELSMANN AG et. al.,

       Defendants.
_____/

No. C 04-2121 MHP

**MEMORANDUM & ORDER**
**Re: Motion for Sanctions**

     The above-captioned actions arise from the litigation involving alleged copyright infringement by Napster, Inc. and its customers.  Now before the court is plaintiffs UMG and EMI's ("plaintiffs") motion for terminating sanctions or, alternatively, for evidentiary sanctions, seeking sanctions against defendant Hummer Winblad ("Hummer") for alleged intentional spoliation of evidence.  Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND[1]

     The instant motion relates to four actions now pending before this court as part of the In re Napster Copyright Litigation multidistrict litigation ("MDL") proceedings, Case No. C MDL-00-1369 MHP.  The history of this litigation is well documented in this court's previous orders.  The instant motion arises out of plaintiffs' allegation that Hummer knowingly and intentionally deleted an undetermined number of emails which they had a duty to preserve and to produce in response to plaintiffs' document requests.  Hummer denies that they knowingly and intentionally deleted any emails which they had a duty to preserve.  The facts relevant to the instant motion are summarized below.

     The basic timeline of events does not appear to be in dispute.  Hummer invested in Napster in May 2000.  At that time, several lawsuits were pending against Napster (collectively "the Napster

2

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   I litigation").  The litigation prompted Hummer to enter into a Common Interest and Defense

2   Agreement with Napster as part of its investment.  On June 1, 2000, deposition and document

3   subpoenas were issued for Hummer officers John Hummer and Henry Barry in the Napster I

4   litigation, calling for all communications regarding Napster.  Two days later, Hummer officer Ann

5   Winblad sent an email to nine Hummer employees, copying Hummer's counsel, with the subject line

6   "a/c: E-mails regarding Napster and review of our long standing doc retention policies."  The email

7   read, in its entirety:

8           Hank has asked me to send this out to everyone.

9           All emails re napster at this point are related to the litigation and
10          should contain the "a/c" (attorney communications) symbol in the
            subject line and djohnson@fenwick.com should be ccd.  We should
            not be sending e-mails on this subject anyway.  Items from outsiders
11          such as resumes do not require this.

12          Hank Barry, [signature information]

13          Please also be aware of our e-mail policy.  As we have all been
            required to surrender Napster e-mails, this should reinforce
14          compliance with our long standing policies.

15          1.    we do not retain e-mails, it is your responsibility to delete your
                  handled e-mails immediately
16          2.    we do not us e-mail to chat about matters related to public
                  companies or matters such as the above
17          3.    we do not retain written copies of e-mails in our files
18          4.    our document retention policy is that we do not retain
                  documents on any public or acquired company and retain
                  limited information on private companies.  all retained
19                information is stored in central files, pls do not retain other
                  docs in your own files unnecessarily
20          5.    we do not retain files separate from our central files which are
                  periodically checked for compliance to policies

21          Please also review the above policies with any summer associates.

22  Boyd Dec., Exh. 1 ("the June 3, 2000 email").

23          That same month, John Hummer met with Edgar Bronfman, Jr., CEO of Universal Music

24  Corp., who advised Hummer that the recording companies intended to sue Napster's investment

25  firms if the alleged copyright infringement continued.  John Hummer claims that Bronfman's

26

27

28

                                                3

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   statement was part of a larger discussion, and that Hummer did not leave the meeting feeling that

2   Hummer Winblad was in danger of being named as a defendant in the Napster litigation.

3        On July 26, 2000, an additional lawsuit was filed against Napster ("the Katz lawsuit"),

4   naming Hummer Winblad and Henry Barry (among several others) as defendants.  Hummer was not

5   served with this complaint until January 2, 2001.  Hummer claims to have first learned about the

6   Katz lawsuit in Fall 2000.  In December 2000, while the Napster I litigation and the Katz lawsuit

7   were both pending, a hearing took place before this court at which plaintiffs' counsel were asked

8   whether they intended to name any additional defendants.  Plaintiffs' counsel responded that they

9   did not intend to bring suit against any additional parties at that time.

10        On August 10, 2000, this court entered an order preliminarily enjoining Napster from

11   "engaging in, or facilitating others in copying, downloading, uploading, transmitting, or distributing

12   plaintiffs' copyrighted musical compositions and sound recordings . . . without express permission

13   of the rights owner."  A & M Records, Inc. v. Napster, Inc., 114 F. Supp. 2d 896, 927 (N.D. Cal.

14   2000) (Patel, C.J.).  The injunction was affirmed on appeal, A & M Records, Inc. v. Napster, Inc.,

15   239 F.3d 1004 (9th Cir. 2001), but the Ninth Circuit remanded with instructions to modify the

16   injunction's scope.  On March 5, 2001, this court entered an order consistent with the Ninth Circuit's

17   instructions.  See A & M Records, Inc. v. Napster, Inc., No. C MDL-00-1369 MHP, 2001 WL

18   227083 (N.D. Cal. Mar. 5, 2001) (Patel, C.J.), aff'd, 284 F.3d 1091 (9th Cir. 2002).  After

19   concluding that it was not technologically feasible to comply with the court's March 2001 order and

20   continue operating its file-sharing network, Napster ceased operations on July 1, 2001.  The Katz

21   lawsuit was dismissed that same month.

22        The Napster I litigation continued, however, and during settlement negotiations with other

23   defendants the following August, counsel for plaintiffs sent a letter to Hummer threatening

24   litigation. Meanwhile, Hummer was attempting  to sell its stake in Napster to defendant

25   Bertelsmann.  In April 2002, during negotiations with Bertelsmann in which Hummer was

26   requesting an indemnification clause from Bertelsmann, John Hummer stated in an email that "We

27

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   [Hummer Winblad] know we are going to be sued." Boyd Dec., Exh. 35. The instant action was

2   filed a year later in April 2003. Hummer was served with the complaint in August 2003.

3          In February 2004, plaintiffs served Hummer with discovery requests in the instant action

4   requesting all Napster-related communications up through the filing of plaintiffs' complaint in 2003.

5   Plaintiffs were dissatisfied with the number of emails produced in response to this request,[2]

6   particularly in light of document productions from other parties which included Napster-related

7   communications involving Hummer that had not been produced by Hummer. In July 2005, plaintiffs

8   initiated a meet and confer process regarding Hummer's discovery responses which included a

9   30(b)(6) deposition of Hummer partner Todd Forrest regarding Hummer's document preservation

10  and collection efforts. Hummer maintained throughout that its document production was proper and

11  complete.

12         In April 2006, near the close of discovery, Hummer produced the June 3, 2000 email to

13  plaintiffs claiming to have mistakenly neglected to produce it earlier. Based on the June 3, 2000

14  email and plaintiffs' perceived problems with Hummer's document production, plaintiffs now allege

15  that Hummer personnel continued to communicate with each other via email regarding Napster,

16  including discussions about issues relevant to the claims and defenses in this action. Plaintiffs

17  further allege that Hummer personnel willfully deleted all of their Napster-related emails in order to

18  avoid turning them over in this litigation.

19         Hummer does not seem to dispute that they deleted any Napster-related emails on the

20  Hummer Winblad system that were generated after June 3, 2000. Hummer acknowledges that its

21  personnel routinely deleted emails on their system without regard to whether the deleted emails were

22  relevant to the instant litigation. However, Hummer alleges that Napster-related email

23  communication within Hummer Winblad decreased dramatically beginning in June 2000, and any

24  Napster-related emails involving Hummer Winblad personnel were preserved on Napster servers.

25  Hummer further claims that no Napster-related communications were deleted willfully or

26  intentionally, and that any relevant communications that were deleted were deleted by inadvertence

27  or mistake.

28

5

1

2    LEGAL STANDARD

3        District courts may impose sanctions as part of their inherent power "to manage their own

4    affairs so as to achieve the orderly and expeditious disposition of cases." Chambers v. NASCO,

5    Inc., 501 U.S. 32, 43, reh'g denied, 501 U.S. 1269 (1991); see also Unigard Sec. Ins. Co. v.

6    Lakewood Eng'g & Mfg. Corp., 982 F.2d 363, 368 (9th Cir. 1992) (excluding evidence as a sanction

7    for spoliation).  This power includes the "'broad discretion to make . . . evidentiary rulings

8    conducive to the conduct of a fair and orderly trial.'"  Id. at 368 (quoting Campbell Indus. v. M/V

9    Gemini, 619 F.2d 24, 27 (9th Cir. 1980)).

10       The district courts' inherent power to sanction may be invoked in response to destruction of

11   evidence.  If a party breaches its duty to preserve evidence, the opposing party may move the court

12   to sanction the party destroying evidence.  See Unigard, 982 F.2d at 365.

13       Courts may sanction parties responsible for spoliation of evidence in three ways.  First, a

14   court can instruct the jury that it may draw an inference adverse to the party or witness responsible

15   for destroying the evidence.  See Glover v. BIC Corp., 6 F.3d 1318, 1329 (9th Cir. 1993); Akiona v.

16   United States, 938 F.2d 158, 161 (9th Cir. 1991), cert. denied, 503 U.S. 962 (1992).  Second, a court

17   can exclude witness testimony proffered by the party responsible for destroying the evidence and

18   based on the destroyed evidence.  See Glover, 6 F.3d at 1329; Unigard, 982 F.2d at 368-69.  Finally,

19   a court may dismiss the claim of the party responsible for destroying the evidence.  See Allstate Ins.

20   Co. v. Sunbeam Corp., 53 F.3d 804, 806-07 (7th Cir. 1995); see also Chambers, 501 U.S. at 45

21   ("outright dismissal . . . is a particularly severe sanction, yet is within the court's discretion");

22   Alexander v. National Farmers Org., 687 F.2d 1173 (8th Cir. 1982), cert. denied, 461 U.S. 937

23   (1983) (dictum) (dismissal of claims is a severe sanction and may be warranted for "outrageous"

24   destruction of evidence).

25       A party's destruction of evidence need not be in "bad faith" to warrant a court's imposition of

26   sanctions.  Glover, 6 F.3d at 1329; Unigard, 982 F.2d at 368 n.2.  District courts may impose

27   sanctions against a party that merely had notice that the destroyed evidence was potentially relevant

28

UNITED STATES DISTRICT COURT
For the Northern District of California

to litigation.  See Glover, 6 F.3d at 1329; Akiona, 938 F.2d at 161; cf. Unigard, 982 F.2d at 368 n.2 (sanctions may be imposed for "willfulness or fault by the offending party").  However, a party's motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed. Baliotis v. McNeil, 870 F. Supp. 1285, 1291 (M.D. Pa. 1994); see also Schmid v. Milwaukee Electric Tool Corp., 13 F.3d 76, 79 (3rd Cir. 1994) (courts should choose "the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim").

DISCUSSION

Plaintiffs argue that Hummer had a duty to preserve Napster-related emails beginning in May 2000, and that this duty remained in place continuously throughout the request period.  Plaintiffs further allege that the June 3, 2000 email demonstrates that Hummer willfully deleted all Napster-related emails in violation of this duty.  Plaintiffs also argue that Hummer deceived plaintiffs and the court in failing to candidly explain the lack of emails produced after June 3, 2000.  Finally, plaintiffs claim that they have been prejudiced by Hummer's deletion and deception, pointing to emails from Hummer personnel gathered from other sources showing that Hummer continued generating probative emails after June 2000.  Plaintiffs therefore argue that they are entitled to a default judgment on their claims against Hummer.  In the alternative, plaintiffs request that the court preclude Hummer from contesting certain issues related to the case, and that the jury be given an adverse inference instruction regarding Hummer's document deletion.  In any case, plaintiffs additionally request monetary sanctions.

In response, Hummer argues that it had no duty to preserve Napster-related emails before learning of the Katz lawsuit, and between the dismissal of the Katz lawsuit and the commencement of the instant action.  Hummer further claims that the June 3, 2000 email was an instruction to produce, rather than delete, Napster-related communications, and that the portion of the email concerning document retention was unrelated to Napster.  In addition, Hummer claims that Napster-related emails within Hummer decreased dramatically following Hummer's May 2000 investment in

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

Napster and that no emails were deleted willfully or intentionally.  Finally, Hummer denies any deceptive conduct and asserts that plaintiffs have offered no evidence of prejudice.

I.      Hummer's Obligation to Preserve Documents

As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action.  National Ass'n of Radiation Survivors v. Turnage, 115 F.R.D. 543, 556-57 (N.D. Cal. 1987) (Patel, J.); Baliotis, 870 F. Supp. at 1290; see also Unigard, 982 F.2d at 365, 369 (upholding the district court's exclusion of plaintiff's expert testimony based on evidence plaintiff destroyed two years before filing suit).

Plaintiffs argue that Hummer had a duty to preserve relevant evidence beginning in May 2000, when it first invested in Napster and became aware of the Napster I litigation.  Hummer argues that it did not anticipate becoming a party to the litigation when it invested in Napster in May 2000, and that the obligation to preserve documents did not attach until Hummer learned about the Katz lawsuit in Fall 2000.  Hummer also suggests that its obligation ended in July 2001 when the Katz lawsuit was dismissed, and did not attach again until August 2003 when it was served with the instant lawsuit.  Hummer clearly had a duty to preserve documents from Fall 2000 to July 2001, and from August 2003 onward.  The court must determine, therefore, whether the obligation existed during the other times at issue.

A.      Hummer's Obligation Before Fall 2000

In support of their position that Hummer's obligation to preserve attached in May 2000, plaintiffs point to deposition testimony by Hummer officer Todd Forrest in which Forrest states that, as early as May 2000, individuals were instructed to keep documents surrounding Napster, instructions which continued throughout the relevant period.  In addition, plaintiffs point to the fact that Hummer was well aware of Napster's legal troubles based on its pre-investment diligence, and entered into a Common Interest Defense Agreement with Napster at the time of investment.  Finally,

UNITED STATES DISTRICT COURT
For the Northern District of California

1  plaintiffs point to the June 3, 2000 email as evidence that Hummer was taking specific actions with

2  an eye toward litigation during this time period.

3          Hummer claims that no obligation existed prior to the filing of the Katz lawsuit, because

4  prior to that point litigation was not "imminent."  Hummer's claim that litigation must be

5  "imminent" is incorrect.  The case cited by Hummer does not stand for this proposition.  Rather, that

6  case states that "[t]here is no doubt that a litigant has a duty to preserve evidence it knows or should

7  know is relevant to imminent litigation."  A. Farber & Partners, Inc. v. Garber, 234 F.R.D. 186, 193

8  (C.D. Cal. 2006).  The court in A. Farber thus held imminence to be sufficient, rather than necessary,

9  to trigger the duty to preserve documents.  Furthermore, the court in A. Farber did not reach the

10  issue of when, exactly, the duty attached.  The duty to preserve documents attaches "when a party

11  should have known that the evidence may be relevant to future litigation."  Zubulake v. UBS

12  Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).  See also National Ass'n of Radiation

13  Survivors, 115 F.R.D. at 556-57. The future litigation must be "probable," which has been held to

14  mean "more than a possibility."  Hynix Semiconductor Inc. v. Rambus, Inc., 2006 WL 565893 at

15  *21 (N.D. Cal. 2006) (Whyte, J.).

16          Although Hummer took actions with respect to its Napster-related documents as early as

17  May 2000 that indicated knowledge of the relevance of the documents to litigation, this does not

18  necessarily suggest that Hummer should have anticipated litigation *against Hummer*.  Rather,

19  Hummer's actions were taken in its roles as an investor in a company that was embroiled in

20  litigation, and as a third party to that litigation that had been served with a subpoena.  It is not

21  surprising that Hummer acknowledged a duty to preserve documents beginning in May 2000 —

22  Hummer was under a legal obligation to do so based on plaintiffs' subpoena in the Napster I

23  litigation.  This also explains the fact that Hummer sought the assistance of counsel in dealing with

24  Napster-related issues.  None of this points to a reasonable expectation that Hummer itself would be

25  named as a defendant in any pending or future litigation.

26          The deposition excerpts cited by plaintiffs do not support the contention that Hummer

27  anticipated being sued as early as May 2000.  Indeed, Forrest testified that the first time he

28

9

anticipated being sued by plaintiffs was in August 2001, when Hummer received a letter from plaintiffs' counsel threatening litigation. Boyd Dec., Exh. 12, Forrest Depo. at 98:8-13. The fact that Hummer was preserving documents in response to obligations arising out of a third-party subpoena does not necessarily suggest that they anticipated being named as defendants.

As for the Common Interest & Defense Agreement between Napster and Hummer, Hummer claims that it entered the agreement because "[Hummer] and Napster shared a common interest in Napster's achieving success in the lawsuit" based on Hummer's multimillion dollar investment in Napster. According to Hummer, the purpose of the agreement was "to cloak the Hummer Winblad entities' communications with Napster's lawyers with the attorney-client privilege." Whether or not this was a legitimate aim of the Common Interest & Defense Agreement, the fact remains that Hummer entered into this agreement because it shared an interest in Napster prevailing in the lawsuit, not because it expected to be named as a party.

However, there is evidence that John Hummer, at least, knew or should have known that litigation was probable as early as June 3, 2000. Hummer testified to being told by Edgar Bronfman, Jr., CEO of Universal Music Corp., at that time that if Hummer did not "instantaneously comply with the injunction, we will sue the venture firm and you people personally." Boyd Dec., Exh. 13, Hummer Depo. at 478:13–17. Hummer acknowledges this, but claims that he "did not leave that meeting anticipating that Hummer Winblad would be sued." Hummer Dec. ¶ 5. Given the already pending litigation against Napster and the clear indication from Mr. Bronfman that the recording industry would be targeting Napster's investors, Hummer Winblad should reasonably have believed that litigation against it was probable if it continued its involvement with Napster. Therefore, Hummer's duty to preserve evidence attached in June 2000.

### B.    Hummer's Obligation Between July 2001 and August 2003

Plaintiffs argue that Hummer's duty to preserve remained in place during the period of time between the dismissal of the Katz lawsuit and the commencement of the instant litigation. Counsel for plaintiffs sent Hummer a letter threatening litigation in August 2001, the month following the

10

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   dismissal of the Katz suit.  In addition, John Hummer himself stated, in an email to Joel Klein dated

2   April 21, 2002, "We know we are going to be sued."  Hummer Dec. ¶ 11.  Plaintiffs therefore argue

3   that Hummer should have known and did know that litigation was likely during this time period.

4         Hummer denies that any duty existed during this period, claiming that "plaintiffs' on/again,

5   off/again litigation certainly made litigation against the Hummer Winblad Defendants a possibility,

6   but the probability of litigation rose and fell as threats passed with no action being taken."  Hummer

7   further argues that plaintiffs represented to Hummer and to the court in December 2001 that they

8   would not add any more defendants to the lawsuit.  An examination of the transcript from the

9   hearing to which Hummer refers, however, reveals that counsel for plaintiffs did not unequivocally

10   represent that there were no future defendants to be named.  When asked by the court whether there

11   were "any defendants that have not been served that you intend to proceed against," plaintiffs'

12   counsel responded "Not at this time, Your Honor."  Hummer Dec., Exh. C at 14:12-14.  This left

13   open the danger of Hummer being named as a defendant.

14         Hummer also downplays the significance of John Hummer's statement in his email to Klein,

15   claiming that this was a "negotiation tactic" employed to secure an indemnification provision from

16   Bertelsmann in their purchase of Hummer's shares of Napster.  Even if Mr. Hummer's purported

17   certainty at being sued in the future cannot be taken at face value, litigation against Hummer was at

18   least probable enough for Hummer to insist on this indemnification provision before selling its

19   shares to Bertelsmann, and likely enough to be used as a negotiation tactic.  This amply

20   demonstrates that there was a reasonable probability of litigation against Hummer during the time

21   period following the dismissal of the Katz lawsuit, and that John Hummer was aware of this

22   probability.

23         Hummer should have remained on notice that litigation against them was probable even after

24   the Katz suit was dismissed.  Hummer had already been sued once, and there were several indicators

25   that they would be sued again.  Even after Napster sought bankruptcy protection and ceased being a

26   party to any lawsuit, the litigation continued, with plaintiffs seeking recovery from the still-solvent

27   entities that invested in Napster before it ceased operations.  As a multimillion dollar investor in

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Napster, Hummer should have anticipated that it would be targeted.  This is particularly evident

2   given the actions on the part of plaintiffs' counsel to keep the threat of litigation alive during this

3   time period, and John Hummer's own statement regarding his fear of litigation.

4         Accordingly, Hummer had a continuing duty to preserve documents after the Katz lawsuit

5   was dismissed in July 2001.

6

7   II.    Sanctions

8         Once Hummer's duty to preserve took effect in June 2000, Hummer was required to suspend

9   any existing policies related to deleting or destroying files and preserve all relevant documents

10  related to the litigation.  Zubulake, 220 F.R.D. at 218 ("Once a party reasonably anticipates

11  litigation, it must suspend its routine document retention/destruction policy and put in place a

12  'litigation hold' to ensure the preservation of relevant documents."); see also National Ass'n. of

13  Radiation Survivors, 115 F.R.D. at 557-58 ("The obligation to retain discoverable materials is an

14  affirmative one; it requires that the agency or corporate officers having notice of discovery

15  obligations communicate those obligations to employees in possession of discoverable materials.").

16  Therefore, even if Hummer's "long standing policies" included deleting emails, Hummer was

17  required to cease deleting emails once the duty to preserve attached in May 2000.  Since Hummer

18  acknowledges that it did not cease its document policy, the court may impose sanctions for

19  Hummer's deletion of documents.  Zubulake, 220 F.R.D. 220 ("Once the duty to preserve attaches,

20  any destruction of documents is, at a minimum, negligent.").

21        Plaintiffs have requested a default judgment against Hummer or, in the alternative, an issue

22  preclusion order and an adverse inference instruction.  Plaintiffs have also requested monetary

23  sanctions independent of any other sanctions the court may impose.  The appropriate sanction, if

24  any, depends largely on the culpability of Hummer and the resulting prejudice to plaintiffs.  Baliotis,

25  870 F. Supp. at 1291; Schmid, 13 F.3d at 79.

26

27

28

12

A.      Default Sanction

When considering a default sanction in response to spoliation of evidence, the court must determine "(1) the existence of certain extraordinary circumstances, (2) the presence of willfulness, bad faith, or fault by the offending party, (3) the efficacy of lesser sanctions, [and] (4) the relationship or nexus between the misconduct drawing the [default] sanction and the matters in controversy in the case."  Halaco Eng'g Co. v. Costle, 943 F.2d 976, 380 (9th Cir. 1988).  In addition, the court may consider the prejudice to the moving party as an "optional" consideration where appropriate.  Id.  This multi-factor test is not "a mechanical means of determining what discovery sanction is just," but rather "a way for a district judge to think about what to do."  Valley Engineers, Inc. v. Electric Eng'g Co., 158 F.3d 1051, 1057 (9th Cir. 1998).


1.      Extraordinary Circumstances

"Dismissal under a court's inherent powers is justified in extreme circumstances."  Id.  In the Ninth Circuit, "extraordinary circumstances exist where there is a pattern of disregard for Court orders and deceptive litigation tactics that threaten to interfere with the rightful decision of a case."  See Advantacare Health Partners, LP v. Access IV, No. C 03-04496 JF, 2004 WL 1837997 at *5 (N.D. Cal. Aug. 17, 2004) (Fogel, J.) (citing Halaco, 943 F.2d at 1057-58).  See also Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995) (holding that it is "well settled that dismissal is warranted where . . . a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings"); Wyle v. R.J. Reynolds Tobacco Co., 709 F.2d 585, 591 (9th Cir. 1983) (upholding dismissal where the district court determined that "the deliberate deception and irreparable loss of material evidence justified the sanction of dismissal"); William T. Thompson Co. v. Gen'l Nutrition Corp., 593 F. Supp. 1443, 1456 (C.D. Cal. 1984) (holding that default and dismissal were proper sanctions in view of party's "willful destruction of documents and records that deprived [the opposing party] of the opportunity to present critical evidence on its key claims to the jury").  Given this requirement of extraordinary circumstances, courts have held that a party's "failure to preserve evidence that they knew or

13

1  reasonably should have known would be relevant to a potential action and might be sought in

2  discovery" does not necessarily warrant default or dismissal if these actions "do not eclipse entirely

3  the possibility of a just result." Advantacare, 2004 WL 1837997 at *5.

4       Plaintiffs argue that Hummer engaged in deceptive practices by willfully destroying relevant

5  documents and subsequently claiming that all responsive documents had been retained and

6  produced.  Specifically, plaintiffs assert that they spent three years attempting to glean an

7  explanation from Hummer regarding the small number of Hummer Winblad emails produced during

8  discovery, and that Hummer deceived them during this period by failing to admit to their document

9  destruction policy and by withholding the June 3, 2000 email until the close of discovery.  In

10 addition, plaintiffs point to the testimony of Todd Forrest, Hummer's 30(b)(6) witness regarding

11 Hummer's document preservation policies.  Forrest failed to acknowledge that Hummer was

12 routinely deleting emails and instead represented that Hummer personnel had been instructed to

13 preserve Napster-related communications.

14      Hummer claims that it failed to produce the June 3, 2000 email due to a mistake as to its

15 relevance and privileged status, claiming that such errors are to be expected in large-scale document

16 production.  Hummer claims to have belatedly located the June 3, 2000 email in a box of

17 miscellaneous files during one of a number of repeated searches for responsive documents.

18 Furthermore, because Hummer denies any wrongdoing with respect to its document preservation

19 duties, it denies that it made any bad-faith representations to plaintiffs regarding its production.

20      It is difficult to say whether Hummer's conduct in this regard resulted from willful deception

21 or simple incompetence.  Hummer presents a muddled account of its knowledge of its duties and the

22 means chosen to execute those duties.  The June 3, 2000 email may have been withheld based on a

23 good-faith belief that it was attorney-client privileged (though it is clearly relevant given that it

24 explicitly discusses the Napster litigation).  But this does not explain why Hummer failed to include

25 it in its privilege log, as plaintiffs point out, and why Hummer suddenly decided to produce it at the

26 close of discovery.  As for Hummer's representations to plaintiffs regarding its email production,

27

28

14

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Hummer claims that it believed all relevant emails were preserved by forwarding them to the

2   Napster server or using Napster.com email addresses.

3

4               2.      Willfulness, Bad Faith, or Fault

5        "For a dismissal to be proper, the conduct to be sanctioned must be due to willfulness, fault,

6   or bad faith." Ahneuser-Busch, 69 F.3d at 348 (internal quotations omitted).  As a preliminary

7   matter, Hummer argues that plaintiffs must prove willfulness, bad faith, or fault by clear and

8   convincing evidence.  In support of this assertion Hummer cites cases from other circuits which have

9   applied a heightened standard of proof to default sanctions in various circumstances.  Maynard v.

10  Nygren, 332 F.3d 462, 468 (7th Cir. 2003) (applying clear and convincing evidence standard to Rule

11  37 dismissal based on willfulness, bad faith, or fault); Aptix Corp. v. Quickturn Design Systems,

12  Inc., 269 F.3d 1369, 1374 (Fed. Cir. 2001) (upholding dismissal based on "extreme litigation

13  misconduct" supported by clear and convincing evidence); Shepherd v. American Broadcasting

14  Cos., 62 F.3d 1469, 1474 (D.C. Cir. 1995) (applying clear and convincing evidence standard to

15  default sanctions based on litigation misconduct); Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118

16  (1st Cir. 1989) (holding that fraud on the court was demonstrated "clearly and convincingly" where

17  party had submitted false evidence and concealed authentic evidence); Pfizer, Inc. v. Int'l Rectifier

18  Corp., 538 F.2d 180, 195 (8th Cir. 1976) (holding that fraud on the court "must be supported by

19  clear, unequivocal and convincing evidence").  Hummer points to no Ninth Circuit authority

20  applying the clear and convincing standard to the exercise of the court's inherent authority to impose

21  dismissal or default sanctions, and the Ninth Circuit has not squarely addressed the issue of which

22  standard of proof is appropriate.  Moreover, none of the cases cited by Hummer dealt with the

23  specific, yet common, situation here — inherent power sanctions resulting from the destruction of

24  evidence.  Accordingly, the court declines to adopt the clear and convincing evidence standard.

25       Plaintiffs argue that Hummer willfully destroyed relevant documents in order to prevent

26  them from being produced in this litigation.  Specifically, plaintiffs allege that the June 3, 2000

27  email clearly amounts to an instruction to delete all Napster-related emails rather than comply with

28

15

1    the outstanding subpoena, and with Hummer's ongoing document preservation duties in its role as a

2    potential and actual defendant.  Plaintiffs further allege that, because there was no system in place to

3    automatically dispose of email, each Napster-related email that was deleted was the result of a

4    conscious decision on the part of a Hummer employee.

5        Hummer denies that the June 3, 2000 email indicates any intentional deletion of Napster-

6    related emails.  Rather, Hummer asserts that the portion of the email concerning Hummer's

7    document retention policy has "nothing to do with Napster," despite the portion of the email that

8    explicitly addresses the Napster I subpoena.  Hummer's claims in this regard do not withstand

9    scrutiny.  Hummer attempts to divide the email into two wholly separate and distinct parts: (1) a

10   Napster-related message preceding Barry's signature, and (2) a non-Napster-related message

11   regarding the company's "long standing" email policy.  Essentially, Hummer would have the court

12   believe that Winblad forwarded a message regarding Napster from John Hummer, and added a

13   completely unrelated additional message regarding document retention as a non-sequitur.  In seeking

14   to make this distinction, Hummer glaringly ignores the sentence between the two portions of the

15   email that explicitly ties the retention policy to the Napster production: "*As we have all been*

16   *required to surrender Napster e-mails*, *this* should reinforce compliance with our long standing

17   policies."  Boyd Dec., Exh. 1 (emphasis added).  The very first tenet of the policy, "reinforce[d]" by

18   the requirement to surrender Napster emails, is "we do not retain e-mails, *it is your responsibility to*

19   *delete your handled e-mails immediately*[.]"  Id. (emphasis added).  This was clearly designed to

20   instruct the recipients to delete all of their Napster-related emails going forward in order to avoid

21   surrendering them.  Hummer offers no plausible explanation to the contrary.

22       Indeed, Hummer's representations regarding its document retention policy are muddled and

23   inconsistent, and do not suggest an organized effort to maintain Napster-related communications as

24   required.  The confusion is compounded by the fact that Hummer distributed a more formal

25   document retention policy in 2003.  Boyd Decl., Exh. 19.  Hummer states that the 2003 policy "did

26   not exist in June of 2000."  However, Todd Forrest testified that he believed that the 2003 policy

27   was consistently followed beginning in January 2000.  Slaughter Dec., Exh. B, Forrest Depo. at

28

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
For the Northern District of California

19:6–20:1.  Hummer further claims, however, that neither Hank Barry nor John Hummer were aware of the policy before reading it in 2003.  The June 3, 2000 email itself, meanwhile, refers to the document retention policy as "long standing."  Absent a clear explanation for why Hummer employees were instructed to "delete all emails" in conjunction with being apprised of a pending subpoena, the court concludes that the June 3, 2000 email served as an command to delete Napster-related emails going forward.

Separate from the June 3, 2000 email, Hummer apparently acknowledges that it routinely deleted Napster-related emails that resided on Hummer's servers.  Hummer's email software was configured such that exiting the program prompted a message asking whether the user wished to permanently delete all the emails in the "Deleted Items" folder.  Hummer asserts that its employees "frequently responded affirmatively to that question without ever checking" what was in their deleted folders.  In addition, the tapes on which Hummer's emails were backed up were recycled every three months, and Hummer employees occasionally received emails reminding them to delete emails.  Thus, while Hummer employees may not have individually decided to delete each Napster-related email, the policy of deleting <u>all</u> emails and failing to preserve Napster-related emails continued apace beginning in June 2000 at the very latest.

Despite failing to maintain files on its own servers, Hummer argues that it attempted to retain Napster-related emails by other means.  In particular, defendants claim that Barry "made a conscious effort" to use his Napster email address for all Napster-related business, and that Barry and Morga forwarded Napster-related emails to themselves at their Napster accounts, believing that these messages would be automatically saved by Napster.  According to Hummer, procedures were in place at Napster to retain all of Napster's emails while Barry was Napster's interim CEO (from May 2000 to July 2001).  Hummer is unclear on what these procedures were, however.  For example, Hummer does not claim that Napster employees were specifically directed to retain all Napster-related communications as required by Hummer's duty to preserve, and does not claim that such procedures were in place when Barry was not serving as Napster's CEO.  Furthermore, given Hummer's affirmative duty to preserve evidence (<u>National Ass'n. of Radiation Survivors</u>, 115

17

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  F.R.D. at 557-58), Hummer's purported reliance on undisclosed backup procedures at a company

2  over which Hummer strenuously denies having any control was grossly deficient.

3        Hummer's deletion of Napster-related emails may not have been willful, but willfulness is

4  not strictly required for the imposition of default sanctions.  Instead, a default sanction requires

5  "willfulness, fault, or bad faith."  At worst, Hummer mounted a knowing and concerted effort to

6  destroy Napster-related emails that it had a duty to preserve and produce.  At best, however,

7  Hummer was grossly negligent in executing its duties to preserve evidence, by failing to implement

8  a litigation hold and instead relying on Napster to preserve Hummer's emails.  Hummer was

9  therefore at fault in failing to preserve Napster-related emails.

10        Hummer's additional arguments do not change this conclusion.  Hummer argues that its

11  failure to produce documents was due to inadvertence or mistake.  Again, mistakes resulting from

12  gross negligence constitute sufficient fault to impose sanctions.  Hummer also argues that the

13  deficiencies in plaintiffs' own production render plaintiffs' allegations inappropriate and unfounded.

14  Hummer does not accuse plaintiffs of discovery malfeasance, but rather cites gaps in plaintiffs'

15  document production to illustrate that documents are inevitably lost or overlooked in large-scale

16  document production.  Any problems with plaintiffs' discovery responses are irrelevant to the

17  factual findings regarding Hummer's production.  Documents may be lost and overlooked in large-

18  scale document production, but the abject failure to preserve an entire source of relevant evidence is

19  sanctionable conduct.

20

21                3.      <u>Efficacy of Lesser Sanctions</u>

22        Plaintiffs have requested the alternative relief of preclusion and an adverse inference

23  instruction in the event that the court does not grant a default sanction.  If such sanctions would be

24  effective, a default sanction is inappropriate.  Given the standard of applying the least onerous

25  effective sanction, plaintiffs must justify the default sanction by either showing that (1) no lesser

26  sanction would adequately punish Hummer and deter other parties from engaging in the same

27  conduct or (2) Hummer has engaged in deceptive conduct and will continue to do so.  <u>Advantacare</u>,

28

1   2004 WL 1837997 at *6 (citing Computer Assoc. Int'l v. Am. Fundware, Inc., 133 F.R.D. 166 (D.

2   Colo. 1990); TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917 (9th Cir. 1987); Chism v. Nat'l

3   Heritage Life Ins. Co., 637 F.2d 1328, 1332 (9th Cir. 1981)).

4       Plaintiffs point to a number of cases in which courts have imposed default or dismissal

5   sanctions where no other remedy would be adequate, but plaintiffs make no specific showing

6   regarding the inadequacy of lesser sanctions in this case.[3]  For the reasons set forth below, the court

7   concludes that lesser sanctions would be adequate given the level of demonstrable culpability on the

8   part of Hummer, and there is nothing in he current representation or conduct to suggest a recurrence.

9    Therefore, this factor weighs against default sanctions.

10

11                    4.    Nexus Between Misconduct and Matters in Controversy

12       In order for default sanctions to be imposed for Hummer's destruction of documents, there

13   must be a nexus between Hummer's conduct and the merits such that the conduct interferes with the

14   rightful decision of the action.  Halaco, 843 F.2d at 381.  In the context of spoliation of evidence, a

15   nexus exists if the party destroyed documents that were relevant to discovery requests.  See

16   Anheuser-Busch, 69 F.3d at 351; Advantacare, 2004 WL 1837997 at *6 –*7.  As discussed above,

17   Hummer systematically failed to preserve emails on its company servers, thereby destroying

18   Napster-related communications that resided on the servers during the relevant time period.

19   Accordingly, there is a nexus between Hummer's misconduct and the matters in controversy.

20

21                    5.    Prejudice

22       Prejudice is an "optional" consideration when determining whether default sanctions are

23   appropriate.[4]  Halaco, 843 F.2d at 382.  Prejudice is a significant consideration here, however, given

24   the dispute over the effect of Hummer's failure to preserve evidence.  In particular, the parties differ

25   over the number of Napster-related emails that Hummer actually deleted.  The fact that a number of

26   Hummer's Napster-related emails have been obtained by plaintiffs from other sources, furthermore,

27   bears on the degree to which plaintiffs have been prejudiced.  If all or substantially all of Hummer's

28

19

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Napster-related emails have been obtained by plaintiffs, a default sanction is not warranted.

2       Plaintiffs contend that Hummer's document destruction policy resulted in the loss of

3  "volumes" of documents over the relevant time period.  In support of their claim they point

4  principally to Hummer's lack of production.  According to plaintiffs, Hummer has produced only

5  approximately 4,000 documents to date in response to discovery requests, fewer than 300 of which

6  are emails.  Plaintiffs also point out that, in response to the Napster I subpoena, Hummer produced

7  271 emails, 89 of which are purely internal, from the seven-day period from May 20, 2000 to May

8  26, 2000.  This, according to plaintiffs, suggests that there should be many more emails generated

9  after that time period, and that these emails were destroyed by Hummer.  In addition, plaintiffs point

10  to several emails collected from other sources which, they claim, demonstrate that Hummer was

11  engaged in communications regarding every aspect of the action.  Again, plaintiffs claim that the

12  limited number of emails that have been obtained indicates a large number of similar emails that

13  were deleted from the Hummer Winblad servers.

14       Hummer offers several explanations for the small number of emails.  To begin with, Hummer

15  disputes plaintiffs' numbers.  Hummer claims to have produced 7,147 documents, 1,450 of which

16  were emails.  In addition, Hummer points to the fact that plaintiffs received 2,965 emails from the

17  Napster bankruptcy trustee, including 2,133 on which Barry was a sender or recipient.  Plaintiffs

18  counter that Hummer's calculations include emails from sources other than Hummer Winblad's

19  servers which were nonetheless produced by Hummer, and that the total number of "humwin.com"

20  emails remains at approximately 300.

21       To further account for the lack of emails, Hummer claims that its employees had limited

22  involvement with Napster after the investment was made in May 2000 and therefore would not have

23  engaged in Napster-related email communication.  Connee Young received a "minuscule amount" of

24  emails related to Napster after the investment, and Dan Beldy and Ann Winblad had "no

25  involvement" with Napster after the investment.  Furthermore, the June 3, 2000 email advised

26  Hummer employees to stop sending emails about Napster.  These facts, coupled with the fact that

27  Hank Barry and Alicia Morga used their Napster.com email accounts for Napster-related emails,

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   indicate that any Napster-related emails that were generated during the relevant time period resided

2   with Napster, and were thus produced by the Napster bankruptcy trustee.

3       Plaintiffs have produced a number of emails collected from sources other than Hummer

4   indicating that Hummer did not strictly adhere to their asserted practices.  In particular, Hank Barry,

5   Alicia Morga and John Hummer used their Hummer Winblad email accounts to discuss Napster-

6   related business after the investment was made.  See Compendium of Documents Missing from the

7   Hummer Winblad Production, Exhs. 165, 181, 183, 185, 186, 188, 216, 231, 238, 241, 245, 248, 267

8   and 275.  Furthermore, as Hummer admits, plaintiffs obtained over 2,100 emails from the Napster

9   trustee in which John Hummer was the sender or recipient, demonstrating that Hummer Winblad

10  email communications regarding Napster did not cease after the distribution of the June 3, 2000

11  email.  There was clearly some amount of email traffic on the Hummer servers related to Napster

12  after the number of produced emails dropped off in June 2000.  The precise number, of course, is

13  impossible to determine given the fact that emails on Hummer Winblad servers were routinely

14  deleted.  As the party at fault for failing to preserve the emails, Hummer would typically bear the

15  consequences of this uncertainty.  See National Ass'n of Radiation Survivors, 115 F.R.D. at 557

16  (holding that where "the relevance and resulting prejudice from destruction of documents cannot be

17  clearly ascertained because the documents no longer exist . . . the culpable party can hardly assert

18  any presumption of irrelevance as to the destroyed documents") (internal quotations omitted); see

19  also Computer Assoc. Int'l, Inc. v. American Fundware, Inc., 133 F.R.D. 166, 170 (D. Colo. 1990).

20  However, because the court cannot conclude that Hummer acted willfully, the presumption of

21  prejudice is not appropriate.

22      Plaintiffs further claim that they have been prejudiced because the Hummer Winblad

23  witnesses have exhibited "litigation amnesia" in claiming an inability to recall facts that would be

24  memorialized in the deleted emails.  While Hummer denies that its witnesses have exhibited any

25  significant lack of recollection, plaintiffs would certainly be better off with documentary evidence

26  than with witnesses' personal recollections of events and communications that occurred years ago.

27  Indeed, Hummer's own representations to this court illustrate the unreliability of the Hummer

28

1   witnesses' personal recollections, as neither John Hummer, Ann Winblad or Hank Barry recall the

2   June 3, 2000 email.  Hummer Dec. ¶ 3; Winblad Dec. ¶ 3; Barry Dec. ¶ 3.

3          Finally, plaintiffs point to specific emails collected from other sources which show that

4   Hummer personnel were sending communications regarding the relevant issues in this action during

5   the relevant time period.  Plaintiffs claim that the deleted emails would shed further light on the facts

6   revealed in these documents, and that they are prejudiced by the unavailability of the additional

7   emails.  Hummer disputes the significance of the examples cited by plaintiffs.  The dispute over the

8   specific contents of a particular email that *was* produced, however, does little to shed light upon the

9   contents of emails that were destroyed other than pointing to the general issues that may have been

10  discussed in the deleted communications.[5]  As discussed above, the loss of an entire source of

11  documents significantly hampers plaintiffs' ability to prepare and prosecute their case.

12         At this stage of the proceedings , when the full evidentiary record has not yet been

13  considered by the court or by a jury, the court cannot determine the extent of prejudice created by

14  Hummer's failure to preserve its emails.  Although Hummer is at fault for deleting emails, plaintiffs

15  have not shown that Hummer acted willfully in destroying its emails, and there is evidence that the

16  actual number of emails lost is small.  The court will therefore engage in a full analysis of the

17  evidence regarding the quality and quantity of emails improperly deleted by Hummer at the

18  Summary Judgment or trial stage.  At this point the court can only conclude that plaintiffs have not

19  produced sufficient evidence of prejudice to justify default sanctions.

20

21                    6.    Summary

22         Hummer deleted emails which it had a duty to preserve and produce to plaintiffs.  These

23  emails related to the merits of the action, and plaintiffs have been prejudiced by their destruction.

24  However, Hummer has shown that they took steps to preserve Napster-related communications,

25  albeit inadequate ones.  Although these steps failed to satisfy Hummer's discovery duties, Hummer's

26  behavior does not constitute a pattern of deliberately deceptive litigation practices that are likely to

27  continue as the action proceeds, thereby preventing the resolution of this action.  In addition, as

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    discussed below, lesser sanctions will adequately remedy Hummer's failure to preserve and produce.

2    Therefore, plaintiffs are not entitled to a default sanction.

3

4              B.    Evidentiary Sanctions

5        Plaintiffs have requested two forms of evidentiary sanctions.  First, plaintiffs request that

6    Hummer be precluded from contesting all or some of a number of issues related to the parties'

7    claims and defenses.  Second, plaintiffs request that the jury be given an adverse inference

8    instruction.

9

10              1.    Preclusion

11       The court's inherent authority to impose sanctions for the wrongful destruction of evidence

12   includes the power to exclude evidence that, given the spoliation, would "unfairly prejudice an

13   opposing party."  Unigard, 982 F.2d at 368; see also Glover, 6 F.3d at 1329.  The propriety of

14   preclusion sanctions, therefore, depends on the extent to which plaintiffs were prejudiced by

15   Hummer's deletion of its Napster-related emails.  This analysis must be made in light of the

16   requirement to impose the "least onerous sanction" given the extent of the offending party's fault

17   and the prejudice to the opposing party.  Schmid, 13 F.3d at 79.

18       As discussed above, the full extent of prejudice is unclear based on the record before the

19   court for the purposes of this motion.  However, plaintiffs have shown sufficient prejudice to warrant

20   some degree of preclusion sanctions.  The nature and extent of these sanctions will be determined at

21   the Summary Judgment or trial stage.

22

23              2.    Adverse Inference Instruction

24       "[A] party seeking an adverse inference instruction based on the destruction of evidence

25   must establish (1) that the party having control over the evidence had an obligation to preserve it at

26   the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3)

27   that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier

28

                                          23

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1  of fact could find that it would support that claim or defense." <u>Hamilton v. Signature Flight Support</u>

2  <u>Corp.</u>, No. C 05-0490, 2005 U.S. Dist. LEXIS 40088 at *9 (N.D. Cal. Dec. 20, 2005) (James, Magis.

3  J.) (citing <u>Residential Funding Corp. v. DeGeorge Financial Corp.</u>, 306 F.3d 99, 107 (2d Cir. 2002)).

4  As discussed above, Hummer deleted Napster-related communications which it had a duty to

5  preserve, knowing that such a duty existed.  Hummer's conduct amounts to gross negligence, if not

6  willfulness, which is sufficient culpability to justify an adverse inference. <u>Id.</u> at *15.  In addition,

7  the deleted emails were relevant to the action as discussed above.  Therefore, plaintiffs are entitled to

8  an adverse inference instruction.  The precise wording of the instruction  will be determined at trial.

9

10           C.     <u>Monetary Sanctions</u>

11       Monetary sanctions may be imposed where one party has wrongfully destroyed evidence.

12  <u>See, e.g.</u>, <u>National Ass'n of Radiation Survivors</u>, 115 F.R.D. at 558-59.  Plaintiffs claim that they are

13  entitled to their attorneys' fees associated with bringing this motion, and with the meet and confer

14  process involved in determining the availability of Hummer's Napster-related emails.  The court

15  finds that monetary sanctions are warranted here.  Hummer could have forestalled a great deal of

16  time and effort by simply acknowledging early on that it was not preserving its internally generated

17  Napster-related communications.

18       Plaintiffs are entitled to an award of attorney fees that is *reasonable* in light of the degree of

19  Hummer's culpability.  Plaintiffs are ordered to submit a request for a specific amount of fees, with

20  evidentiary support, for the court's consideration.

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

CONCLUSION

For the above reasons the court hereby DENIES plaintiffs' motion for sanctions to the extent plaintiffs seek default sanctions, and GRANTS plaintiffs' motion for sanctions to the extent plaintiffs seek a preclusion order, an adverse inference instruction and attorneys' fees.

Plaintiffs shall submit their declaration and contemporaneous records in support of attorneys' fees and costs with thirty (30) days of this order.  Defendant Hummer shall file its response, if any, as to reasonableness only within thirty (30) days of the filing of plaintiffs' submission.


IT IS SO ORDERED.




Dated: October 24, 2006

_____
MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

25

**<u>ENDNOTES</u>**

1.  Unless otherwise noted, background facts are taken from the declarations submitted with the parties' briefs and from this court's previous orders.

2.  The exact number of Hummer Winblad emails produced by Hummer is in dispute.  Plaintiffs claim that Hummer produced less than 300 emails; Hummer claims to have produced 1,450.

3.  Hummer interprets plaintiffs' brief as lacking any argument regarding the inadequacy of lesser sanctions whatsoever, and explicitly declines to address the issue.

4.  Hummer claims that the Ninth Circuit has "found the element of prejudice to be essential" when determining whether dismissal is an appropriate sanction, citing <u>Wanderer v. Johnston</u>, 910 F.2d 652, 656.  However, the case on which Hummer relies for this point concerned sanctions under Federal Rule of Civil Procedure 37.  <u>Id.</u>  Plaintiffs have requested sanctions pursuant to the court's inherent authority "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases."  <u>Chambers</u>, 501 U.S. at 43.  Sanctions imposed pursuant to a court's inherent powers is governed by a different set of principles than sanctions under Rule 37.  <u>See Unigard</u>, 982 F.2d at 368 (finding that a district court lacked power to impose a sanction under Rule 37, but properly imposed the sanction as an exercise of its inherent powers).

5.  Likewise, Hummer argues that several of the documents fail to show prejudice because they were preserved.  This argument completely misses the point of plaintiffs' citation of the documents.  Obviously, the documents that are now in the hands of plaintiffs were preserved—otherwise plaintiffs would not have them.  Plaintiffs do not argue that they have been prejudiced by the deletion of these specific documents.  Rather, plaintiffs claim that these documents illustrate the types of communications that were *not* preserved by Hummer.  Such a showing is pertinent to the existence of relevant documents which were destroyed.  <u>See Zubulake v. UBS Warburg LLC</u>, 229 F.R.D. 422, 437 (S.D.N.Y. 2004) (holding that the content of emails recovered from other sources was probative of the contents of lost emails).